**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRAIG NOWAKOWSKI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AXT, INC., MORRIS S. YOUNG, and GARY L. FISCHER<br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Craig Nowakowski ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding AXT, Inc. ("AXTI" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded AXTI securities between March 24, 2021 and April 3, 2024, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased AXTI securities during the Class Period and was economically damaged thereby.

7.     Defendant AXTI describes itself as a "worldwide materials science company that develops and produces high-performance compound and single element semiconductor substrates, also known as wafers. Two of our consolidated subsidiaries produce and sell certain raw materials some of which are used in our substrate manufacturing process and some of which are sold to other companies."

8.     Pertinent to this action is Beijing Tongmei Xtal Technology Co., Ltd. ("Tongmei"), a Company subsidiary. Specifically, the Company attempted to list Tongmei on the Shanghai Stock Exchange's "Sci-Tech innovAtion boaRd", which is known as the "STAR Market."

9.     AXTI is incorporated in Delaware and its head office is located at 4281 Technology Drive, Fremont, California 94538. AXTI's common stock trades on the NASDAQ exchange under the ticker symbol "AXTI".

10.    Defendant Morris S. Young ("Young") served as the Company's Chief Executive Officer ("CEO") throughout the Class Period.

11.    Defendant Gary L. Fischer served as the Company's Chief Financial Officer ("CFO") and Corporate Secretary throughout the Class Period.

12.    Defendants Young and Fischer are collectively referred to herein as the "Individual Defendants."

13.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     AXTI is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     AXTI and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements
### Issued During the Class Period

17.     On March 23, 2021, after market hours, AXTI filed with the SEC its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 Annual Report"). Attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of

2002 ("SOX") signed by Defendants Young and Fischer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.     The 2020 Annual Report contained a risk disclosure under the heading "[s]hutdowns or underutilizing our manufacturing facilities may result in declines in our gross margins." It then stated the following:

> ***An important factor in our success is the extent to which we are able to utilize the available capacity in our manufacturing facilities***. A number of factors and circumstances may reduce utilization rates, including periods of industry overcapacity, low levels of customer orders, operating inefficiencies, ***mechanical failures and disruption of operations due to expansion, power interruptions, fire, flood, other natural disasters or calamities or government-ordered mandatory factory shutdowns, including as a result of the COVID-19 pandemic***. Severe air pollution in Beijing can trigger mandatory factory shutdowns. ***For example, in the first quarter of 2018, over 300 manufacturing companies, including AXT, were intermittently shut down by the local government for a total of ten days from February 27 to March 31, due to severe air pollution***. Further, we have increased capacity by adding two new sites and this could reduce our utilization rate and increase our depreciation charges. Because many portions of our manufacturing costs are relatively fixed, high utilization rates are critical to our gross margins and operating results. If we fail to achieve acceptable manufacturing volumes or experience product shipment delays, our results of operations will be negatively affected. During periods of decreased demand, we have underutilized our manufacturing lines. If we are unable to improve utilization levels at our facilities during periods of decreased demand and correctly manage capacity, the fixed expense levels will have an adverse effect on our business, financial condition and results of operations. For example, in the three months ended December 31, 2019, our revenue dropped to $18.4 million and our gross margin was only 21.0%.

> If we are unable to utilize the available capacity in our manufacturing facilities, we may need to implement a restructuring plan, which could have a material adverse effect on our revenue, our results of operations and our financial condition. For example, in 2013, we concluded that incoming orders were insufficient and that we were significantly underutilizing our factory capacity. As a result, in February 2014, we announced a restructuring plan with respect to our wafer manufacturing company, Tongmei, in order to better align manufacturing capacity with demand. Under the restructuring plan, we recorded a charge of approximately $907,000 in the first quarter of 2014.

> (Emphasis added).

19.     The statement in ¶ 18 was materially false and misleading at the time it was made

because it omitted that there had been a major fire at the Company's Beijing facility, which led to the departures of "many" Company employees. Further, the Company had been forced to move its raw chemicals out of Beijing in 2020.

20.    The 2020 Annual Report contained a risk disclosure under the heading "[i]f any of our facilities are damages by occurrences such as fire, explosion, power outage or natural disaster, we might not be able to manufacture our products." It then stated the following:

> The ongoing operation of our manufacturing and production facilities in China is critical to our ability to meet demand for our products. If we are not able to use all or a significant portion of our facilities for prolonged periods for any reason, we would not be able to manufacture products for our customers. ***For example, a fire or explosion caused by our use of combustible chemicals, high furnace temperatures or, in the case of InP, high pressure during our manufacturing processes could render some of our facilities inoperable for an indefinite period of time***. Actions outside of our control, such as earthquakes or other natural disasters, could also damage our facilities, rendering them inoperable. If we are unable to operate our facilities and manufacture our products, we would lose customers and revenue and our business would be harmed.
>
> ***On the evening of March 15, 2017, an electrical short-circuit fire occurred at our Beijing manufacturing facility. The electrical power supply supporting 2-inch, 3-inch and 4-inch gallium arsenide and germanium crystal growth was damaged and production in that area was stopped***. In addition, a waste water pipe was damaged resulting in a halt to wafer processing for four days until the pipe could be repaired. We were able to rotate key furnace hardware and use some of the 6-inch capacity for smaller diameter crystal growth production to mitigate the impact of the fire and resume production. If we are unable to recover from a fire or natural disaster, our business and operating results could be materially and adversely affected.

(Emphasis added).

21.    The statement in ¶ 20 was materially false and misleading at the time it was made because it omitted that the Company's Beijing facility had had a major fire in 2020 which caused "many" employees to leave the Company.

22.    The 2020 Annual Report contained a risk disclosure under the heading "[t]he Chinese central government is increasingly aware of air pollution and other forms of environmental pollution and their reform efforts can impact our manufacturing, including

intermittent mandatory shutdowns." It then stated the following:

> ***The Chinese central government is demonstrating strong leadership to improve air quality and reduce environmental pollution. These efforts have impacted manufacturing companies through mandatory shutdowns, increased inspections and regulatory reforms***. In the fourth quarter of 2017, many manufacturing companies in the greater Beijing area, including AXT, were instructed by the local government to cease most manufacturing for several days until the air quality improved. In the first quarter of 2018, from February 27 to March 31 over 300 manufacturing companies, including AXT, were again intermittently shut down by the local government for a total of ten days, or 30 percent of the remaining calendar days, due to severe air pollution. Our shipments were delayed and our revenue for the quarter was negatively impacted. We expect that mandatory factory shutdowns will occur in the future. If the frequency of such shutdowns increases, especially at the end of a quarter, or if the total number of days of shutdowns prevents us from producing enough wafers to ship, then these shutdowns will have a material adverse effect on our manufacturing output, revenue and factory utilization. Each of our raw material supply chain companies could also be impacted by environmental related orders from the central government.

(Emphasis added).

23.     The statement in ¶ 22 was materially false and misleading at the time it was made because it understated the Company's environmental risk, given the Company's business practices in China, which violated Chinese environmental regulations.

24.     The 2020 Annual Report contained a  risk disclosure under the heading "[i]f we, or any of our partially-owned supply chain companies, fail to comply with environmental and safety regulations, we may be subject to significant fines or forced to cease our operations." It then stated the following:

> We are subject to federal, state and local environmental and safety laws and regulations in all of our operating locations, including laws and regulations of China, such as laws and regulations related to the development, manufacture and use of our products, the use of hazardous materials, the operation of our facilities, and the use of our real property. ***These laws and regulations govern the use, storage, discharge and disposal of hazardous materials during manufacturing, research and development, and sales demonstrations***. ***If we, or any of our partially-owned supply chain companies, fail to comply with applicable regulations, we could be subject to substantial liability for clean-up efforts, personal injury, fines or suspension or be forced to close or temporarily cease our operations, and/or suspend or terminate the development, manufacture or use of certain of our products, the use of our facilities, or the use of our real property, each of which***

*could have a material adverse effect on our business, financial condition and results of operations*.

*The Chinese central government is demonstrating strong leadership to improve air quality and reduce environmental pollution. The central government encourages employees to report to the appropriate regulatory agencies possible safety or environmental violations but there may not be actual violations*. These efforts have impacted manufacturing companies through mandatory shutdowns, increased inspections and regulatory reforms. In the first quarter of 2018, from February 27 to March 31 over 300 manufacturing companies were again intermittently shut down by the local government for a total of ten days, or 30 percent of the remaining calendar days, due to severe air pollution. Our shipments were delayed and our revenue for the quarter was negatively impacted. We expect that mandatory factory shutdowns will occur in the future. If the frequency of such shutdowns increases, especially at the end of a quarter, or if the total number of days of shutdowns prevents us from producing enough wafers to ship, then the shutdowns will have a material adverse effect on our manufacturing output, revenue and factory utilization. We believe the relocation of our gallium arsenide and germanium manufacturing lines mitigates our exposure to factory shutdowns. Each of our raw material supply chain companies could also be impacted by environmental related orders from the central government.

In addition, from time to time, the Chinese government issues new regulations, which may require additional actions on our part to comply. For example on February 27, 2015, the China State Administration of Work Safety updated its list of hazardous substances. The previous list, which was published in 2002, did not restrict the materials that we use in our wafers. The new list added gallium arsenide. As a result of the newly published list, we were required to seek additional permits.

(Emphasis added).

25.     The statement in ¶ 24 was materially false and misleading at the time it was made because it omitted that in 2020, the Company had been fined by the Beijing Public Security Bureau over its use of hazardous chemicals, and had been required to move dangerous chemicals out of Beijing.

26.     On January 10, 2022, the Company filed with the SEC a Current Report on Form 8-K. Attached to this current report was an exhibit entitled "Preliminary Information Document of to Beijing Tongmei Xtal Technology Co., Ltd." (the "Beijing Tongmei Prospectus").

27.     The Beijing Tongmei Prospectus contained an appendix of the "main properties and land use rights of the issuer and its subsidiaries." It included the following properties on this list as being "owned" by Chaoyang Jinmei, a subsidiary, in Kazuo County, China:

| 30 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020066 | Block 1, Duanzheng Village, Gongyingzi Town, Kazuo County | 12,020.00 | Production workshop | N/A |
|----|-----------------|--------------------------------------------------------|----------------------------------------------------------|-----------|---------------------|-----|
| 31 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020072 | Block 2, Duanzheng Village, Gongyingzi Town, Kazuo County | 2,991.00 | Class-A workshop | N/A |
| 32 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020069 | Block 3, Duanzheng Village, Gongyingzi Town, Kazuo County | 234.00 | Equipment intermediate warehouse | N/A |
| 33 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020067 | Block 4, Duanzheng Village, Gongyingzi Town, Kazuo County | 340.00 | Warehouse for hazardous and waste substances | N/A |
| 34 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020074 | Duanzheng Village, Gongyingzi Town, Kazuo County | 262.00 | Raw material warehouse | N/A |
| 35 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020073 | Duanzheng Village, Gongyingzi Town, Kazuo County | 411.00 | Liquid nitrogen vaporization workshop | N/A |
| 36 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020070 | Duanzheng Village, Gongyingzi Town, Kazuo County | 295.00 | Transformer substation | N/A |

Beijing Tongmei Xtal Technology Co., Ltd.                                                                                                    Prospectus

| 37 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020071 | Duanzheng Village, Gongyingzi Town, Kazuo County | 142.00 | Fire pump room | N/A |
|----|-----------------|--------------------------------------------------------|----------------------------------------------------------|-----------|---------------------|-----|
| 38 | Chaoyang Jinmei | Liao [2021] Ka Zuo Xian Bu Dong Chan Quan No. 20210020068 | Duanzheng Village, Gongyingzi Town, Kazuo County | 488.00 | Boiler room | N/A |
| 39 | Chaoyang Jinmei | Liao [2019] Ka Zuo Xian Bu Dong Chan Quan No. 20190003066 | 01111, Block 10, Gongyingzi Town [Kangda Small Town], Kazuo County | 89.25 | Residence | N/A |
| 40 | Chaoyang Jinmei | Liao [2019] Ka Zuo Xian Bu Dong Chan Quan No. 20190003068 | 01112, Block 10, Gongyingzi Town [Kangda Small Town], Kazuo County | 84.20 | Residence | N/A |
| 41 | Chaoyang Jinmei | Liao [2019] Ka Zuo Xian Bu Dong Chan Quan No. 20190003071 | 01113, Block 10, Gongyingzi Town [Kangda Small Town], Kazuo County | 88.46 | Residence | N/A |
| 42 | Chaoyang Jinmei | Liao [2019] Ka Zuo Xian Bu Dong Chan Quan No. 20190003070 | 04111, Block 10, Gongyingzi Town [Kangda Small Town], Kazuo County | 88.64 | Residence | N/A |
| 43 | Chaoyang Jinmei | Liao [2019] Ka Zuo Xian Bu Dong Chan Quan No. 20190003069 | 04112, Block 10, Gongyingzi Town [Kangda Small Town], Kazuo County | 84.38 | Residence | N/A |
| 44 | Chaoyang Jinmei | Liao [2019] Ka Zuo Xian Bu Dong Chan Quan No. 20190003072 | 04113, Block 10, Gongyingzi Town [Kangda Small Town], Kazuo County | 89.44 | Residence | N/A |

28.     The statement in ¶ 27 was materially false and misleading because it overstated Chaoyang Jinmei's property holdings in Kazuo County, China.

29.     On March 15, 2022, AXTI filed with the SEC its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Young and Fischer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30.     The 2021 Annual Report contained a risk disclosure under the heading "[i]f any of our facilities are damages by occurrences such as fire, explosion, power outage or natural disaster, we might not be able to manufacture our products," It then stated the following:

> The ongoing operation of our manufacturing and production facilities in China is critical to our ability to meet demand for our products. If we are not able to use all or a significant portion of our facilities for prolonged periods for any reason, we would not be able to manufacture products for our customers. For example, a fire or explosion caused by our use of combustible chemicals, high furnace temperatures or, in the case of InP, high pressure during our manufacturing processes could render some of our facilities inoperable for an indefinite period of time. Actions outside of our control, such as earthquakes or other natural disasters, could also damage our facilities, rendering them inoperable. If we are unable to operate our facilities and manufacture our products, we would lose customers and revenue and our business would be harmed.

> On the evening of March 15, 2017, an electrical short-circuit fire occurred at our Beijing manufacturing facility. The electrical power supply supporting 2-inch, 3-inch and 4-inch gallium arsenide and germanium crystal growth was damaged and production in that area was stopped. In addition, a waste water pipe was damaged resulting in a halt to wafer processing for four days until the pipe could be repaired. We were able to rotate key furnace hardware and use some of the 6-inch capacity for smaller diameter crystal growth production to mitigate the impact of the fire and resume production. If we are unable to recover from a fire or natural disaster, our business and operating results could be materially and adversely affected.

(Emphasis added).

31.     The statement in ¶ 30 was materially false and misleading at the time it was made because it omitted that the Company's Beijing facility had had a major fire in 2020 which caused "many" employees to leave the Company. Further, the Company had been found to be out of compliance with safety regulations.

32.     The 2021 Annual Report contained a risk disclosure under the heading "[t]he Chinese central government is increasingly aware of air pollution and other forms of environmental pollution and their reform efforts can impact our manufacturing, including intermittent mandatory shutdowns." It then stated the following:

> ***The Chinese central government is demonstrating strong leadership to*** improve air quality ***and reduce environmental pollution***. These efforts have impacted manufacturing companies through mandatory shutdowns, increased inspections and regulatory reforms. In the fourth quarter of 2017, many manufacturing companies in the greater Beijing area,

including AXT, were instructed by the local government to cease most manufacturing for several days until the air quality improved. In the first quarter of 2018, from February 27 to March 31 over 300 manufacturing companies, including AXT, were again intermittently shut down by the local government for a total of ten days, or 30 percent of the remaining calendar days, due to severe air pollution. Our shipments were delayed and our revenue for the quarter was negatively impacted. We expect that mandatory factory shutdowns will occur in the future. If the frequency of such shutdowns increases, especially at the end of a quarter, or if the total number of days of shutdowns prevents us from producing enough wafers to ship, then these shutdowns will have a material adverse effect on our manufacturing output, revenue and factory utilization. Each of our raw material supply chain companies could also be impacted by environmental related orders from the central government.

(Emphasis added).

33.     The statement in ¶ 32 was materially false and misleading at the time it was made because in November 2021, an environmental report documented how there were excess levels of arsenic in the soul and groundwater around certain of the Company's facilities.

34.     The 2021 Annual Report contained a risk disclosure under the heading "[e]nhanced trade tariffs, import restrictions, export restrictions, Chinese regulations or other trade barriers may materially harm our business." It then stated the following:

All of our wafer substrates are manufactured in China and in the years 2021 and 2020, approximately 10% of our revenue was generated by sales to customers in North America, primarily in the U.S. In September 2018, the Trump Administration announced a list of thousands of categories of goods that became subject to tariffs when imported into the United States. This pronouncement imposed tariffs on wafer substrates we imported into the United States. The initial tariff rate was 10% and subsequently was increased to 25%. In the years 2021, 2020 and 2019 we paid approximately $1.3 million, $1.3 million and $0.7 million, respectively, in tariffs. The future impact of tariffs and trade wars is uncertain. We may be required to raise prices, which may result in the loss of customers and our business, financial condition and results of operations may be materially harmed. Additionally, it is possible that our business could be adversely impacted by retaliatory trade measures taken by China or other countries in response to existing or future tariffs, which could cause us to raise prices or make changes to our operations, which could materially harm our business, financial condition and results of operations.

The economic and political conditions between China and the United States, in our view, create an unstable business environment. The United States government has restricted access by certain Chinese technology companies to items produced domestically and abroad from U.S. technology and software, which may impact our ability to grow our revenue. Trade restrictions against China have resulted in a greater determination within China to be self-sufficient and produce more goods domestically. Government agencies in

China may be encouraging and supporting the founding of new companies, the addition of new products in existing companies and more vertical integration within companies. These factors have resulted in lower revenue from sales of our wafer substrates in China. Further, the continued threats of tariffs and other trade restrictions could have a generally disruptive impact on the global economy and, therefore, negatively impact our sales.

*In addition, we may incur increases in costs and other adverse business consequences, including loss of revenue or decreased gross margins, due to changes in tariffs, import or export restrictions, further trade barriers, or unexpected changes in regulatory requirements*. For example, in July 2012, we received notice of retroactive value-added taxes (VATs) levied by the tax authorities in China, which applied for the period from July 1, 2011 to June 30, 2012.  We expensed the retroactive VATs of approximately $1.3 million in the quarter ended June 30, 2012, which resulted in a decrease in our gross margins. These VATs will continue to negatively impact our gross margins for the future quarters. Given the relatively fluid regulatory environment in China and the United States, there could be additional tax or other regulatory changes in the future. Any such changes could directly and materially adversely impact our financial results and general business condition.

(Emphasis added).

35.     The statement in ¶ 34 was materially false and misleading because it omitted that in 2021, Tongmei had been fined for exporting dangerous chemicals without a permit.

36.     The 2021 Annual Report contained a risk disclosure under the heading "[i]ntellectual property infringement claims may be costly to resolve and could divert management attention." It then stated the following:

Other companies may hold or obtain patents on inventions or may otherwise claim proprietary rights to technology necessary to our business. The markets in which we compete are comprised of competitors that in some cases hold substantial patent portfolios covering aspects of products that could be similar to ours. We could become subject to claims that we are infringing patent, trademark, copyright or other proprietary rights of others. We may incur expenses to defend ourselves against such claims or enter into cross license agreements that require us to pay royalty payments to resolve such claims. For example, in 2020, we and a competitor entered into the Cross License Agreement, which has a term that began on January 1, 2020 and expires on December 31, 2029. We have in the past been involved in lawsuits alleging patent infringement, and could in the future be involved in similar litigation.

37.     The statement in ¶ 36 was materially false and misleading because it omitted that Tongmei had been sued for trade secret violations by a company called Shandong Guojing.

38.     On March 16, 2023, AXTI filed with the SEC its annual report on Form 10-K for the period ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual

Report were certifications pursuant to SOX signed by Defendants Young and Fischer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

39.     The 2022 Annual Report contained a risk disclosure under the heading "[we could be subject to suits for personal injuries caused by hazardous materials." It then stated the following:

> In 2005, a complaint was filed against us alleging personal injury, general negligence, intentional tort, ***wage loss and other damages***, including punitive damages, as a result of exposure of plaintiffs to high levels of gallium arsenide in gallium arsenide wafers, and methanol. Other current and/or former employees could bring litigation against us in the future. ***Although we have in place engineering, administrative and personnel protective equipment programs to address these issues, our ability to expand or continue to operate our present locations could be restricted or we could be required to acquire costly remediation equipment or incur other significant expenses if we were found liable for failure to comply with environmental and safety regulations***. Existing or future changes in laws or regulations in the United States and China may require us to incur significant expenditures or liabilities, or may restrict our operations. In addition, our employees could be exposed to chemicals or other hazardous materials at our facilities and we may be subject to lawsuits seeking damages for wrongful death or personal injuries allegedly caused by exposure to chemicals or hazardous materials at our facilities.
>
> ***Litigation is inherently uncertain and while we would expect to defend ourselves vigorously, it is possible that our business, financial condition, results of operations or cash flows could be affected in any particular period by litigation pending and any additional litigation brought against us***. ***In addition, future litigation could divert management's attention from our business and operations, causing our business and financial results to suffer***. We could incur defense or settlement costs in excess of the insurance covering these litigation matters, or that could result in significant judgments against us or cause us to incur costly settlements, in excess of our insurance limits.

(Emphasis added).

40.     The statement in ¶ 39 was materially false and misleading because it understated the general risk of litigation, considering the Company's unsafe business practices in China, as well as its labor practices. It spoke of prior litigation in part over wage loss, but omitted that Tongmei had been successfully sued multiple times over failure to pay wages, which resulted in negative publicity in China.

41.     On March 15, 2024, AXTI filed with the SEC its annual report on Form 10-K for the period ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual

Report were certifications pursuant to SOX signed by Defendants Young and Fischer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

42.   The 2023 Annual Report contained a risk disclosure under the heading "***[i]f we have low product yields, the shipment of our products may be delayed and our product cost and operating results may be adversely impacted***". (Emphasis added). It then stated the following:

A critical factor in our product cost is yield. Our products are manufactured using complex crystal growth and wafer processing technologies, and the number of usable wafer substrates we produce can fluctuate as a result of many factors, including:

- poor control of furnace temperature and pressure;
- impurities in the materials used;
- contamination of the manufacturing environment;
- quality control and inconsistency in quality levels;
- lack of automation and inconsistent processing requiring manual manufacturing steps;
- substrate breakage during the manufacturing process; and
- equipment failure, power outages or variations in the manufacturing process.

An example where yield is of special concern is for our six-inch semi-conducting gallium arsenide substrates, which can be used for manufacturing industrial lasers and LED lighting. These applications require very low defect densities, also called EPD, and our yields will be lower than the yields achieved for the same substrate when it will be used in other applications. If we are unable to achieve the targeted quantity of low defect density substrates, then our manufacturing costs would increase and our gross margins would be negatively impacted.

In addition, we may modify our process to meet a customer specification, but this can impact our yields. If our yields decrease, our revenue could decline if we are unable to produce products to our customers' requirements. At the same time, our manufacturing costs could remain fixed, or could increase. Lower yields negatively impact our gross margin. We have experienced product shipment delays and difficulties in achieving acceptable yields on both new and older products, and such delays and poor yields have adversely affected our operating results. We may experience similar problems in the future and we cannot predict when they may occur, their duration or severity.

***If our manufacturing processes result in defects in our products making them unfit for use by our customers, our products would be rejected, resulting in compensation costs paid to our customers, and possible disqualification. This could lead to revenue loss and market share loss.***

(Emphasis added).

43.     The statement in ¶ 42 was materially false and misleading at the time it was made because it spoke of low product yields in hypothetical terms when, in reality, the issue had already materialized.

44.     The 2023 Annual Report contained a risk disclosure under the heading "[t]he terms of the private equity raised in China as a first step towards an IPO on the Star Market grant each Investor a right of redemption if Tongmei fails to achieve its IPO." It then stated the following:

> Pursuant to the Capital Investment Agreements with the Investors, each Investor has the right to require AXT to redeem any or all Tongmei shares held by such Investor at the original purchase price paid by such Investor, without interest, in the event the IPO fails to pass the audit of the Shanghai Stock Exchange, is not approved by the CSRC or Tongmei cancels the IPO application. The aggregate redemption amount is approximately $49 million.
>
> Tongmei submitted its IPO application to the Shanghai Stock Exchange and it was formally accepted for review on January 10, 2022. The Shanghai Stock Exchange approved the IPO application on July 12, 2022. On August 1, 2022, the CSRC accepted for review Tongmei's IPO application. The STAR Market IPO remains subject to review and approval by the CSRC and other authorities. The process of going public on the STAR Market includes several periods of review and, therefore, is a lengthy process. ***Subject to review and approval by the CSRC and other authorities, Tongmei expects to accomplish this goal in the coming months***. ***The listing of Tongmei on the STAR Market will not change the status of AXT as a U.S. public company. There can be no assurances that Tongmei will complete its IPO in 2024 or at all***. In the event that investors exercise their redemption rights, we may be required to seek additional capital in order to redeem their Tongmei shares and there would be no assurances that such capital would be available on terms acceptable to us, if at all. Any redemptions could have a material adverse effect on our business, financial condition and results of operations.

(Emphasis added)

45.     The statement in ¶ 44 was materially false and misleading at the time it was made because it understated the risk that Tongmei would never list on the STAR Market and that, accordingly, private investors would seek to redeem their invested capital.

46.     The 2023 Annual Report contained the following statement about Tongmei's IPO application:

> As one of the first steps in the process of listing Tongmei on the STAR Market and going public, we sold approximately 7.28% of Tongmei to private equity investors for

15

approximately $49 million in the aggregate. Pursuant to the Capital Investment Agreements with the Investors, each Investor has the right to require AXT to redeem any or all Tongmei shares held by such Investor at the original purchase price paid by such Investor, without interest, in the event the IPO fails to pass the audit of the Shanghai Stock Exchange, is not approved by the CSRC or Tongmei cancels the IPO application. The aggregate redemption amount is approximately $49 million.

Tongmei submitted its IPO application to the Shanghai Stock Exchange, and it was formally accepted for review on January 10, 2022. The Shanghai Stock Exchange approved the IPO application on July 12, 2022. *On August 1, 2022, the CSRC accepted for review Tongmei's IPO application. The STAR Market IPO remains subject to review and approval by the CSRC and other authorities*. The process of going public on the STAR Market includes several periods of review and, therefore, is a lengthy process. *Subject to review and approval by the CSRC and other authorities, Tongmei hopes to accomplish this goal in the coming months*. The listing of Tongmei on the STAR Market will not change the status of AXT as a U.S. public company.

(Emphasis added).

47.     The statement in ¶ 46 was materially false and misleading because it overstated the likelihood that Tongmei would be listed on the STAR Market.

48.     The statements contained in ¶¶ 18, 20, 22, 24, 27, 30, 32, 34, 36, 39, 42, 44, and 46 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) AXT, Inc. overstated its property holdings; (2) the Company did not disclose that the attempted listing of an AXT, Inc. subsidiary in China had reportedly failed; (3) AXT, Inc. routinely engaged in environmental violations and unsafe business practices; (4) AXT, Inc.'s production declined in 2023; and (5) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH EMERGES

49.     On April 4, 2024, before the market opened, J Capital Research ("J Capital") released a report (the "Report") about AXTI.

50.     Preliminarily, the Report stated that "Problems have rained down on AXTI in China – where the company has nearly all its operations, but U.S. investors know little of the peril. ***AXTI sales have crashed, production plummeted, and environmental problems forced the company to move hazardous chemical operations to a rural county 300 miles from the factory***." (Emphasis in original).

51.     Regarding production, the Report included the following:

> ***We interviewed three former employees of AXTI China, who all said that production since early 2023 has bene at no more than 50% of capacity***, and a glut of competition means that sales will not recover. Chinese export and purchase bans on the materials AXTI trades in add a layer of geopolitical challenge that the company may not survive.

> (Emphasis added).

52.     The Report stated the following about the attempted listing in Shanghai of Tongmei, a Company subsidiary:

> AXTI is listed in the U.S., but its business operations are almost all conducted through a subsidiary in China. AXTI wants to list that subsidiary in Shanghai to capture new financing. But the listing prospectus attracted unexpected scrutiny and unveiled a plethora of undisclosed issues in China. Our research has found those issues are only the tip of the iceberg.

> The listing vehicle raised $49 [million] from private investors at a sky-high valuation in 2020. AXTI expected to capture much more investment at the time of the IPO. But it has been 18 months since the last IPO update, and U.S. investors haven't been told that the IPO has apparently been blocked by Chinese regulators.

53.     Contrary to the Company's optimistic comments about Tongmei's prospects of being listed on the STAR Market, The Report further stated the following about the status of the attempted listing of Tongmei on the STAR Market:

> Chinese regulators asked a lot of questions about the original submission, and slowly, AXTI responded. The last submission was in August 2022. Now the process has stalled. ***U.S. Investors have been told nothing, but several press outlets in China have reported that the IPO application has been blocked***.

> (Emphasis in original.

54.    The Report then included the following image, taken from media in China and dated March 14, 2023:



55.    J Capital then stated that it had "uncovered a deluge of reasons why Chinese regulators potentially blocked this IPO, including falsifying data, tax evasion, improper storage of hazardous chemicals, [. . .], IP litigation, and defaulting on wages to employees."

56.    The Report highlighted production woes due to environmental issues, stating the following:

> ***AXTI's production has been halted more than 10 times for environmental problems over the last five years***. Chinese reporters depict this behavior as "puzzling" and point out that the company's attitude toward regulation is almost one of disregard. There is no clear pathway for AXTI to fix these issues and get the Shanghai IPO, which is needed to fund further expansion.

> Among the environmental woes: a government report points to arsenic contamination in the groundwater. ***We also learned in interviews of a 2020 fire at the Beijing factory that has not been disclosed to U.S. investors***. ***That and the use of hazardous chemicals forced AXTI's factory to move half its production to facilities 300 miles away***, meaning production involves shipping materials on a 7-plus hour truck ride.

(Emphasis added).

57.     The Report further stated that "Tongmei's production process uses toxic chemicals such as sulfuric acid, arsenic, acetic acid, ammonia, and sodium hydroxide. Production was reportedly halted more than 10 times by regulators in a five-year period. The company has been repeatedly fined."

58.     It further stated that "[t]he Beijing Public Security Bureau imposed a fine on Tongmei in 2020, saying 'Beijing Tongmei *failed to disclose the types, quantities, and throughput of explosive precursor hazardous chemicals by the required deadline*."

59.     The Report further stated the following:

> *A November 2021 environmental report detected excess levels of arsenic in the soil and groundwater*. The company said that the problems did not necessarily resul[t] from their manufacturing process. The environmental scientists said: '[It] cannot be ruled out that the problem may be related to the impact of enterprise production. Therefore, it is recommended that the enterprise continue to strengthen environmental management during the continued production process, especially for key facilities and key areas that are of concern for hidden danger investigation." *This raises serious environmental governance concerns for U.S. funds holdings this stock*.

(Emphasis in original).

60.     The Report then included the following image, regarding this issue:



Hazardous chemicals in the groundwater

61.     The Report further stated that **"[i]n 2021, Tongmei was fined for exporting dangerous chemicals without a permit**, but Customs does not publicly report the amount of the fine or the specific infraction." (Emphasis added).

62.     As seen below, the Report brought attention to media in China that discussed the Company's environmental misconduct:



63.     The Report further stated that "[a] former production worker at Tongmei in Beijing said that AXTI **was required to move its raw chemicals out of Beijing in 2020**, a key reason why the company closed down one production line and moved dangerous chemicals to the anything goes region of Kazuo in Liaoning." The Report said that "**[t]he engineer said the company experienced a major fire in 2020, and after that, many employees left**." (Emphasis added).

64.     The Report further said the following:

Tongmei seemed unfazed by the disclosures. **While continuing non-compliant production, the company was fined by regulators for failing to implement basic factory safety protocol**, including, according to Chinese press reports:
1. **Proper storage of flammable material and chemical products**,

2. ***Informing employees of hazards and possible accidents at the factory***,
3. Organizing regular emergency drills.

(Emphasis added).

65.     The Report stated that "[s]everal government notices indicate that Tongmei was still out of compliance with safety regulations in 2021." The Report then included the following image:



66.     The Report then discussed the Company's production, which has declined, stating the following:

> We learned from interviews with former managers that ***production volume tumbled starting in early 2023 to an average of about 50% previous levels and in some months, just 10%***. The Chinese market became glutted with product, and customers demanded price cuts from AXTI China. "When the market goes bad, [the customer] says: 'We won't buy unless the price is lowered. We have a lot of inventory anyway.' It's a vicious cycle forcing us to lower prices."

> One interviewee told us that production efficiency in Liaoning, where the company blends gallium and arsenic and grows crystals, has dropped by two-thirds in two years. ***"The company's yield rate is not very good now,"*** the former production leader said. ***"In the past, probably in 2022, the yield was 40-60%. Now the lowest is only in the teens and usually between 10-20%. When yield is high, it is only 30%."*** The former employee was speaking of the proportion of arsenic and gallium to gallium arsenide crystals.

(Emphasis in original).

67.     The Report further stated the following about the Company's litigation liability:

An allegation against Tongmei of IP infringement is reportedly among the issues blocking an IPO. ***A company called Shandong Guojing reportedly filed suit against Tongmei in 2021 for allegedly stealing technology***.

(Emphasis added).

68.     The Report further revealed that this lawsuit had been covered in Chinese media

in 2023:



69.     The Report discussed how Tongmei has been sued "multiple times for defaulting

on wages to employees", which has been covered in Chinese media:



In 2022, Baidu IPO reported: *"Publicly available documents indicated that Beijing Tongmei was brought to court on various occasions due to failure to pay on time or outright refusal to pay wages. In the end, Beijing Tongmei lost every lawsuit."*

70.     The Report further stated that "[a] typical case is that of Cui Dongmei, a Beijing-based employee who did not want to move to Liaoning Province when the company closed down half of its production in Beijing and moved it to a rural county about 300 miles North. Cui won most of her claims."

71.     Regarding the Company's physical infrastructure, the Report further stated that "[w]e show that the $99.3 [million] at cost in buildings reported by AXTI is very unlikely. The buildings consist principally of a ramshackle factory in Beijing and a lot of dormitories in a tiny rural county in Liaoning."

72.     The Report further stated the following:

Between 2018 and the year of the Tongmei prospectus, AXTI added $69 [million] in buildings, going from $39.8 [million] in buildings at the end of 2018 to $99.3 [million] at [the end of] June 2021. This represented the value of 44 buildings owned by Tongmei in China. Of these, according to AXTI disclosures, 15 are residences and six are warehouses, some with shared use. All but five are in the tiny rural area of Gongyingzi Village in Kazuo County, Liaoning, an enclave of people of the Mongolian ethnicity. Kazuo is a tiny, rural county that has aspirations to develop a semiconductor park but so far looks very undeveloped.

***Fourteen of the properties, including six of the residences, belong to the subsidiary Chaoyang Jinmei in Kazuo***. But, despite a land-use table presented in the January 2022 8K showing extensive [holdings,] ***Chinese government records show that Chaoyang Jinmei owns just one piece of land, for which it paid [the equivalent of $7,339].*** Possibly AXTI is consolidating holdings and Chinese records are not, but we would expect a land-use table to name the specific entity that holds the land.

***We also find it difficult to believe that AXTI could have spent over $60 [million] on building this cheap land in a god-forsaken part of northern China***.

(Emphasis added).

73.     The Report then displayed the following land record, showing the land acquired for the equivalent of $7,339:



74.     On this news, the price of AXTI stock fell $1.73 per share, or 34.94%, to close at $3.22 per share on April 4, 2024. The next day, AXT's stock fell $0.11, or 3.4%, to close at $3.11 per share on April 5, 2024.

75.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

76.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired AXTI securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

77.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

78.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

82.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

83. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

84. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

<u>COUNT I</u>
**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder**
**<u>Against All Defendants</u>**

85. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

87.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

89.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential

proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

90.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

91.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

92.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

93.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

94.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members

of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

97.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

98.      Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

99.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 6, 2024                          **THE ROSEN LAW FIRM, P.A.**


/s/ Phillip Kim
Phillip Kim, Esq.
Laurence M. Rosen, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

31