# Exhibit 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE GOLDEN HEAVEN GROUP
HOLDINGS LTD. SECURITIES
LITIGATION

Case No. 2:23-cv-10619-HDV-SK

**ORDER DENYING IN PART AND
GRANTING IN PART DEFENDANT R.F.
LAFFERTY'S MOTION TO DISMISS AND
DENYING GOLDEN HEAVEN'S MOTION
TO DISMISS [76, 77]**

1

## I.    INTRODUCTION

This case arises out of an alleged international investment scam.  Investors in Golden Heaven Group Holdings Ltd.'s ("Golden Heaven") April 2023 Initial Public Offering ("IPO") were told they were investing in "a leading amusement park operator," sating the consumer demand of China's growing middle class.  Amended Class Action Complaint ("AC") ¶ 30 [Dkt. No. 63]; Declaration of Evan S. Strassberg ("Strassberg Decl.") ¶¶ 4–5, Ex. A at 1 [Dkt. No. 76-3]. [1]  According to its prospectus, Golden Heaven boasted six properties, including "amusement parks, water parks and complementary recreational facilities," each visited by hundreds of thousands of guests each year.  AC ¶¶ 3, 23; Strassberg Decl. ¶¶ 4–5, Ex. A at 1.  Investors could expect further growth as Golden Heaven was well-positioned to benefit from the end of China's COVID-era policies.  AC ¶ 3.  The IPO valued the six parks at approximately $200 million, and in the months that followed, Golden Heaven's stock soared by 320 percent.  Id. ¶¶ 38, 41.

But unbeknownst to investors, Golden Heaven had acquired the six parks for just $7.5 million in 2021.  Id. ¶ 41.  As subsequent investigations revealed, Golden Heaven's visitor figures fell far short of its reported numbers by several orders of magnitude.  Id. ¶¶ 39–40.  Plaintiff's own investigators reported that the parks were largely abandoned, had few employees, and were in deplorable states of disrepair.  Id. ¶¶ 55, 128–48.  When the truth came to light, Golden Heaven's stock plummeted by nearly 89 percent, causing its investors to suffer significant losses.  Id. ¶¶ 5–6.

Plaintiff Rahul Patange brings this putative class action on behalf of persons and entities who purchased Golden Heaven securities between April 13, 2023 and December 8, 2023.  Id. ¶ 1.  Plaintiff asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 48 Stat. 881, 15 U.S.C. § 78a et seq., against Golden Heaven, its executives, and its U.S. representative (collectively "the Exchange Act Defendants").  AC ¶¶ 12–22.  Plaintiff further asserts claims under the Securities Act of 1933 (the "Securities Act"), 48 Stat. 74, 15 U.S.C. § 77a et seq., against the Exchange Act Defendants, as well as Golden Heaven's underwriters and accounting firm.  AC

---

[1] The Court takes judicial notice of Golden Heaven's April 2023 Prospectus, as it was "incorporated into the complaint by reference."  Request for Judicial Notice [Dkt. No. 76-2]; Strassberg Decl. ¶¶ 4–5, Ex. A; Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

¶¶ 190–210.  Golden Heaven, joined by its U.S. representative Colleen De Vries and her employer Cogency Global Inc. ("Cogency Global"), move to dismiss all claims against it ("Golden Heaven Motion"), arguing in the main that Plaintiff failed to allege actionable misrepresentations.  [Dkt. Nos. 77-1, 79].  Underwriter R.F. Lafferty & Co ("R.F. Lafferty") separately moves to dismiss the Securities Act claims ("Lafferty Motion"), arguing that Plaintiff lacks standing.  [Dkt. No. 76-1].

## II.    BACKGROUND

### A.    Factual Background[2]

On April 13, 2023, Golden Heaven, which manages and operates six amusement parks, water parks, and recreational facilities in China, filed a prospectus with the Securities and Exchange Commission.  AC ¶¶ 26–37; Strassberg Decl. ¶¶ 4–5, Ex. A.  Golden Heaven had acquired all six parks from a related entity for $7.5 million in 2021.  *Id.* ¶ 41.  Golden Heaven is incorporated in the Cayman Islands and has its principal place of business in Nanping City, China.  *Id.* ¶¶ 23–24.

In support of its IPO, Golden Heaven claimed to draw hundreds of thousands of visitors from the nearly 21 million Chinese citizens living near its parks.  *Id.* ¶¶ 31–32; Strassberg Decl. ¶¶ 4–5, Ex. A at 1, 75–76.  Its prospectus reported that in FY 2022, Golden Heaven drew in $41,788,196 in revenue, from approximately 2.41 million guests.  AC ¶ 33; Strassberg Decl. ¶¶ 4–5, Ex. A at 75.  Each park was reportedly staffed with a robust "full-time onsite professional team," with a total of over 600 employees "overseeing daily operations, repairs and maintenance," and other responsibilities.  AC ¶¶ 35–36; Strassberg Decl. ¶¶ 4–5, Ex. A at 75, 83.

For example, the prospectus reported the following about Golden Heaven's largest park:

> Yueyang Amusement World features a double-decker carousel, pirate ship, pendulum ride, sky-high swing ride, ice rink, bumper cars, boat rides, and the Dongting Eye Ferris wheel. As of the date of this prospectus, its management team consists of approximately 135 members and it can accommodate approximately 1,100 guests at the full operating capacity. In the fiscal years ended September 30, 2021 and 2022, it attracted

---

[2] The AC is bifurcated into Exchange Act and Securities Act claims.  Because the factual allegations are largely identical, the Court cites to the factual allegations in the Exchange Act section.

At this stage in the pleadings, the Court accepts all plausible facts from Plaintiff's AC as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

approximately 930,000 and 890,000 guests, respectively, representing a decrease of 4.3%. It is managed by Yueyang Jinsheng Amusement Development Co., Ltd., one of the operating entities.

AC ¶ 58; Strassberg Decl. ¶¶ 4–5, Ex. A at 76.

On the strength of these reports, the IPO valued Golden Heaven's six parks at $200 million—nearly 27 times its value less than two years ago. AC ¶ 41. In the months following, its stock rose a further 320 percent. *Id.* ¶ 38. At its peak, Golden Heaven reached a market capitalization of $1.2 billion on November 12, 2023. *Id.* ¶ 38.

In the months following its IPO, Golden Heaven continued to report growth. *See id.* ¶ 84 (June 6, 2023 press release reporting 30 percent year on year growth during China's Labor Day); *id.* ¶ 98 (October 23, 2023 press release announcing ten percent year on year growth during China's Mid-Autumn Festival). On a conference call with investors on August 3, 2023, Golden Heaven CEO Qiong Jin and CFO Jinguang Gong represented that they "expect an increasing number of tourists" as the tourism sector recovered from the pandemic and that Golden Parks had begun an "comprehensive upgrade of [its] six parks," which was expected to be completed by September. *Id.* ¶¶ 89–96.

On November 13, 2023, Hindenburg Research ("Hindenburg") made a series of posts on X.com, announcing that it was short-selling Golden Heaven. *Id.* ¶¶ 51–53, 101–15. Hindenburg reported that when its investigators visited Golden Heaven's parks on the weekends, it found dilapidated conditions and few visitors. *Id.* For example, Yueyang Amusement World, purportedly Golden Heaven's most-visited property, had only ten cars in the lot on Saturday at noon. *Id.* ¶¶ 107–09. What Golden Heaven touted as a water attraction was in reality a "large pond full of trash." *Id.* ¶ 109. Hindenburg noted similar discrepancies between Golden Heaven's reports and their observations of the other parks. *Id.* ¶¶ 110–15.

Golden Heaven waved aside the Hindenburg report, characterizing its findings as "baseless allegations." *Id.* ¶¶ 117–18. Despite its denials, Golden Heaven announced in December 2023 that it planned to lease its parks to another established Chinese amusement group. *Id.* ¶¶ 121–22. Following this news, Golden Heaven's share price fell nearly 90 percent, to $2.32 per share. *Id.*

¶ 123. As the Hindenburg report circulated, Golden Heaven's stock continued to plummet, reaching just $1.31 per share on December 11, 2023. *Id.* ¶¶ 124–25.

When Plaintiff sent his own investigative team in June 2024, it corroborated the Hindenburg report, finding that the parks were largely abandoned, had few employees, and were in various states of disrepair. *Id.* ¶¶ 55, 128–48. When the team spent the entire day at Yueyang Amusement World, they counted only *twenty* visitors throughout the afternoon and no more than five cars in the parking lot. *Id.* ¶¶ 129–33. It found Golden Heaven's other parks similarly bereft of visitors. *Id.* ¶¶ 134–48. Plaintiff also alleges that Golden Heaven drastically inflated its employee counts. While its prospectus reported over 617 employees in 2022, data reported to China's social endowment office show that Golden Heaven had 132 employees. *Id.* ¶ 77; Strassberg Decl. ¶¶ 4–5, Ex. A at 83.

Unbeknownst to U.S. investors, the key parties in Golden Heaven's IPO had faced prior scrutiny. Golden Heaven CEO Qiong Jin and her husband were accused of defrauding Chinese investors in a pharmaceutical company in 2019. AC ¶ 42. Ms. Jin is also subject to an equity freeze for her failure to satisfy outstanding judgments. *Id.* ¶ 43. The IPO underwriters R.F. Lafferty and Revere Securities LLC have seen average returns of -56 percent and -47 percent, respectively, following IPOs. *Id.* ¶ 45. Golden Heaven's authorized accounting firm, BF Borgers CPA PC, faced Securities and Exchange Commission charges in 2024. *Id.* ¶¶ 47–48.

**B.  Procedural Background**

Plaintiff Jerrod Parks filed this putative class action on December 19, 2023. [Dkt. No. 1]. The Court consolidated two related actions, appointing Rahul Patange as lead plaintiff in the consolidated action. Order Consolidating Related Actions ¶¶ 1, 7 [Dkt. No. 49]. Plaintiff then filed an amended class action complaint. The AC asserts violations of section 10(b) of the Exchange Act against Golden Heaven, CEO Qiong Jin, CFO Jinguang Gong, Director Bin Chen, Director Daofu Lin, and Golden Heaven's U.S. representative Colleen De Vries (collectively known as the "Individual Defendants"), AC ¶¶ 12–22, 165–174; violations of section 20(a) of the Exchange Act against the Individual Defendants, AC ¶ 175–78; violations of Section 11 and/or Section 15 of the Securities Act against Golden Heaven, the Individual Defendants, Cogency Global, B.F. Borgers, and underwriters R.F. Lafferty and Revere Securities LLC ("Underwriter Defendants"), AC ¶¶ 190–

210, 348–360; and violations of Section 12 of the Securities Act against the Underwriter Defendants. AC ¶¶ 201–203, 361–367.

Defendant R.F. Lafferty move to dismiss the Securities Act claims against it on the grounds that Plaintiff lacks standing.[3] Lafferty Motion at 4–7. Defendant Golden Heaven move to dismiss both the Exchange Act and Securities Act claims against it. Golden Heaven Motion at 1–3. Ms. De Vries and Cogency Global joined Golden Heaven's Motion. The Court heard oral argument on Defendants' Motions on January 30, 2025, and took the matter under submission. [Dkt. No. 102].

## III. LEGAL STANDARD

### A. Pleading Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief may be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Only where a plaintiff fails to "nudge[] [their] claims . . . across the line from conceivable to plausible" is the complaint properly dismissed. *Id.* at 680. While the plausibility requirement is not a probability assessment, it demands more than "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Determining whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In making this determination, allegations of material fact should be construed in the light most favorable to the plaintiff. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000) (citation omitted).

When alleging fraud, the party must meet the higher pleading standard imposed by Federal Rule of Civil Procedure 9(b). Fed. R. Civ. P. 9(b) (requiring parties to "state with particularity the

---

[3] Because Plaintiff voluntarily withdraws his Section 12 claims, the Court will not address them below. Opposition to Golden Heaven Motion 24 n.12 [Dkt. No. 85].

circumstances constituting fraud or mistake"). "To properly plead fraud with particularity under Rule 9(b), 'a pleading must identify the who, what, when, where, and how of the misconduct charged.'" *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (quoting *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018)).

### B. Exchange Act

Together, the Exchange Act and the Securities Act regulate securities transactions. The Exchange Act and its implementing regulation, Rule 10b-5, prohibit material misrepresentations and omissions "in connection with" the sale of "any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5 ("Rule 10b-5"); *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 763 (2023) (explaining that the Exchange Act "sweeps more broadly" than the Securities Act). The Supreme Court recognizes an implied private cause of action to enforce section 10(b) and its implementing regulation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).

### C. Securities Act

In comparison to the Exchange Act, the Securities Act is "narrower," imposing strict liability on issuing companies that include material misstatements or misleading omissions on the registration statements they are required to provide to prospective buyers. *Slack Techs.*, 598 U.S. at 762–63 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 572 (1995)). Section 11 of the Securities Act provides an express private cause of action for those "who buy[] a security issued under a materially false or misleading registration statement." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013); 15 U.S.C. § 77k(a) (allowing plaintiffs to hold liable the directors of the issuer, anyone who signed the registration statement, and the underwriters, among others). Section 15 imposes secondary liability on those who "control[] any person liable under [Section 11]." 15 U.S.C. § 77o(a).

### IV. DISCUSSION

### A. Exchange Act

Defendant Golden Heaven argues that Plaintiff's Exchange Act claims fall short of the heightened pleading standards required under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). It makes two principal arguments: (1) that Plaintiff fails to allege that

Golden Heaven made actionable misrepresentations or omissions of material fact at all, Golden Heaven Motion at 5–14; and (2) that Plaintiff's allegations do not give rise to a strong inference of scienter. *Id.* at 15–16.

To recover damages under Section 10(b) and Rule 10b-5, a plaintiff must plead that: (1) defendant made a misrepresentation or misleading omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Halliburton*, 573 U.S. at 267 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013)). Because Golden Heaven only challenges the first two prongs, the Court does not address the remaining prongs.

Fraud claims under the Exchange Act are subject to both the Rule 9(b) pleading standard and the higher standard set by the PSLRA. 15 U.S.C. § 78u-4(b)(1)–(2); *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1031–32 (9th Cir. 2016). To allege fraud under the Exchange Act, a plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rts.*, Ltd., 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)); 15 U.S.C. § 78u-4(b)(2) (requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

### 1.    Misrepresentation

In the Exchange Act context, statements are false if they "directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Omissions are misleading if they would "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The Exchange Act does not create an affirmative duty to disclose all material information but requires disclosure "when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b–5(b)). A misrepresentation or omission is material "if there is a substantial likelihood that a reasonable investor would have acted

8

differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

Here, Plaintiff alleges that:

- Golden Heaven's statements in its prospectus that each of its six parks have large demand, robust management teams, and working rides were materially false and misleading because the Hindenburg investigation and Plaintiff's own investigative visit revealed substantially different conditions, AC ¶¶ 57–69, Strassberg Decl. ¶¶ 4–5, Ex. A at 1, 75–76;

- Golden Heaven's statement in its prospectus that its parks "generate significant revenue from guest spending on rides and attractions," including nearly $40 million in the fiscal year ending 2022, was materially false and misleading because investigations suggest its parks do not attract the number of guests necessary to generate such revenue, AC ¶¶ 70–72, Strassberg Decl. ¶¶ 4–5, Ex. A at 1, 78;

- Golden Heaven's statements in its prospectus that "[e]ach park is managed by a full-time onsite professional team which is responsible for operations and management of such park" and that it employs over 600 total full-time employees is materially false and misleading because data reported to China's social endowment office suggest that Golden Heaven had only 132 employees in 2022, AC ¶¶ 73–77, Strassberg Decl. ¶¶ 4–5, Ex. A at 1, 75, 83; and

- Golden Heaven's disclosures about risks in its prospectus were materially false and misleading, given the poor condition of its parks. AC ¶¶ 81–83; Strassberg Decl. ¶¶ 4–5, Ex. A at 14–41.

These allegations adequately establish misrepresentations of material fact, with sufficient particularity to satisfy both Rule 9(b) and the PSLRA. Claims about revenue, park visitors, staffing, and park conditions are clearly material. The chasm between Golden Heaven's statements and the apparent reality is so broad as to suggest that Golden Heaven's statements were false when made. *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (noting that statements constitute material misrepresentations under Section 10(b) "if there is no reasonable basis for the

9

speaker's belief in the statement's accuracy . . . ."). At a minimum, they "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006.

Golden Heaven asks the Court to discredit the Hindenburg report and Plaintiff's own investigation on the theory that the reported conditions only arose *after* the April 2023 prospectus. Golden Heaven Motion at 15. This strains credulity in the extreme. Plaintiff alleges states of disrepair that are inconsistent with a sudden downturn, suggesting that Golden Heaven's statements were false when made. *See* AC ¶¶ 57–69. Moreover, Golden Heaven continued to report favorable conditions until three months before the Hindenburg report. *See* AC ¶¶ 88–96. Far from alerting investors of ongoing deterioration, Golden Heaven executives reported that the company was in the midst of a "comprehensive upgrade of [its] six parks," which was due to be completed in September 2023. *Id.* ¶ 94. Defendant cannot avoid liability merely because Plaintiff's investigations were not instantly contemporaneous with the IPO.

Golden Heaven next claims that many of Plaintiff's allegations are exempted under the PSLRA's safe harbor provision. Golden Heaven Motion at 9–13. Under the PSLRA, a defendant is not liable for a forward-looking statement that is (1) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) immaterial. 15 U.S.C. § 78u–5(c)(1)(A). This safe harbor provision extends to issuers, persons acting on their behalf, and underwriters. *Id.* § 78u-5(a). But "where defendants make mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). For example, a statement that sales were "still going strong," is a "mixed present/future statement" that is "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Id.* (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)).

Of the statements Golden Heaven challenges, the vast majority are at most mixed statements expressing the belief that favorable current conditions will continue. Golden Heaven Motion at 10–11 (citing AC ¶¶ 78, 84–85, 86–87, 89–90, 96–97). *See, e.g., id.* ¶ 78 (emphasis added) ("We

10

believe that innovative amusement facilities will enable us to *maintain* the existing guest patronage . . .”); *id.* ¶¶ 84–85 (reporting “30% Year-over-Year Traffic Growth During China’s Labor Day Holiday”); *id.* ¶¶ 86–87 (describing a park’s current features); *id.* ¶¶ 96–97 (emphasis added) (“. . . we *are* well positioned for even stronger business growth . . . .”). As discussed *supra*, these statements are material. But even if each of these purportedly forward-looking statements were stricken, Plaintiff’s Exchange Act claim would still survive.

Neither are these misrepresentations mere puffery. Golden Heaven Motion at 13–14. Nonactionable puffing statements amount to nothing more than “vague statements of optimism like ‘good,’ ‘well-regarded,’ or other feel good monikers.” *Oregon Public Employees Retirement Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (quoting *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1111 (9th Cir. 2010)). Far from vague puffery, Plaintiff identifies **specific** statements about park conditions, business valuation and revenue, and the number of park visitors and personnel.

### 2. Scienter

Golden Heaven next alleges that Plaintiff failed to establish scienter. Motion at 16–18. A plaintiff may establish scienter under section 10(b) by alleging facts demonstrating that defendants acted with “intent to deceive, manipulate, or defraud” or with “deliberate recklessness.” *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quoting *Matrixx Initiatives*, 563 U.S. 27 at 48); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The PSLRA requires allegations giving rise to “a strong inference” that the defendant acted with the required state of mind. *ESG Cap. Partners*, 828 F.3d at 1032–33; 15 U.S.C. § 78u–4(b)(2)(A). At the pleading stage, a complaint adequately establishes scienter “only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.” *Tellabs*, 551 U.S. at 324.

Plaintiff has more than adequately established scienter. Where, as here, the misrepresented “facts [are] prominent enough that it would be ‘absurd to suggest’ that top management was unaware of them,” Golden Heaven’s misrepresentations raise a strong inference of scienter. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–89 (9th Cir. 2008) (quoting *No. 84 Employer–*

11

*Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003)). Since over 90 percent of Golden Heaven's revenue derives from its parks, Golden Heaven and Ms. De Vries would have necessarily been grossly reckless had they been genuinely unaware of the parks' actual attendance, staffing, revenue, and overall conditions. AC ¶ 33; *id.* ¶ 19 (alleging that each individual defendant was "directly involved in the day-to-day operations of the Company at the highest levels"). Indeed, the parks' stratospheric rise in valuation from 7.5 million in 2021 to *$200 million* in 2023 should have raised suspicions to management that the reported performance metrics were grossly inflated. *Id.* ¶ 41. The broad chasm between statements made in the prospectus and the reported reality suggests that Defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308–09 (2nd Cir. 2000)).

### B. Securities Act

R.F. Lafferty, Golden Heaven, Cogency Global, and Ms. De Vries move to dismiss Plaintiff's Securities Act claims on the ground that statutory standing is lacking. Lafferty Motion at 3; Golden Heaven Motion at 18–20; *id.* at 18 n.1 (joining Lafferty's concurrent motion to dismiss Plaintiff's Section 11 and 15 claims). In the alternative, Defendants argue that Plaintiff fails to plead materially false or misleading representations or omissions pursuant to Rule 9(b). Golden Heaven Motion at 21–23.

"To bring a claim under [Section] 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC*, 598 U.S. at 768. Assuming standing exists, the plaintiff must then establish "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005), *abrogated on other grounds by Matrixx*, 563 U.S.). *See also Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (explaining that

12

because the Securities Act is more "limited in scope" than the Exchange Act, "Section 11 places a relatively minimal burden on a plaintiff," requiring no showing of scienter).

### 1.    Statutory standing

To assert a claim under Section 11, a plaintiff must establish statutory standing by alleging that they can trace their shares back to the misleading registration statement. *Century Aluminum*, 729 F.3d at 1106. "When all of a company's shares have been issued in a single offering under the same registration statement," this "tracing" requirement will typically pose "no obstacle." *Id.* at 1106–07 (quoting *Twombly*, 550 U.S. at 557) (noting that in such a context, an allegation that plaintiff's shares are "'directly traceable' to the offering in question" with no "further factual enhancement" may "well suffice"). But where a company has issued shares in multiple offerings under more than one registration statement, satisfying the tracing requirement requires greater factual specificity. In that situation, a plaintiff must allege (1) that they purchased their shares directly in the relevant offering, or (2) that "their shares, although purchased in the aftermarket, can be traced back to the [relevant] offering." *Id.* This latter approach is "often impossible," because it "would require plaintiffs to trace the chain of title for their shares back to the [relevant] offering . . . ." *Id.* (quoting *Barnes v. Osofsky*, 373 F.2d 269, 271–72 (2d Cir. 1967)).

Here, Plaintiff alleges that he and other class members purchased shares "pursuant and/or traceable to the Registration Statement issued in connection with the [April 2023 IPO]." AC ¶ 342. If, as Plaintiff plausibly claims, Golden Heaven issued *all* publicly available shares in a single offering under one registration statement, Plaintiff's allegations are sufficient to establish statutory standing. Opposition to Golden Heaven Motion ("Opposition") 27 [Dkt. No. 85]; *Century Aluminum Co.*, 729 F.3d at 1106. Neither R.F. Lafferty nor Golden Heaven point to any other registration statement—or any evidence that renders Plaintiff's account implausible. Though Plaintiff acknowledges that outstanding shares existed prior to the IPO, he also suggests that these were unregistered shares held by Defendants and other insiders. Lafferty Motion at 3, 7; AC ¶ 150 (noting that CEO Jin owned 30 percent of Golden Heaven's outstanding shares prior to the IPO). Neither does Plaintiff's later purchase date or higher purchase price suggest that Golden Heaven

issued publicly available shares in a second registration statement.[4] Lafferty Motion at 7 (citing Complaint ¶¶ 37 and 45 [Dkt. No. 1], Ex. A (PSLRA Certification) 1–2 [Dkt. No. 1-1]). Plaintiff could have easily purchased his shares in the aftermarket in the months after the IPO when Golden Heaven's stock soared. Plaintiff's "theory of standing is straightforward, eminently plausible, and, indeed, highly likely."[5] *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1119 (N.D. Cal. 2014), *aff'd in part, rev'd in part and remanded*, 669 F. App'x 878 (9th Cir. 2016) (finding standing where plaintiffs alleged a single registration statement though plaintiffs could have theoretically purchased a small number of unrestricted shares not originating in the IPO). That suffices to survive a motion to dismiss.

### 2.    Sufficiency

Defendants also contend that, even if Plaintiff can establish standing, he fails to allege a claim under Sections 11 and 15. Golden Heaven Motion at 21–23; Lafferty Motion at 8. Defendants argue that Plaintiff fails to plead that Golden Heaven's registration statement contained material misrepresentations or omissions in accordance with Rule 9(b)'s heightened pleading standard. Golden Heaven Motion at 21–23; *Rubke*, 551 F.3d at 1161.[6]

---

[4] Jerrod Parks purchased his shares at prices ranging from $6.05 to a high of $19.62 per share between September 22, 2023 and November 3, 2023. Lafferty Motion at 7 (citing Complaint ¶¶ 37, 45 [Dkt. No. 1], Ex. A (PSLRA Certification) 1–2 [Dkt. No. 1-1]). Lead Plaintiff Rahul Patange purchased shares at between $17.01 to $22.14 per share on December 7, 2023. *Id.* at 6 n.5 (quoting Certification of Rahul Patange 4 [Dkt. No. 34-3]).

[5] *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1188 (9th Cir. 2025) is inapposite as there, the plaintiff "expressly waived any allegation of traceability." Golden Heaven's Notice of Supplemental Authority 2 [Dkt. No. 107]; *Pirani*, 127 F.4th at 1188 (noting that plaintiff, far from than alleging traceability, argued that tracing "is a concept that no longer exists in today's market and is not possible"). Plaintiff has not made such a waiver here.

In making this finding, the Court does not rely on Plaintiff's response to the Notice of Supplemental Authority. [Dkt. No. 108].

[6] The parties dispute whether Plaintiff's Securities Act claims are also subject to Rule 9(b)'s heightened pleading requirement. Golden Heaven Motion at 21–22; Opposition at 24. *See also Rubke*, 551 F.3d at 1161 (quoting *In re Daou Sys.*, 411 F.3d at 1027) ("Although the heightened pleading requirements of the PSLRA do not apply to section 11 claims . . . plaintiffs are required to allege their claims with increased particularity under Federal Rule of Civil Procedure 9(b) if their complaint

Plaintiff alleges that Golden Heaven's registration statement was "materially false and misleading," because it omitted risks associated with "(1) the low level of park attendance, (2) the accuracy of Golden Heaven's figures regarding park attendance and revenue, (3) the true, poor condition of Golden Heaven's rides and attractions." AC ¶¶ 272–78. In particular, he alleges that Golden Heaven omitted "material information relevant to an assessment of [its] financial condition" from its registration statement when it omitted information about its true valuation and its parks' visitors, staffing, and general conditions. *Id.* ¶ 273; 17 C.F.R. § 229.303. He also alleges that Golden Heaven omitted key risk factors by failing to disclose the true condition of its parks. AC ¶ 274 (citing 17 C.F.R. §229.105). That is more than sufficient. Plaintiff has pled with particularity omissions that "would have misled a reasonable investor about the nature of his or her investment." *Rubke*, 551 F.3d at 1161. Accordingly, Plaintiff has stated a claim under Sections 11 and 15 of the Securities Act.

**V.    CONCLUSION**

For the reasons set forth above, Golden Heaven's Motion to Dismiss is denied. Defendant R.F. Lafferty's Motion to Dismiss is denied in part and granted in part. Plaintiff's claim against R.F. Lafferty under Section 12 of the Securities Act has been voluntarily withdrawn and is therefore dismissed with prejudice. The remainder of R.F. Lafferty's motion is denied.

Dated: March 3, 2025

_____
Hernán D. Vera
United States District Judge

---

'sounds in fraud.'"). Even assuming that the heightened pleading standard applies, Plaintiff has met it.

15