**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs and the Class*

Additional counsel listed on the signature page.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CRAIG NOWAKOWSKI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>AXT, INC., MORRIS S. YOUNG, and GARY L. FISCHER,<br><br>Defendants. | ) | Case No. 3:24-cv-02778-MMC<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL<br><br>Judge: Hon. Maxine M. Chesney<br>Action Filed: May 6, 2024 |

# TABLE OF CONTENTS


**I. NATURE OF THE ACTION ........ 1**

**II. JURISDICTION AND VENUE ........ 9**

**III. PARTIES ........ 9**

**IV. SUBSTANTIVE ALLEGATIONS ........ 11**

**A. AXT, Tongmei, and the Importance of PBN Technology ........ 11**

**B. AXT's STAR Market Strategy and the $49 Million Redemption Exposure ........ 13**

**C. Mr. Zhang's Work at Guojing, His Subsequent Work for Tongmei, Guojing's Pre-Class-Period Notice to BoYu, and the Criminal Proceedings ........ 16**

**D. The January 2022 Initial Prospectus Framed an Existing Technology-Ownership Controversy as a Hypothetical Future Risk ........ 23**

**E. The February 2022 Police Search Made the Continued Hypothetical-Risk Framing Even More Misleading ........ 24**

**F. The Shanghai Stock Exchange Required a Direct Answer Concerning the Source of Tongmei's Technology and the Existence of Any Dispute ........ 24**

**G. Tongmei Conducted a Detailed, Guojing-Specific Investigation and Categorically Denied Any Infringement, Dispute, or Potential Dispute ........ 26**

**H. The Shanghai Stock Exchange Approved Tongmei's Application on a Record Containing Its Categorical Denials, and the August 1 Registration Package Carried the Same Disclosure Narrative Forward ........ 33**

**I. The CSRC Immediately Required Tongmei to Address the Trade-Secret Dispute and Criminal Case, Yet Tongmei Provided No Response to Resolve the Inquiry During the Class Period ........ 35**

**V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........ 36**

**A. March 23, 2021 Form 10-K ........ 36**

**B. January 10, 2022 Form 8-K ........ 37**

**C. March 15, 2022 Form 10-K ........ 40**

**D. June 16, 2022 Second-Round Reply, Legal Opinion, and June 17, 2022 Form 8- K ........ 42**

**E. August 2, 2022 Form 8-K and Registration Package ........ 44**

**F. October 27, 2022 Earnings Call ........ 46**

**G. February 16, 2023 Earnings Call ........ 46**

**H. March 16, 2023 Form 10-K ........ 47**

**I. April 27, 2023 Earnings Call ........ 47**

**J. August 3, 2023 Earnings Call ........ 48**

**K. November 2, 2023 Earnings Call ........ 49**

**L. February 22, 2024 Earnings Call ........ 49**

**M. March 15, 2024 Form 10-K ........ 50**

**VI. PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER ........ 51**

**A. Defendant Young Acted with Actual Knowledge or Deliberate Recklessness ........ 53**

**B. Defendant Fischer Acted with Actual Knowledge or Deliberate Recklessness ........ 59**

**C. AXT Acted with Corporate Scienter ........ 62**

**D. The Scienter Allegations Are Cogent and Compelling When Considered Holistically ........ 62**

**VII. LOSS CAUSATION ........ 65**

**A. Defendants' Statements Created and Maintained a Distinct IPO-Related Component of Inflation ........ 65**

**B. The April 4, 2024 J Capital Report Revealed an Integrated Concealed Condition, Not Merely a Half-Page IP Allegation ........ 66**

C. **The J Capital Report's Six Numbered Problems and Additional Accusations Did Not Carry Equal Incremental Informational Content ... 68**

D. **The Six Problems and Additional Accusations Cannot Be Treated as Equally New or Equally Corrective ... 76**

E. **Analyst Commentary Distinguishing the IPO and Redemption Issues, Together with the Limited April 8 Rebound, Further Supports the IPO-Related Causal Inference ... 77**

F. **The IPO-Related Corrective Information Was One Substantial Cause and a Substantial Factor Contributing to the Loss ... 78**

G. **SEDA's Event Study and Information-Content Analysis Support That the IPO-Related Corrective Information Was an Economically Material Contributor to the April 4–5, 2024 Decline ... 80**

H. **The July 2026 Withdrawal Occurred Under Materially Different Financial and Market Conditions ... 81**

**VIII. THE OMITTED CHINESE-LANGUAGE INFORMATION WAS NOT CREDIBLY AVAILABLE TO REASONABLE U.S. INVESTORS ... 82**

A. **The Criminal Escalation and IPO Obstruction Were Not Disseminated Through Ordinary U.S. Market Channels ... 82**

B. **The Chinese Financial Reporting Concerning the Criminal Case and IPO Obstruction Was Not Part of Ordinary U.S. Investor Information Channels ... 83**

C. **Defendants' Selected English-Language Disclosures Did Not Place the Omitted Truth on the Market ... 83**

**IX. PLAINTIFFS' CLASS ACTION ALLEGATIONS ... 85**

**X. COUNTS ... 87**

A. **COUNT I - For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants ... 87**

B. **COUNT II - Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ... 89**

**XI. PRAYER FOR RELIEF.......... 90**

**XII. JURY TRIAL DEMANDED.......... 90**

**DEFINED TERMS**

| **Defined Term** | **Definition** |
|---|---|
| **"Initial Prospectus"** | Tongmei's initial prospectus submitted to the Shanghai Stock Exchange ("SSE") with its application for an initial public offering and STAR Market listing. The SSE accepted the application for review on January 10, 2022, and AXT furnished an English translation as Exhibit 99.1 to its January 10, 2022 Form 8-K. Available at https://www.sec.gov/Archives/edgar/data/1051627/000155837022000165/0001558370-22-000165-index.htm. |
| **"June 16 Second-Round Reply"** | Tongmei's and Haitong Securities Co., Ltd.'s ("Haitong") June 16, 2022 Reply to the Second Round Audit Inquiry Letter on Tongmei's STAR Market application. It responded to the SSE's April 26, 2022 second-round inquiry and addressed the source of Tongmei's technologies, Guojing's Report Letter, Zhang's work for the BoYu entities, alleged trade-secret infringement, and the existence of any dispute or potential dispute. AXT furnished an English translation as Exhibit 99.1 to its June 17, 2022 Form 8-K. Exhibit 99.1 is available at https://www.sec.gov/Archives/edgar/data/1051627/000155837022010098/axti-20220617xex99d1.htm ; https://www.sec.gov/Archives/edgar/data/1051627/000155837022010098/0001558370-22-010098-index.htm; Form 8-K is availabe at https://www.sec.gov/Archives/edgar/data/1051627/000155837022010098/0001558370-22-010098-index.htm. |
| **"June 16 Supplemental Legal Opinion II"** | King & Wood Mallesons' ("KWM") June 16, 2022 Supplementary Legal Opinion (II) on Tongmei's STAR Market offering. Issued by Tongmei's IPO counsel, it accompanied the June 16 Second-Round Reply and addressed KWM's investigation of Guojing's allegations and its conclusions on independent development, noninfringement, and the absence of any dispute or potential dispute. AXT furnished an English translation as Exhibit 99.2 to its June 17, 2022 Form 8-K, available at https://www.sec.gov/Archives/edgar/data/1051627/000155837022010098/axti-20220617xex99d2.htm. |
| **"August 1 Registration Prospectus"** | Tongmei's prospectus, designated the Draft for Registration, submitted after the SSE Listing Committee approved the application and it advanced to the registration stage. The CSRC accepted the registration application on August 1, 2022, and AXT furnished an English translation as Exhibit 99.1 to its August 2, 2022 Form 8-K. Exhibit 99.1 is available at https://www.sec.gov/Archives/edgar/data/1051627/000155837022011572/axti-20220801xex99d1.htm. |
| **"August 1 Registration Package"** | The registration-stage materials the CSRC accepted for review on August 1, 2022, comprising the August 1 Registration Prospectus, Haitong's sponsorship letters, KWM's registration-stage legal opinion, and Tongmei's audited |

| Defined Term | Definition |
| --- | --- |
| | financial statements. AXT furnished English translations as exhibits to its August 2, 2022 Form 8-K. Form 8-K is available at https://www.sec.gov/Archives/edgar/data/1051627/000155837022011572/0001558370-22-011572-index.htm. |
| **"Criminal Judgment"** | The June 13, 2025 criminal judgment of the Yucheng City People's Court of Shandong Province in People's Procuratorate of Yucheng City v. Zhang Jiawei, Case No. (2024) Lu 1482 Xing Chu No. 114, attached hereto as Exhibit 23. It convicted Zhang of infringing Guojing's trade secrets, sentenced him to one year and seven months' imprisonment, imposed a RMB 300,000 fine, and made findings concerning his use and disclosure of Guojing's confidential technical information in work for the BoYu entities and in connection with Chinese Patent No. CN110662314B. |

**LIST OF EXHIBITS ATTACHED HERETO**

| Exhibit | Description |
|---|---|
| **1** | Shanghai Stock Exchange ("SSE") website screenshots showing the English-language home page and the navigation path to the STAR Market and IPO-company-information sections. |
| **2** | SSE website screenshots showing the Issuance and Listing / Disclosure of Review Information pages and the Review Project Updates function. |
| **3** | SSE Review Project Updates search results for Beijing Tongmei Xtal Technology Co., Ltd., showing the project's review status and identifying its sponsor, law firm, and accounting firm. |
| **4** | SSE project-detail page for Beijing Tongmei Xtal Technology Co., Ltd.'s STAR Market IPO, showing the January 10, 2022 filing date, review status, and disclosure history for the filing draft, listing-committee draft, registration draft, inquiry letters, and responses. |
| **5** | Economic Herald / Eagle Eye IPO Watch article, "Exclusive: Obstacles for Beijing Tongmei Xtal's IPO as Investigation Concludes in the 'Shandong Guojing Trade Secret Infringement Case'—Criminal Prosecution Pending," dated March 14, 2023, together with an English translation. The article was cited and incorporated in J Capital's April 4, 2024 report. |
| **6** | Koukoucaixun article, "After More Than 14 Months of Submitting the Registration, the Approval Still Remains Elusive: Why Is Beijing Tongmei's IPO Journey to Listing So Long and Fraught with Difficulties?" (Oct. 19, 2023), together with an English translation. The article was cited and incorporated in J Capital's April 4, 2024 report. |
| **7** | China Securities Regulatory Commission ("CSRC"), Beijing Tongmei Xtal Technology Co., Ltd. Registration Stage Inquiry Questions (Aug. 10, 2022), together with an English translation. |
| **8** | J Capital Research, "AXTI May Be on the Brink of Collapse: Chinese Headlines Say Its Local IPO Has Failed. Its Revenue Is Plummeting and Creditors Are at the Door—The Chinese Reports AXTI Doesn't Want You to See", dated April 4, 2024. |
| **9** | CSRC website screenshots showing the path from the CSRC home page to the government-information and STAR Market registration-review materials relevant to Beijing Tongmei. |
| **10** | CSRC Government Affairs Information / Government Information Disclosure directory screenshots relevant to locating Beijing Tongmei's registration-stage materials. |

| Exhibit | Description |
|---|---|
| **11** | CSRC "View by Topic" search results identifying Beijing Tongmei's Registration Stage Inquiry Questions dated August 10, 2022 and reflecting no published response from Tongmei. |
| **12** | Shandong Guojing New Materials Co., Ltd. invention patent, Application No. 201810752512.1, Publication No. CN108892541A, Grant No. CN108892541B, filed July 10, 2018, naming Zhang Jiawei as a co-inventor, together with an English translation. |
| **13** | Shandong Guojing New Materials Co., Ltd. invention patent application, Application No. 201810480872.0, Publication No. CN108517511A, filed May 18, 2018, naming Zhang Jiawei as a co-inventor, together with an English translation. |
| **14** | Shandong Guojing New Materials Co., Ltd. invention patent, Application No. 201810479625.9, Publication No. CN108545914A, Grant No. CN108545914B, filed May 18, 2018, naming Zhang Jiawei as a co-inventor, together with an English translation. |
| **15** | Shandong Guojing New Materials Co., Ltd. utility-model patent, Application No. 201820745273.2, Grant No. CN208250152U, filed May 18, 2018, naming Zhang Jiawei as a co-inventor, together with an English translation. |
| **16** | Shandong Guojing New Materials Co., Ltd. invention patent, Application No. 201810753176.2, Publication No. CN108863443A, Grant No. CN108863443B, filed July 10, 2018, naming Zhang Jiawei as a co-inventor, together with an English translation. |
| **17** | Economic Herald article, "'Registration Holdout' Receives New Development: Employee Convicted of Trade-Secret Infringement; Shandong Guojing to Bring Civil Action Against the Company", dated August 11, 2025, together with an English translation. |
| **18** | Wedbush Securities Inc. Research Division, "Does 'J' Stand for 'Just Lazy Speculation'?", dated April 8, 2024. |
| **19** | The National Enterprise Credit Information Publicity System ("NECIPS") registration records for Beijing BoYu Semiconductor Vessel Craftwork Technology Co., Ltd., including principal-personnel and social-insurance enrollment information. |
| **20** | NECIPS registration records for BoYu (Tianjin) Semiconductor Materials Co., Ltd., including principal-personnel and social-insurance enrollment information. |
| **21** | NECIPS registration records for BoYu (Chaoyang) Semiconductor Materials Co., Ltd., including principal-personnel and social-insurance enrollment information. |
| **22** | China National Intellectual Property Administration patent record for Application No. 201910855023.3, published as CN110662314A and granted as CN110662314B, "A |

| Exhibit | Description |
|---|---|
| | Heater and Method for Preparing the Same," filed September 10, 2019 by BoYu (Tianjin) Semiconductor Materials Co., Ltd. and BoYu (Chaoyang) Semiconductor Materials Co., Ltd., naming He Junfang as inventor. |
| **23** | Yucheng City People's Court, Criminal Judgment in People's Procuratorate of Yucheng City v. Zhang Jiawei, Case No. (2024) Lu 1482 Xing Chu No. 114 ((2024) 鲁 1482 刑初 114 号), issued June 13, 2025, together with a certified English translation. |
| **24** | Tianyancha search results and underlying litigation records identifying twelve legal proceedings involving Beijing Tongmei, including three wage-related disputes totaling approximately RMB 421,887.60. |

Lead Plaintiff Charles Grubb and named plaintiff Craig Nowakowski ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following on personal knowledge as to themselves and their own acts, and on information and belief as to all other matters. Plaintiffs' allegations rest on counsel's investigation, which included review of Defendants' public filings, press releases concerning AXT, Inc. ("AXT" or the "Company"), Chinese regulatory and judicial records, and information obtainable on the Internet. Additional evidentiary support will likely exist after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. Plaintiffs bring this class action for all persons and entities that purchased AXT, Inc. ("AXT" or the "Company") common stock between March 23, 2021 and April 3, 2024 (the "Class Period") and were damaged thereby, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5.

2. AXT is a NASDAQ-listed materials-science company. It conducts its manufacturing, research and development, and revenue-producing operations in the People's Republic of China ("China") through Beijing Tongmei Xtal Technology Co., Ltd. ("Tongmei") and Tongmei's wholly owned entities. At December 31, 2021, Tongmei employed approximately 1,396 of AXT's 1,399 employees and generated approximately 97% of AXT's consolidated revenue.

3. Beginning in November 2020, Defendants promoted a "strategic plan" to list Tongmei on the Shanghai Stock Exchange's STAR Market. Defendants told investors the IPO would unlock the value of AXT's Chinese assets, replenish cash, strengthen the balance sheet with minimal dilution, increase customer confidence, fund expansion and new-product development, and create substantial value for AXT's U.S. shareholders.

4. That promotion moved AXT's stock. On the first trading day after the announcement, AXT common stock rose approximately 23.3%. Analysts covering AXT treated the listing as a significant valuation catalyst. Craig-Hallum Capital Group stated that AXT's valuation was likely to increase as the listing approached and estimated as much as 200% upside from a successful listing. Needham & Company treated completion as part of the "bull" case and failure as part of the "bear" case.

5. To qualify for listing, AXT and Tongmei raised approximately $49 million from Chinese private-equity funds for a minority interest in Tongmei. The agreements gave the funds redemption rights if the application was rejected or withdrawn, and Defendants acknowledged that "[a]ny redemptions could have a material adverse effect on our business, financial condition and results of operations." Once the application was accepted for review, redemption was deferred while it remained pending. The application's pendency therefore preserved anticipated IPO value while postponing a substantial cash obligation.

6. Throughout the Class Period, Defendants told investors that Tongmei's technology was lawfully developed, that Tongmei faced only hypothetical intellectual-property risks, and that its application was progressing through ordinary review. None of that was true. A serious dispute had engulfed the listing over whether ZHANG Jiawei ("Zhang"), a former employee of Shandong Guojing New Materials Co., Ltd. ("Guojing"), used Guojing's trade secrets to develop products and obtain patents for Tongmei's wholly owned BoYu operations.

7. Tongmei directly owned 100% of Beijing BoYu Semiconductor Vessel Craftwork Technology Co., Ltd. ("Beijing BoYu"), which directly owned 100% of BoYu (Tianjin) Semiconductor Materials Co., Ltd. ("Tianjin BoYu") and 100% of BoYu (Chaoyang) Semiconductor Materials Co., Ltd. ("Chaoyang BoYu"). AXT's SEC filings identified those two

as Beijing BoYu's only subsidiaries. The challenged conduct thus occurred inside Tongmei's consolidated business, not at a remote affiliate.

8. Throughout the Class Period, Defendant Morris S. Young ("Young") was the legal representative and Chairman of Beijing BoYu, Tianjin BoYu, and Chaoyang BoYu, and Defendant Gary L. Fischer ("Fischer") was a director of all three. Chinese State Administration for Market Regulation ("SAMR") records list them among only four or five registered principal personnel at each company, each of which reported basic-pension enrollment of no more than approximately 113 persons. Young and Fischer thus governed the three compact entities tied to Zhang's employment, the disputed R&D data, the accused products, and the patent.

9. According to CW-1, Guojing first suspected misuse in approximately September or October 2019, after customers reported that a competitor had reproduced several Guojing products unusually quickly. Guojing's investigation identified Beijing BoYu. Liu Ruqiang, Guojing's legal representative and General Manager, then asked Mr. He Junfang ("He")—the second-ranking executive immediately below Young, of all three BoYu entities—whether BoYu was using Guojing's technology. He denied it.

10. CW-1 further stated that in early 2020 Guojing learned that a former Guojing technical employee had joined BoYu. After confirming that Zhang had joined Tianjin BoYu and worked from Beijing BoYu's premises, Guojing sent Beijing BoYu a written notice demanding that it cease the infringement. Beijing BoYu never responded in writing, and Mr. He continued to deny the allegation orally.

11. In May 2019, Zhang joined Tianjin BoYu but worked from Beijing BoYu's premises. The Criminal Judgment later found that he disclosed and used Guojing's confidential

process parameters to develop composite heaters for Tianjin BoYu and Chaoyang BoYu and helped obtain patent protection for them. *See* Ex. 23 at 2, 18–25.

12. AXT issued the first challenged statement on March 23, 2021, warning only that third parties "may" claim proprietary rights, that AXT "could become" subject to intellectual-property claims, and that AXT "could in the future" face similar litigation. By then Guojing had raised the misuse with He, had sent Beijing BoYu a written demand to cease, and the BoYu entities had filed a composite-heater patent application using work later adjudicated to contain Guojing's protected information. The claim was concrete, not hypothetical.

13. In September 2021, Guojing reported to the Yucheng City Public Security Bureau that Zhang and Tongmei had infringed its trade secrets. On October 13, 2021, the Bureau found the matter met the criteria for case initiation and opened a criminal investigation concerning Zhang, R&D data, and patenting activity within Tongmei's wholly owned business. *See* Ex. 4 at 5; *see also* Ex. 23 at 5.

14. On January 10, 2022, the Shanghai Stock Exchange accepted Tongmei's Initial Prospectus, which AXT furnished in English through a Form 8-K signed by Fischer. Young signed the Initial Prospectus as a Tongmei director and AXT's authorized representative. It omitted Guojing's notice, the police complaint, and the criminal case; described competitor IP disputes only as risks that "may" arise; and represented that ownership of Tongmei's core technologies was clear and undisputed.

15. On February 23, 2022, police detained Zhang, searched his workplace at Beijing BoYu, and seized items related to his work. The search occurred at the operating premises of companies Young legally represented and chaired and on whose boards Fischer sat—before

AXT's March 15, 2022 Form 10-K and before Tongmei's June 2022 regulatory denial. *See* Ex. 23 at 1, 5–7.

16. During the Exchange's review, Guojing submitted a Report Letter alleging that Tongmei and Zhang had infringed its trade secrets. The Exchange required Tongmei to explain the source of its technologies, whether they originated in work performed for former employers, whether infringement had occurred, and whether any dispute or potential dispute existed.

17. Tongmei and King & Wood Mallesons ("KWM"), its IPO counsel, then investigated Guojing's allegations in detail. KWM reviewed records of Zhang's employment, his obligations to Guojing, his departure, his financial activity, his communications, his ownership interests, and his written and legal explanations. According to the Criminal Judgment, Zhang's own attorneys were also KWM attorneys. KWM interviewed Tongmei's core technicians, its PBN research-and-development leaders, responsible personnel at Beijing BoYu, Young, and Tongmei's General Manager.

18. Tongmei's own materials admitted that Zhang was "chiefly responsible" for R&D on auxiliary PG and PBN-PG composite heaters, yet portrayed him as a non-core employee of limited contribution who "has not formed any patent in the Company." Tongmei's independent-development explanation rested substantially on the prior technical work of He—a founder, senior manager, material indirect Tongmei shareholder, and the named inventor on the BoYu patent later identified in the Criminal Judgment.

19. KWM stated that its conclusions—independent development, no infringement, and no dispute or potential dispute—were confirmed through counsel's interview with Young. Young then signed the Second-Round Reply containing the categorical denial of "any dispute or potential dispute between the Company and relevant entity [i.e. Guojing]" and certified that he

had carefully read the entire response, that it contained no false record, misleading statement, or material omission, and that he accepted responsibility for its accuracy and completeness. Fischer signed the Form 8-K furnishing the Reply and KWM opinion to U.S. investors.

20. On July 12, 2022, the Shanghai Stock Exchange approved Tongmei's application on a record containing Tongmei's categorical denials but omitting the criminal investigation and related process. The application then advanced to the CSRC registration stage.

21. The CSRC accepted Tongmei's registration application on August 1, 2022. CW-1, acting on Guojing's behalf, reported the dispute to the CSRC. On August 10, 2022, the CSRC issued an inquiry of two questions. The first, titled "Regarding Trade Secret Disputes," required Tongmei to explain the dispute's progress; whether a public-security agency had established, or was likely to establish, a case against Tongmei or its subsidiaries; whether the matter constituted a corporate crime; and whether it obstructed the IPO. The CSRC also required Tongmei's sponsor and IPO counsel to verify those matters and give clear opinions. *See* Ex. 7 at 4–5.

22. No response to those two questions was filed during the Class Period, and the application did not advance to registration. Defendants nevertheless repeatedly described the questions as ordinary, dialogue as active, responses as underway, progress as continuing, and approval as expected in the coming months.

23. By May 2023 the investigation had reached the BoYu companies directly. Police went to Beijing BoYu for evidence concerning the composite heaters, served inquiry notices on senior personnel, and received written responses in May, August, and September 2023. Police also sought evidence from Chaoyang BoYu, which responded that the relevant process materials were stored on Zhang's seized computer and the company could send its personnel to retrieve, print, and submit the materials with Chaoyang BoYu's official seal. *See* Ex. 23 at 5–6.

24. On October 27, 2022, Fischer called the CSRC questions "normal and customary" and predicted approval "soon." On February 16 and April 27, 2023, he said AXT had "active dialogue" with the CSRC, was responding to "a couple of additional items," and expected approval "in the coming months." Those statements omitted the trade-secret and criminal issue the CSRC had identified and the companies' ongoing dealings with law enforcement.

25. On August 3, 2023, Young said AXT relied heavily on its Chinese "bankers" [i.e. underwriters]; that "these 2 little question[s]" had taken unexpectedly long; that AXT had provided "really good answers"; that he had repeatedly reported expected approval timing to AXT's Board; and that only "one question" remained.

26. On November 2, 2023, Fischer told investors that only "one open item" remained, that "Morris is in China as we speak and is working on this matter," that AXT was "making progress," and that Tongmei would be approved to proceed. Young joined the same call from China, spoke immediately afterward, and did not correct or qualify Fischer's account of his personal involvement.

27. Zhang was detained again on December 23, 2023 and formally arrested on January 5, 2024. Nevertheless, on February 22, 2024, Fischer again said one open item remained, progress was being made, and Tongmei remained an excellent listing candidate. Young said progress might be "less visible externally" but remained confident the IPO could be completed.

28. These allegations do not rest on titles or theoretical access. Young governed the three BoYu entities; led Tongmei's technology organization; was interviewed in the Guojing-specific investigation; certified the categorical denial; knew the exact number of CSRC questions and graded Tongmei's answers; identified the sponsor and underwriter team as his source; briefed AXT's Board; and worked in China on the remaining item. Fischer governed the same entities,

was described by Young as "very much involved" in the IPO process "every day," repeatedly disseminated the regulatory narrative, knew Young was working on the sole remaining item, and understood that pendency deferred the approximately $49 million redemption rights.

29. On April 4, 2024, before the market opened, J Capital Research ("J Capital") issued a report on AXT. It did not merely disclose an isolated half-page IP allegation. Its title, opening summary, and financial discussion revealed to U.S. investors that Chinese reporting indicated Tongmei's local IPO had failed or been blocked, that the undisclosed trade-secret dispute and criminal proceedings were a material reason it could not advance, and that, because pendency deferred redemption, the impasse made AXT's approximately $49 million exposure concrete.

30. On this news, AXT's stock price declined $1.73 per share, or approximately 34.94%, from $4.95 on April 3, 2024 to $3.22 on April 4, 2024, followed by an additional approximately 3.4% decline on April 5, 2024.

31. The Report's accusations did not carry equal incremental informational content: its lengthy non-IP discussions rested on facts AXT had already disclosed in English-language SEC filings, to which J Capital added adverse characterizations and calculations. Analysts singled out the IPO-related exposure as the "Real Risk."

32. On July 8, 2026, AXT disclosed that Tongmei had withdrawn its STAR Market application and that the withdrawal gave the funds the contractual right to require redemption of $49 million invested in Tongmei.

33. Defendants thereby caused AXT common stock to trade at artificially inflated prices. When the market learned that Tongmei's IPO had stalled or been blocked, that the obstruction involved the undisclosed trade-secret and criminal matter, and that the blockage

materially increased the financial risk attached to the $49 million investment, that inflation dissipated, causing substantial losses to Plaintiffs and the Class.

## II. JURISDICTION AND VENUE

34. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

35. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

36. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because AXT maintained its headquarters in this District, material acts and omissions occurred here, and the alleged misstatements were issued from or approved in this District.

37. In connection with the acts alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, the Internet, SEC filing systems, earnings calls, and facilities of a national securities exchange.

## III. PARTIES

38. Lead Plaintiff Charles Grubb, as set forth in his PSLRA Certifications on file with the Court (Dkt. Nos. 17-3 and 17-4) and incorporated herein, purchased AXT common stock during the Class Period and suffered damages as a result of the violations alleged herein.

39. Named Plaintiff Craig Nowakowski, as set forth in his PSLRA Certification on file with the Court (Dkt. No. 1-1) and incorporated herein, purchased AXT common stock during the Class Period and suffered damages as a result of the violations alleged herein.

40. Defendant AXT is incorporated in Delaware and maintained its principal executive offices at 4281 Technology Drive, Fremont, California 94538. AXT's common stock traded on NASDAQ under the ticker symbol "AXTI."

41. Defendant Tongmei was AXT's principal Chinese operating subsidiary and the proposed STAR Market issuer. It directly owned Beijing BoYu, which directly owned Tianjin BoYu and Chaoyang BoYu. The alleged conduct therefore occurred within a wholly owned chain consolidated into Tongmei's business and IPO application.

42. Defendant Young served throughout the Class Period as AXT's Chief Executive Officer and Chairman of its Board; as Tongmei's Chairman and legal representative; as legal representative and Chairman of Beijing BoYu, Tianjin BoYu, and Chaoyang BoYu; as one of Tongmei's four core technicians; and as the executive AXT's Board authorized to promote Tongmei's IPO.

43. Defendant Fischer served throughout the Class Period as AXT's Chief Financial Officer, Vice President, and Corporate Secretary, and as a director of Beijing BoYu, Tianjin BoYu, and Chaoyang BoYu.

44. Defendants Young and Fischer are referred to collectively as the "Individual Defendants." AXT and the Individual Defendants are referred to collectively as "Defendants."

45. The Individual Defendants controlled AXT's public statements and exercised that control through SEC filings, press releases, prepared earnings-call remarks, and answers to analysts. Each statement attributed to them below was made within the scope of his authority and on AXT's behalf.

46. AXT is liable for statements and conduct of its senior officers and authorized agents undertaken within the scope of their employment and apparent authority. The scienter of Young and Fischer is imputed to AXT as alleged below.

## IV. SUBSTANTIVE ALLEGATIONS

### A. AXT, Tongmei, and the Importance of PBN Technology

47. AXT develops and produces semiconductor substrates, or wafers, for applications in which silicon cannot meet performance requirements, and sells raw materials used to make them, including purified gallium, indium-phosphide materials, and PBN products. AXT manufactured substantially all of its products in China. Tongmei employed nearly all of AXT's personnel and generated nearly all of its revenue, so AXT's public-company value depended on Tongmei's operations, technology, regulatory status, and access to capital. Tongmei described itself in the Initial Prospectus as a "world-renowned semiconductor materials technology company."

48. Pyrolytic boron nitride, or PBN, is a high-purity ceramic used in crucibles to produce compound semiconductors and in molecular-beam epitaxy. Its uses are expanding to include high-functional PG (pyrolytic graphite)/PBN heaters for semiconductors and thin films for photovoltaic power generation. Tongmei's Initial Prospectus described PBN and high-purity materials as two "wings" supporting its substrate business and stated that PBN production involved significant technological complexity, high added value, and limited stable mainland supply.

49. Tongmei conducted its PBN operations through Beijing BoYu, Tianjin BoYu and Chaoyang BoYu. Tongmei's prospectus described Beijing BoYu as principally engaged in PBN research, development, production, and sale within Tongmei's main business. In 2021, PBN

crucibles contributed approximately 6.44% of Tongmei's revenue and crucible recycling and other PBN sales approximately 5.88%. Tongmei identified PBN technologies among its core technologies, listed multiple PBN patents, and described ongoing PBN research-and-development projects assigned to BoYu's team.

50. Tongmei's prospectus identified Young as one of only four core technicians and stated that he led its technology team, determined technical routes, and guided selection of key equipment and consumables. Young was simultaneously legal representative and Chairman of Tongmei and of each of the three BoYu entities through which the PBN, composite-heater, and patenting activities were conducted. Fischer was a director of all three.

51. In China, the legal representative legally represents the company; every company must have one, typically the board chairman, executive director, or general manager. Under the Civil Code of the People's Republic of China, a company bears the legal consequences of civil activities the legal representative conducts in its name. The legal representative is a central figure in the company's day-to-day operations, possessing authority that can determine its direction.

52. Public NECIPS corporate-registration records[1] identified only five registered principal personnel at Beijing BoYu: Young as Chairman, Fischer as a director, He Junfang as Vice Chairman and General Manager, a supervisor, and a finance officer. The same records identified only four at Tianjin BoYu—Young as Chairman, Fischer as a director, He as director and General Manager, and one supervisor—and only five at Chaoyang BoYu, in the same roles as at Beijing BoYu. See Exs. 19–21. During the Class Period, Beijing BoYu reported basic-

[1] The National Enterprise Credit Information Publicity System ("NECIPS") is the official Chinese government database for corporate-registration and enterprise-credit information, administered by the SAMR.

pension enrollment of approximately 91 to 106 persons, Tianjin BoYu approximately 59 to 77, and Chaoyang BoYu approximately 92 to 113. See Exs. 19-21.

53. Young and Fischer were thus two of only four or five registered principal personnel at each of three compact operating entities. Those roles establish a direct corporate and operational nexus to the disputed conduct and materially strengthen the scienter inference when considered with Young's technical leadership and participation in the Guojing investigation, Fischer's acknowledged daily involvement in the IPO, and both Defendants' repeated descriptions of the regulatory questions and response process.

**B. AXT's STAR Market Strategy and the $49 Million Redemption Exposure**

54. On November 16, 2020, AXT announced a "strategic plan to access China's capital markets" by listing Tongmei on the STAR Market. Young explained that, having largely completed the relocation to China, AXT was positioned to seize "some of the biggest, most influential technology trends of the next decade," which required additional cash. Listing would "give[] us the ability to replenish our cash and increase our market value for our shareholders with minimal dilution," and "[s]trengthening our balance sheet can give our customers greater confidence in our ability to support at scale the strong, expected demand for our strategic compound semiconductor materials." The press release named Fischer as the contact person.

55. The November 16, 2020 Press Release also announced that, to meet the STAR Market listing standard, AXT and Tongmei had entered and would enter investment agreements to secure approximately $50 million from private equity firms "[i]n exchange for approximately a 7.14 percent minority interest in Tongmei." It expressly noted that "AXT's ability to retain these investments is contingent upon a successful completion of the STAR Market listing." (Emphasis added.)

56. Investors responded enthusiastically to the November 16, 2020 announcement, driving AXT's share price from a $7.84 close on November 16, 2020 to $9.67 on November 17, 2020—a 23.3% one-day gain.

57. On November 19, 2020, AXT filed a Form 8-K ("November 19, 2020 Form 8-K") detailing the investment agreements. It stated that "[o]n November 13, 2020, AXT and Tongmei entered into two sets of definitive transaction documents" with Chinese private equity investors. For an approximately 7.14% minority interest, the firms would invest approximately $50 million in two tranches, and AXT and Tongmei granted them the right to redeem any or all shares at the original purchase price, without interest, upon a material adverse change or if Tongmei failed to achieve its STAR Market IPO by December 31, 2022. The first-tranche investors had signed; the second had not. The Form 8-K stated:

> Under the First Supplemental Agreements and Second Supplemental Agreements, if the Listing has not been completed and the China Securities Regulatory Commission (the "CSRC") has not otherwise approved Tongmei's Listing application by December 31, 2022, then ***each Investor will have the right to require AXT to repurchase such Investor's Placement Shares*** at a price equal to the initial purchase price paid by such Investor, without interest.

(Emphasis added.)

58. Defendant Fischer signed the November 19, 2020 Form8-K.

59. On December 31, 2020, AXT filed a Form 8-K ("December 31, 2020 Form 8-K") reporting that the first tranche of the private-equity investment had funded. On February 18, 2021, AXT filed a Form 8-K ("February 18, 2021 Form 8-K") reporting fourth-quarter and fiscal-year 2020 results. Its "STAR Market Listing Update" section stated that "[i]n January 2021, AXT completed the private equity investment funding in Tongmei," and reported that the firms had invested approximately $49 million for an approximately 7.28 percent minority interest. Fischer signed it.

60. On March 23, 2021, AXT filed its 2020 Annual Report, signed by Young and Fischer. It disclosed that if Tongmei's IPO application was submitted to and accepted by the Shanghai Stock Exchange for review by December 31, 2022, the investors' redemption rights were suspended until the Exchange or the CSRC rejected the application or Tongmei withdrew it. The 2020 Annual Report stated:

> In exchange for an investment of approximately $49 million, the Investors received a 7.28% noncontrolling interest in Tongmei. Pursuant to the investment agreements ("Capital Investment Agreements") with the Investors, each Investor has the right to require AXT to redeem any or all Tongmei shares held by such Investor at the original purchase price paid by such Investor, without interest, in the event of a material adverse change or if Tongmei does not achieve its IPO on or before December 31, 2022. This right is suspended when Tongmei submits its formal application for IPO to the China Securities Regulatory Commission ("CSRC"). Tongmei currently plans to submit its formal application to the CSRC in the third quarter of 2021. However, if on December 31, 2022 the IPO application has been submitted and accepted by the CSRC or the stock exchange and such submission remains under review, then the date when such investor is entitled to exercise such redemption right shall be deferred to a date when such submission is rejected by the CSRC or stock exchange, or the date when Tongmei withdraws its IPO application.

61. The 2020 Annual Report also acknowledged, as a material risk factor under Item 105 of Regulation S-K, that "[a]ny redemptions could have a ***material adverse effect*** on our business, financial condition and results of operations." (Emphasis added.) Every AXT annual report filed during the Class Period contained the same acknowledgment.

62. The market assigned significant value to the transaction. On June 25, 2021, Craig-Hallum Capital Group published "STARstruck: AXTI Trading At 30%+ Discount to Likely STAR Market Valuation", stating, "we believe AXTI's valuation in the US is likely to significantly increase as Tongmei's STAR Market listing approaches." Comparing Tongmei with a similar company further along in the STAR process, the report concluded that on a successful listing "we see as much as 200% upside potential to AXT[]'s stock."

63. On October 28, 2022, Needham published "Despite Macro Headwinds, AXTI Appears Oversold; Reduce PT to $6 & Reit Buy," identifying Tongmei's successful IPO by the end of 2022 as key to the "bull" case and failure to list as contributing to the "bear" case. Needham reaffirmed its "Buy" rating because Tongmei's anticipated Q4 2022 offering would allow "its tangible book value to grow and to provide stronger valuation support to the stock."

64. Throughout the Class Period, each of AXT's quarterly Form 8-K results releases—roughly six pages, filed every three months—contained a "STAR Market Listing Update" reporting the status of Tongmei's application, and Fischer signed each one. AXT's Forms 10-Q and 10-K contained fuller updates, and Young and Fischer signed those. Management repeatedly addressed the IPO's progress, regulatory steps, expected timing, anticipated financial benefits, and effect on AXT's balance sheet and valuation. The IPO was not a peripheral subject.

**C. Mr. Zhang's Work at Guojing, His Subsequent Work for Tongmei, Guojing's Pre-Class-Period Notice to BoYu, and the Criminal Proceedings**

a. <u>Zhang's Work at Guojing and His Access to Guojing's Protected Technical Information</u>

65. Official records of the China National Intellectual Property Administration identify Zhang as a co-inventor on four Guojing invention-patent filings and one utility-model filing, each filed before he left Guojing on October 25, 2018. Three concern PBN-PG composite heaters and related technologies; the fourth concerns PBN coatings. These records corroborate that Zhang performed substantive technical work in the same field later implicated by the Guojing dispute, the BoYu development project, and Chinese Patent No. CN110662314B. See Exs. 12–16.

66. The Criminal Judgment states that Zhang worked for Guojing from July 11, 2016 to October 25, 2018 and, on joining, executed a Confidentiality and Intangible Asset Use and

Protection Agreement covering product-process routes, original research and production records, production formulas, and technical achievements developed by Guojing employees. The agreement imposed a three-year post-employment noncompetition obligation and barred disclosure of Guojing's trade secrets even after that period. Guojing also restricted access to internal technical records, required individually controlled company email accounts, and required departing employees to return credentials and work materials. The court found those measures sufficient to protect the information at issue. *See* Ex. 23 at 1–2, 12–13, 22–23.

67. The Criminal Judgment, attached hereto as Exhibit 23 and incorporated herein by reference, recounts extensive documentary and testimonial evidence that Zhang's work at Guojing was central, technical, and continuous. Zhang led Guojing's development of boron-doped PBN-PG composite heaters; formulated production processes; directed workshop personnel; advanced the project's production technology; communicated with customers and with Guojing's Japanese technical expert about proposed modifications; and participated throughout development of cylindrical composite heaters. He compiled and organized all process documents, experimental records, test results, and technical data the project generated, and understood the process-parameter combinations for Guojing's boron-doped planar, pure-PG planar, and boron-doped cylindrical composite heaters. He also compiled PG-process information, revised precision-processing procedures, and tracked heater-testing results.

68. Confidential Witness 1 ("CW-1") has worked for Shandong Guojing New Materials Co., Ltd. since 2016 and currently serves as Director of its Production Technology Department. CW-1 is a core technician and engineer who worked in Guojing's production-technology function throughout Zhang's employment. CW-1 had direct, personal knowledge of Guojing's development of PBN-PG composite heaters and related products, of Zhang's role in

those projects, and of Guojing's later investigation and enforcement efforts. CW-1 participated in identifying the suspected misuse, in confirming Zhang's employment at BoYu, and in Guojing's reports to law enforcement and to the securities regulators. The Criminal Judgment independently corroborates the technical role and knowledge of the manager of Guojing's Production Technology Department.

69. CW-1 confirmed that Zhang's role at Guojing was substantive and continuing. Zhang joined Guojing after graduate study, worked in its research-and-development and production-technology functions, and participated in the composite-heater program throughout its development. Through that work, CW-1 stated, Zhang acquired knowledge of Guojing's confidential doped-pyrolytic-graphite process parameters—including press ratios, gas-flow rates, furnace temperatures, and deposition sequences—that Guojing treated as its most closely held technical information.

b. Zhang Joined the BoYu Entities and Participated Directly in Developing the Accused Technology

70. Zhang left Guojing on October 25, 2018. The Criminal Judgment states that he worked briefly for another company before joining Tianjin BoYu in May 2019, while performing his work from Beijing BoYu's premises.

71. The Criminal Judgment recounts testimony from Beijing BoYu's Deputy Technical Department Manager, Shuyue Liu, that BoYu began developing a PBN-PG composite heater near the end of 2018 because Hanergy wished to purchase such heaters, that Zhang joined the Technical Department in May 2019, that Zhang and BoYu personnel jointly developed the boron-doped PG coating beginning in June 2019, and that the work was successfully completed in August 2019—approximately three months after Zhang arrived.

72. Critically, the Criminal Judgment recounted Liu's testimony that, "[b]efore the development of the PBN-PG composite heater, BoYu Company did not possess the technology for composite heaters." *See* Ex. 23 at 18. Liu's testimony distinguished the pure-PG coating work undertaken before Zhang's arrival from the boron-doped PG-coating technology developed after he joined. Although BoYu had conducted preliminary work and a first furnace experiment before Zhang arrived, the boron-doped PG project began in June 2019 and was developed through work performed jointly by Liu and Zhang.

73. The Criminal Judgment recounts consistent testimony from Wenbo Fu, Chaoyang BoYu's workshop production director, that Zhang transmitted drawings and process parameters to Chaoyang BoYu's production personnel, that Chaoyang BoYu produced products according to those parameters, and that Zhang collected the production results.

74. The Criminal Judgment also recounts testimony from Junyong Wang, Beijing BoYu's Deputy General Manager, that BoYu had not previously produced composite heaters, that the PBN-PG composite-heater project began only after Hanergy's inquiry, and that Zhang directly participated in the PBN-PG composite-heater after Zhang joined.

c. <u>The BoYu Patent and Zhang's Role in Preparing the Patent Materials</u>

75. On September 10, 2019, shortly after completion of the boron-doped coating work, Tianjin BoYu and Chaoyang BoYu applied for the invention patent that issued as CN110662314B, "A Heater and Method for Preparing the Same," naming He Junfang as inventor. *See* Ex. 22.

76. According to the Criminal Judgment, Shuyue Liu, testified that "The initial draft of the patent-disclosure document for this patent was written by Zhang Jiawei." Liu further testified that Zhang provided the he data and documents in the patent. *See* Ex. 23 at 18. Zhang's personal testimony also confirmed such. . Thus, although the patent named Mr. He Junfang rather than

Zhang as the inventor, the testimony recounted in the Criminal Judgment established that Zhang drafted the initial technical disclosure and assembled and supplied the technical data, experimental records, trial-production records, and other documents used in the application.

77. Tongmei's own June 16 Second-Round Reply admitted that, after joining the BoYu organization, Zhang was "chiefly responsible for the R&D and production of metal heaters for evaporation (OLED evaporation point source) and the R&D of auxiliary PG and PBN-PG composite heaters."

78. Tongmei nevertheless characterized Zhang as a non-core employee of limited contribution, represented that the relevant technology had been independently developed before he arrived, and stated that he "has not formed any patent in the Company."

d. Guojing Placed BoYu's Senior Management on Notice Before the Class Period

79. CW-1 stated: "We had spent many years developing this composite-heater product. If no one had disclosed the technical secrets, how could they independently accomplish it? It defies common sense." Liu Ruqiang, Guojing's legal representative and General Manager, then contacted He Junfang. Liu asked He whether BoYu was using Guojing's technology. According to CW-1, He denied that any such conduct had occurred.

80. According to CW-1, Guojing also sent Beijing BoYu a written notice requiring it to stop using Guojing's technology and cease the alleged infringement, "but the other side never responded." CW-1 further stated that Mr. He Junfang continued to deny the allegation in telephone communications.

e. Guojing Reported the Matter to Police, and the Investigation Reached Zhang's BoYu Workplace Before the June 2022 Denial

81. According to CW-1, Guojing reported to the Yucheng City Public Security Bureau in September 2021 that Zhang and Beijing Tongmei had infringed Guojing's trade secrets. On

February 23, 2022, police took Zhang to a local police station for interrogation, released him on bail pending investigation, and searched his workplace at Beijing BoYu. From the company's premises they seized a desktop computer at Zhang's workstation, a notebook, three USB drives, two mobile phones, and four composite heaters taken from office cabinets and a display area. The search preceded AXT's March 15, 2022 Form 10-K, the Shanghai Stock Exchange's second-round inquiry, KWM's interview of Young, and Young's June 16, 2022 certification. *See* Ex. 23 at 1, 5–7.

f. <u>Guojing Continued to Place the Matter Before the Securities Regulators</u>

82. CW-1 stated that, after BoYu continued to deny the allegations and no resolution was reached, Guojing submitted reports to the Shanghai Stock Exchange concerning Tongmei's pending IPO application.

83. After the application advanced to the CSRC registration stage, CW-1, acting for Guojing, traveled to the CSRC and reported the dispute.

g. <u>Beijing BoYu and Chaoyang BoYu Received Police Demands and Submitted Written Responses During 2023</u>

84. The Criminal Judgment records that police repeatedly sought evidence directly from Beijing BoYu and Chaoyang BoYu between May and September 2023. On May 8, 2023, officers went to Beijing BoYu, whose personnel accepted the evidence-demand documents but refused to sign for them; police also served inquiry notices on managers Shuyue Liu and Junyong Wang. On May 10, 2023, police went to Chaoyang BoYu, whose personnel declined to cooperate. On May 11, 2023, police returned to Beijing BoYu after Liu and Wang failed to appear and did not answer calls or messages. Beijing BoYu submitted written responses on May 26, August 22, and September 13, 2023, and Chaoyang BoYu submitted one on August 22, 2023. See Ex. 23 at 5–6.

85. By the time Young publicly referred on August 3, 2023 to "these 2 little question[s]" and called AXT's answers "really good," Beijing BoYu had already received repeated police evidence demands and had answered them in writing.

86. By the time Fischer stated on November 2, 2023 that only "one open item" remained and that Young was "in China as we speak" working on it, both BoYu entities had exchanged written communications with police concerning the same composite-heater R&D.

h. The Criminal Court Found That Zhang Disclosed Guojing's Trade Secret Through the BoYu Patent

87. The Criminal Judgment recounts three judicial appraisal opinions connecting Zhang's work at Guojing with the technology later used at BoYu. The appraisers concluded that the Tianjin BoYu R&D data recovered from Zhang's devices, and the technical information disclosed in CN110662314B, were in the "identical technical field" as, and "substantively identical" to, Guojing's protected information, differing only in a nonessential cleaning-and-drying step. Ex. 23 at 19-20.

88. The court convicted Zhang of infringing Guojing's trade secrets, sentenced him to one year and seven months' imprisonment, imposed a RMB 300,000 fine, and ordered the forfeiture of four composite heaters, a desktop computer, and a Huawei P30 mobile phone. *See* Ex. 23 at 1, 25–26.

89. The patent records, CW-1's firsthand account, the pre-Class-Period oral and written notice to BoYu, the BoYu-employee testimony, the internal technical data, and the judicial appraisals together establish that Zhang carried Guojing's protected process information into the BoYu organization and used it there. Guojing identified Beijing BoYu as the likely user of its technology shortly after the BoYu patent application was filed, confronted BoYu's General Manager, and demanded in writing that the infringement stop—all before the Class Period began.

When BoYu did not respond, Guojing reported the matter to the police, who opened a criminal case in October 2021 and searched Beijing BoYu's premises in February 2022.

90. This was therefore not a case in which an isolated employee's previously unknown conduct surfaced only years later. The company that employed Zhang had been told, in writing, before the Class Period began, that it was using a competitor's trade secrets.

### D. The January 2022 Initial Prospectus Framed an Existing Technology-Ownership Controversy as a Hypothetical Future Risk

91. On January 10, 2022, the Shanghai Stock Exchange accepted Tongmei's Initial Prospectus. AXT announced the acceptance the same day in a Form 8-K signed by Fischer, stating:

> This is a **significant achievement and an important milestone for AXT**. . . . [Tongmei] has grown into a company that is engaged in the research, development, production and sale of InP substrates, GaAs substrates, germanium substrates, PBN and other high-purity materials, which we believe makes it **an attractive offering on the STAR Market**.

(Emphasis added.)

92. AXT further stated that, if completed, the IPO would provide proceeds for Tongmei to expand capacity, develop new products, and pursue additional growth.

93. Young signed the Initial Prospectus as a Tongmei director and as AXT's authorized representative, thereby certifying on behalf of both companies that the document contained no false record, misleading statement, or material omission.

94. The Initial Prospectus, the English translation of which was attached to the Form 8-K, was the principal disclosure document through which Tongmei sought approval to sell securities to the Chinese public, and AXT furnished it in English to U.S. investors. By January 10, 2022, the Guojing controversy was not a merely hypothetical risk. The Initial Prospectus, however,

did not identify Guojing, Guojing's oral notice to He, the written demand sent to Beijing BoYu, the September 2021 police report, or the criminal case opened on October 13, 2021.

95. The Initial Prospectus separately identified "ZHANG Jiawei" in a table listing the natural-person limited partners of Boyu Hengye, an employee-shareholding platform, reflecting his indirect economic interest in Tongmei. That entry did not identify Zhang as a former Guojing R&D employee, as a co-inventor on Guojing patent filings, as an employee subject to Guojing confidentiality obligations, as the person Guojing accused of using its trade secrets, or as the individual reported to the police.

### E. The February 2022 Police Search Made the Continued Hypothetical-Risk Framing Even More Misleading

96. On March 15, 2022, approximately three weeks after the police search conducted in February 2022, AXT filed its Form 10-K for 2021, again warning only that intellectual-property claims "may" arise and that the IPO "could fail to be completed."

97. The Form 10-K thus disclosed a hypothetical IPO failure but not the specific matter then obstructing the application.

### F. The Shanghai Stock Exchange Required a Direct Answer Concerning the Source of Tongmei's Technology and the Existence of Any Dispute

98. During the Exchange's review, Guojing submitted a Report Letter concerning the source of Tongmei's PBN and composite-heater technologies, and the Exchange issued a second-round inquiry that stated, in relevant part:

> **Q7. Legality and Compliance of Source of Core Technologies**
>
> The Issuer is required to explain the source of its core technologies, whether or not originated from the research contents and results of relevant personnel in their former employers, whether or not infringing upon trade secrets, patents or other intellectual properties of other entities and relevant proofs, and whether or not there is any dispute or potential dispute with relevant entity; if any dispute exists, please

> specify its progress and its influence on R&D, production and operation of the Company.
>
> The Sponsor and the Issuer's Attorney are required to offer express verification opinions on the legality and compliance of source of core technologies of the Company.

99. The Exchange thus required direct answers concerning:

a. the origin of Tongmei's core technologies;
b. whether those technologies originated from work performed by relevant personnel at former employers;
c. whether Tongmei had infringed trade secrets, patents, or other intellectual-property rights;
d. whether an actual or potential dispute existed; and
e. if a dispute existed, its status and effect on Tongmei's R&D, production, and operations.

100. The Exchange separately required Tongmei's IPO sponsor/lead underwriter and counsel to conduct verification and provide express professional opinions on those issues.

101. In its June 16 Second-Round Reply, Tongmei acknowledged that it had received a Report Letter concerning the alleged infringement:

> The Company received a relevant Report Letter, alleging that: an involved employee of the Company participated in the research and development of **PBN-PG composite heaters, PG process products, PBN clamping rods, and other core products** during his employment at the reporting party, hence acquired core technologies of the reporting party, while such technology information was trade secret of the reporting party.
>
> (Emphasis added.)

102. Tongmei further acknowledged that the employee was working for Tongmei and had acquired an ownership interest in Tongmei by stating that "At present, the involved employee is working for the Issuer and has acquired shares in the Issuer." Tongmei then acknowledged the specific corporate accusation: "The reporting party held that the Issuer and the involved employee were suspected of infringing the trade secret of the reporting party."

103. The accusation was therefore not directed only at Zhang as a private individual. Tongmei expressly acknowledged that Guojing accused the Company itself.

**G. Tongmei Conducted a Detailed, Guojing-Specific Investigation and Categorically Denied Any Infringement, Dispute, or Potential Dispute**

a. Tongmei, Haitong, and KWM Conducted a Detailed, Guojing-Specific Investigation

104. According to the June 16 Second-Round Reply and KWM's June 16 Supplemental Legal Opinion II, Tongmei conducted what it called a "self-investigation" after receiving the Exchange's inquiry. Both documents show that the investigation was not a generic review of Tongmei's intellectual-property portfolio. It was directed specifically to Guojing, to Zhang's prior employment and obligations, to the disputed PBN-PG and related technologies, to Zhang's subsequent work within the BoYu entities, and to whether he had used Guojing's protected information after joining.

105. According to the June 16 Second-Round Reply and KWM's June 16 Supplemental Legal Opinion II, in conducting that investigation, Tongmei, its IPO sponsor and lead underwriter, Haitong Securities Co., Ltd. ("Haitong"), and KWM reviewed extensive records. *See* June 16 Second-Round Reply at 8-1-288 - 8-1-290; see also KWM's June 16 Supplemental Legal Opinion II at 8-3-48 - 8-3-50. Among other things, Tongmei, Haitong, and KWM specifically also examined "the samples of the Employment Contract and the Contract for Confidentiality and Use and Protection of Intangible Assets of Guojing provided by the involved employee, inspected the materials in relation to his departure from the Guojing and his bank statement for 12 months after his departure from Guojing; and obtained communication materials between the involved employee and the relevant responsible person of the reporting party, bank certificates in relation to relevant payments made by Guojing, the statement on relevant circumstances issued by the

involved employee and the legal opinion issued by the attorney" in order to determine whether Zhang had breached any noncompetition or confidentiality obligation owed to Guojing—a review directed to the specific relationship among Zhang, Guojing, Tongmei, and the BoYu entities. See June 16 Second-Round Reply at 8-1-289; see also KWM's June 16 Supplemental Legal Opinion II at 8-3-49.

106. KWM also reviewed Tongmei's audit reports, sales contracts, revenue detail, and the income contribution of the accused products; interviewed Tongmei's core technicians and PBN R&D leaders and responsible personnel at Beijing BoYu about the sources of the disputed technologies; and interviewed Young and Tongmei's General Manager.

107. The investigation was therefore not a generalized patent search or a review of an unidentified complaint. It concerned Guojing by name, Zhang's employment and confidentiality obligations, the specific PBN-PG and PG technologies identified in the accusation, the source of the BoYu products, and whether an actual or potential dispute existed.

108. According to the Criminal Judgment, Zhang was represented in the criminal matter by attorneys affiliated with KWM's Shanghai office—the same firm serving as Tongmei's IPO counsel and conducting the Guojing investigation.

109. After the detailed investigation, Tongmei, Haitong, and KWM represented in and June 16 Second-Round Reply and the June 16 Supplemental Legal Opinion II that Tongmei's core technologies have sources that comply with laws and regulations, "**not originating from the research contents and results of relevant personnel in their former employers**." (Emphasis added.) June 16 Second-Round Reply at 8-1-290; June 16 Supplemental Legal Opinion II at 8-3-50.

110. Tongmei, Haitong, and KWM further represented that Tongmei's core technologies "**do not infringe upon trade secrets**, patents or other intellectual properties of other entities, and **there is no dispute or potential dispute** between the Company and relevant entity." *Id.* (Emphasis added.)

b. Tongmei Attempted to Minimize Both the Accused Products and Zhang's Role

111. In the June 16 Second-Round Reply, Tongmei sought to confine the accusation to a narrow set of products, stating:

> Pyrolytic graphite (PG), PBN-PG composite heater and PBN clamping rod described in the Report Letter belong to the products of Beijing Boyu, a controlled subsidiary of the Company, and do not involve technologies and products in the field of semiconductor substrates and high-purity materials, nor are they the main products in the field of PBN such as PBN crucibles.

112. Tongmei further minimized the accusation by pointing to the accused products' historical revenue contribution, characterizing it as immaterial to Tongmei's overall results.

113. That revenue-based characterization did not answer the issue raised by Guojing or the Shanghai Stock Exchange. Guojing did not merely allege that the accused products represented a large percentage of historical sales. The controversy implicated the lawful source and ownership of technology used within Tongmei's consolidated business; R&D undertaken within Beijing BoYu, Tianjin BoYu, and Chaoyang BoYu; patenting activity undertaken for those subsidiaries' benefit; an active criminal investigation concerning the same employee and technology; potential corporate criminal or regulatory exposure; and Tongmei's eligibility to proceed with a public offering on the STAR Market.

114. Isolating the accused products from Tongmei's "main products" also obscured that they arose from the same PBN, PG, and composite-heating technologies Tongmei identified among its core technologies.

> [Tongmei] has formed a product matrix 'centered on semiconductor substrates, with PBN materials and high-purity materials as two wings' to meet the diverse needs of customers in the semiconductor field.

115. Tongmei's own financial disclosures showed that its PBN operations were commercially significant: PBN crucibles and related recycling and material sales together contributed more than 12% of Tongmei's 2021 revenue. AXT's 2020 and 2021 Annual Reports likewise attributed material portions of reported revenue growth (14.5% in 2020 and 44.1% in 2021) to increased demand for PBN crucibles and PBN-based OLED manufacturing tools.

116. When Tongmei submitted the August 1 Registration Prospectus, two of its ten identified "main ongoing research and development projects" were PBN-related and assigned to BoYu's team.

117. The materiality of Guojing's accusation therefore did not turn on the historical revenue of the particular accused products. It turned on whether Tongmei's core technology was lawfully its own.

118. Tongmei also minimized Zhang's role by relying on his formal title and on the absence of his name from the patent's inventor designation, even though its own opinion stated that he was:

> "chiefly responsible for the R&D and production of metal heaters for evaporation (OLED evaporation point source) and the R&D of auxiliary PG and PBN-PG composite heaters."

*See* June 16 Supplemental Legal Opinion II at 8-3-44.

119. Tongmei thus admitted that Zhang had principal R&D responsibility for the same general product and technology category the accusation concerned.

120. As alleged above, the Criminal Judgment later recounted evidence that Zhang supervised the Beijing BoYu project, jointly developed the boron-doped PG coating after joining, transmitted drawings and process parameters to Chaoyang BoYu, collected the results, organized the trial-production records, drafted the initial patent-disclosure document that became CN110662314B, and supplied the data used in that application.

121. The statement that Zhang "has not formed any patent in the Company" was therefore materially incomplete and misleading in context. The assertion that Zhang was not a designated "core technician" likewise did not disclose his actual responsibilities.

122. Tongmei's response thus minimized the accusation twice over: it isolated the accused products from Tongmei's broader PBN business, and it isolated Zhang from the technology he had in fact developed.

c. <u>Tongmei's Independent-Development Explanation Relied Substantially on He Junfang</u>

123. Tongmei's independent-development explanation in the June 16 Second-Round Reply relied substantially on the qualifications and prior technical work of He Junfang.

124. During the relevant period, He served as General Manager of Beijing BoYu, Tianjin BoYu, and Chaoyang BoYu and was the principal executive responsible for their day-to-day operations and technical affairs. He was a founder of the BoYu business, a material indirect shareholder of Tongmei, and the named inventor on CN110662314B. He was also the executive Guojing contacted directly in 2019 about the suspected use of its technology, and the executive who denied it.

125. Mr. He's role is significant because Tongmei rested its independent-development defense on the technical narrative of the same senior executive who managed the accused operations and who had personally denied Guojing's accusation.

d. Tongmei Categorically Denied Any Infringement, Dispute, or Potential Dispute

126. Similarly, in June 16 Second-Round Reply, after acknowledging the Report Letter, describing its self-investigation, admitting Zhang's work involving PBN-PG composite heaters, and relying on He's technical history, Tongmei stated:

> The Company insists on the technology development mode of **independent R&D**; its core technologies are obtained through independent R&D and **do not infringe upon trade secrets**, patents or other intellectual properties of other entities, and **there is no dispute or potential dispute with relevant entity**.

*See* June 16 Second-Round Reply at 8-1-290. (Emphasis added.)

127. The representation contained three categorical assertions of present fact: that Tongmei's core technologies originated through independent R&D; that Tongmei did not infringe Guojing's trade secrets or other intellectual-property rights; and that no actual or potential dispute existed.

128. The "no dispute or potential dispute" representation was false when made. By June 16, 2022:

a. Guojing had identified Beijing BoYu as the likely user of its technology;
b. Guojing's legal representative had confronted He;
c. He had denied the accusation;
d. Guojing had sent Beijing BoYu a written demand that it stop the alleged infringement;
e. Beijing BoYu had not provided a written response;
f. Guojing had reported the matter to the police;
g. the police had formally opened a criminal case;
h. Guojing had submitted the Report Letter to the Shanghai Stock Exchange;
i. the Exchange had issued a formal inquiry into the accusation;
j. Tongmei, Haitong, and KWM had conducted a detailed investigation into the matter; and
k. police had searched Zhang's Beijing BoYu workplace and seized R&D materials, composite heaters, computers, USB drives, and mobile phones.

129. Those facts established an actual controversy and, at a minimum, a potential dispute. Tongmei's belief that it would ultimately prevail did not make the dispute nonexistent.

130. Tongmei's limited acknowledgment that it had received a Report Letter did not disclose the concealed truth. Tongmei disclosed the accusation only to reject it, and disclosed neither the police report, the criminal case, the February 2022 search, nor the seizure of company property.

e. Defendant Young Personally Participated in and Certified the Guojing-Specific Response

131. In its June 16 Supplemental Legal Opinion II, KWM stated that its conclusions on independent development, noninfringement, and the absence of any dispute or potential dispute were confirmed through its interviews with Young and Tongmei's General Manager. Young was therefore personally interviewed on the precise conclusions challenged here.

132. The June 16 Second-Round Reply that Young certified described the Report Letter, the accusation against Tongmei and Zhang, and Zhang's prior employment and obligations. Young certified:

> I have **carefully read the entire reply** to the inquiry letter for Beijing Tongmei Xtal Technology Co., Ltd. in this audit, and hereby confirm that the reply contains **no false records, misleading statements or major omissions**, and I assume corresponding legal responsibility for the **authenticity, accuracy, completeness and timeliness** of the reply.
> (Emphasis added.)

f. Fischer Disseminated the June 2022 Denials to U.S. Investors

133. On June 16, 2022, Tongmei and Haitong executed the Second-Round Reply and KWM issued Supplemental Legal Opinion II. The Exchange disclosed both the next day, and AXT furnished English translations to U.S. investors as exhibits to a Form 8-K signed by Fischer.

134. Fischer's connection to those disclosures was not ministerial. He was AXT's Chief Financial Officer, was continuously involved in the IPO process, and served as a director of all

three BoYu entities whose operations, technology, employee, products, and patenting the representations concerned.

g. Beijing BoYu's Management Remained Unchanged Through the Restructuring, and Tongmei's Own Disclosures Identified Formal Reporting and Oversight Channels

135. The June 16 Second-Round Reply stated that there was "No change" in Beijing BoYu's directors or management as a result of the December 2020 restructuring. Its board consisted of Young, He, and Fischer, and He remained General Manager. Tongmei also represented that major subsidiary matters had to be reported to its General Manager "without delay," that subsidiaries had to transmit board resolutions and other important documents promptly, and that Tongmei audited its subsidiaries quarterly, performed annual internal-control evaluations, and could conduct special audits.

136. On February 28, 2022—five days after the police search at Beijing BoYu—Tongmei's Board approved a Chaoyang BoYu PBN expansion project, and on March 24, 2022 it approved a guarantee involving Beijing BoYu. Plaintiffs do not allege from timing alone that those proceedings addressed the search; they show that Tongmei's Board and senior management were actively supervising the BoYu entities during the same period.

## H. The Shanghai Stock Exchange Approved Tongmei's Application on a Record Containing Its Categorical Denials, and the August 1 Registration Package Carried the Same Disclosure Narrative Forward

137. On July 12, 2022, after Tongmei, Haitong, and KWM submitted the Second-Round Reply and supporting verifications, the Exchange approved Tongmei's application. The application record presented to the Shanghai Stock Exchange contained Tongmei's representations that:

a. the relevant technologies had been independently developed;

b. the technologies did not originate from research contents or results obtained by personnel while working for former employers;

c. Tongmei did not infringe Guojing's trade secrets or any other third-party intellectual-property rights;

d. Zhang was not a core technician of Tongmei or Beijing BoYu and "has not formed any patent in the Company"; and

e. "there is no dispute or potential dispute with relevant entity."

138. The application record did not disclose that Guojing had reported the matter to the Yucheng City Public Security Bureau, that the Bureau had opened a criminal case in October 2021, or that police had searched Beijing BoYu and seized company property in February 2022.

139. The Exchange's approval therefore rested on a record containing Tongmei's categorical denials and omitting the criminal proceeding then underway against the same employee, technology, and entities.

140. On August 1, 2022, Tongmei submitted its August 1 Registration Package, which the CSRC accepted for review; AXT furnished English translations to U.S. investors on a Form 8-K. The Registration Prospectus nevertheless did not identify Guojing, Guojing's prior oral or written notice to BoYu, the September 2021 police report, the October 2021 criminal case, the February 2022 search, or CN110662314B. It also repeated the representation that ownership of Tongmei's principal assets and core technologies was clear and undisputed. Thus, the Registration Prospectus continued to omit the controversy and the criminal proceeding.

141. Defendant Young again signed the August 1 Registration Prospectus as a Tongmei director and as AXT's authorized representative. On behalf of AXT, Defendant Young represented:

> The company hereby undertakes that there are **no false records, misleading statements or major omissions** in this Prospectus, and will assume any individual and joint legal liabilities for its **authenticity, accuracy, and completeness**.

(Emphasis added.)

142. Fischer signed AXT's August 2, 2022 Form 8-K furnishing the Registration Package to U.S. investors.

### I. The CSRC Immediately Required Tongmei to Address the Trade-Secret Dispute and Criminal Case, Yet Tongmei Provided No Response to Resolve the Inquiry During the Class Period

143. The CSRC accepted Tongmei's registration application on August 1, 2022. According to CW-1, upon learning that Tongmei's application had advanced to the CSRC registration stage, he acted on Guojing's behalf, personally reported to the CSRC the trade-secret dispute between Guojing and Tongmei. On August 10, 2022, the CSRC issued a registration-stage inquiry consisting of only two questions. The first was captioned "Regarding Trade Secret Disputes." The CSRC required Tongmei to explain the progress of the issuer's trade secret disputes; whether a public security agency has established a case, or will likely establish a case in the future, against the issuer and its subsidiaries; whether it constitutes a corporate crime, and whether it constitutes an obstacle to the pending IPO. *See* Ex. 7. As used in the inquiry, a "public security agency" is the local police authority responsible for opening and investigating criminal cases. The registration record thus reflected an unresolved impasse: the CSRC had made the trade-secret dispute and possible criminal case a condition of registration.

144. The CSRC's only other registration-stage question concerned sales and revenue. One of the two subjects in the entire published inquiry was therefore the Guojing trade-secret dispute and the criminal case.

145. Tongmei provided no response resolving the CSRC's August 10, 2022 questions during the Class Period, and the application never advanced.

146. A Chinese-language article titled "After more than 14 months of submitting the registration, the approval still remains elusive. Why is Beijing Tongmei's IPO journey to listing so long and fraught with difficulties?" reported in October 2023 that the unresolved trade-secret matter was blocking Tongmei's IPO. The article quoted an experienced Chinese IPO sponsor as explaining:

> Significant disputes over trade secrets that have already entered the judicial process generally require a clear resolution before regulatory authorities will determine the progress of a company's IPO based on the extent of the impact [of the outcome].

Ex. 6.

147. The article further reported that completion of the police investigation, the absence of a settlement between Tongmei and Guojing, and the pending prosecution were the principal reasons the registration had not advanced.

148. On June 13, 2025, the Yucheng City People's Court entered the Criminal Judgment.

149. According to CW-1, Guojing thereafter pursued a separate civil infringement action in a Tianjin court against Tianjing BoYu. Economic Herald article, "'Registration Holdout' Receives New Development: Employee Convicted of Trade-Secret Infringement; Shandong Guojing to Bring Civil Action Against the Company", dated August 11, 2025, also confirmed such civil litigation. Ex. 17.

## V. <u>MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD</u>

### A. March 23, 2021 Form 10-K

150. On March 23, 2021, after market hours, AXT filed its annual report on Form 10-K for the period ended December 31, 2020, signed by Young and Fischer, which warned:

> ***Intellectual property infringement claims may be costly to resolve and could divert management attention.***
> Other companies may hold or obtain patents on inventions or may otherwise claim proprietary rights to technology necessary to our business. ***The markets in which***

> ***we compete are comprised of competitors that in some cases hold substantial patent portfolios covering aspects of products that could be similar to ours. We could become subject to claims that we are infringing patent, trademark, copyright or other proprietary rights of others.*** We may incur expenses to defend ourselves against such claims or enter into cross license agreements that require us to pay royalty payments to resolve such claims. For example, in 2020, we and a competitor entered into the Cross License Agreement, which has a term that began on January 1, 2020 and expires on December 31, 2029. We have in the past been involved in lawsuits alleging patent infringement, and ***could in the future be involved in similar litigation.***

(Emphasis added).

151. The warning was vague, generic, and materially misleading because it described a third-party proprietary-rights claim only as a future possibility. By March 23, 2021, Guojing had already identified Beijing BoYu as the user of its technology, had confronted Mr. He, and had sent Beijing BoYu a written demand to stop. The BoYu entities had already filed the patent application later adjudicated to have disclosed Guojing's protected information. A concrete, company-level claim already existed, and describing it as something that "may" occur in the future affirmatively misled investors.

### B. January 10, 2022 Form 8-K

a. <u>The "significant achievement," "important milestone," and "attractive offering" statements</u>

152. On January 10, 2022, AXT filed a Form 8-K ("January 10, 2022 Form 8-K") announcing that the Shanghai Stock Exchange had accepted Tongmei's IPO application, stating:

> This is a **significant achievement and an important milestone for AXT**," said Morris Young, chief executive officer. "We founded Tongmei back in 1998. Since then, it has grown into a company that is engaged in the research, development, production and sale of InP substrates, GaAs substrates, germanium substrates, PBN and other high-purity materials, which **we believe makes it an attractive offering on the STAR Market**.

(Emphasis added.)

153. The statements were materially misleading because they promoted acceptance as a major value-enhancing milestone and characterized Tongmei as an attractive issuer while omitting that Guojing had directly notified Beijing BoYu of the alleged misuse, a criminal case concerning the same conduct had been initiated, the controversy implicated company R&D and patenting activity within Tongmei's wholly owned BoYu operations, and the regulatory risk each created. The statements were materially misleading because they promoted acceptance as a value-enhancing milestone and characterized Tongmei's prospects without disclosing the pending accusation, the criminal case.

b. The "lengthy process" and "no assurance" statements

154. The January 10 Form 8-Kand accompanying press release also stated:

> The process of going public on the STAR Market **includes several periods of review and, therefore, is a lengthy process**. Tongmei does not expect to complete the IPO until the second half of 2022. . . . **There can be no assurance that this process will be completed.**

(Emphasis added.)

155. These cautionary statements were materially misleading because they attributed uncertainty to the ordinary length and complexity of the process while omitting the existing, company-specific technology dispute and criminal matter. Investors were warned that the IPO might not be completed for generic reasons, but were not told that a concrete controversy concerning technology used in Tongmei's business already threatened the integrity of the application and the likelihood of regulatory scrutiny.

c. The Initial Prospectus's hypothetical competitor-IP warning

156. The English-language Initial Prospectus furnished as Exhibit 99.1 with the January 10 Form 8-K stated:

> We attach great importance to the proprietary nature and compliance of our R&D system . . . . **Any IP dispute raised by our competitors against us** or infringement of our IPs by our competitors **may have an adverse effect on our production and operations.**

(Emphasis added.)

157. This warning was materially misleading because it described a competitor dispute as a hypothetical future event when a specific competitor had already accused Tongmei, demanded that BoYu stop, and reported the matter to the police.

d. <u>The Initial Prospectus's "clear ownership" and "no major ownership dispute" statements</u>

158. The Initial Prospectus further represented:

> The ownership of the Issuer's main assets, **core technologies**, and trademark **is clear, there is no major ownership dispute**, nor is there any major debt repayment risk, major guarantee, litigation, arbitration, and any other contingency . . . .

(Emphasis added.)

159. The statement was materially misleading because Guojing's accusation directly challenged the lawful source and use of technology within Tongmei's consolidated business, which is the opposite of clear and undisputed ownership.

e. <u>The Initial Prospectus's independent-intellectual-property statement</u>

160. The Initial Prospectus also stated:

> After years of accumulation, the Company **has developed a large number of core technologies with independent intellectual property rights and applied them to its main products**, which have gained recognition from customers.

(Emphasis added.)

161. The statement was materially misleading because it assured investors that Tongmei's core technology portfolio was independently developed when a competitor had accused Tongmei of taking that technology and police had opened a criminal case.

**C. March 15, 2022 Form 10-K**

a. The statement that the IPO merely "could fail to be completed"

162. On March 15, 2022, AXT filed its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Form 10-K"), signed by Young and Fischer, which warned:

> The proposed Tongmei IPO on the STAR Market in China **could fail to be completed**. This could result in investor disappointment and in failure to secure sufficient capital needed to take advantage of market opportunities for our products. Our stock price could decline.

(Emphasis added.)

163. The warning was materially misleading because it presented failure only as a generic future possibility while omitting the actual, company-specific obstacle then impeding the application—an obstacle police had confirmed three weeks earlier by searching Beijing BoYu and seizing company property.

b. The statement that redemption merely "could result" in returning the investment

164. The 2021 Form 10-K further warned:

> The terms of the private equity raised by Tongmei in China grant each investor a right of redemption if Tongmei fails to achieve the IPO on or before December 31, 2022. **This could result in disgorging the cash that we raised from the investors.**

(Emphasis added.)

165. This statement was materially misleading because it disclosed the contractual mechanism while omitting the specific legal and regulatory matter that made its triggering condition materially more likely.

c. The continuing generic intellectual-property-risk warning

166. The 2021 Form 10-K repeated materially similar language warning only that AXT could become subject to intellectual-property claims and could in the future be involved in litigation. Specifically, it stated that:

> ***Intellectual property infringement claims may be costly to resolve and could divert management attention.***
> Other companies may hold or obtain patents on inventions or may otherwise claim proprietary rights to technology necessary to our business. The markets in which we compete are comprised of competitors that in some cases hold substantial patent portfolios covering aspects of products that could be similar to ours. **We could become subject to claims that we are infringing patent, trademark, copyright or other proprietary rights of others.** We may incur expenses to defend ourselves against such claims or enter into cross license agreements that require us to pay royalty payments to resolve such claims. For example, in 2020, we and a competitor entered into the Cross License Agreement, which has a term that began on January 1, 2020 and expires on December 31, 2029. We have in the past been involved in lawsuits alleging patent infringement, and **could in the future be involved in similar litigation.**

(Emphasis added.)

167. The repeated hypothetical framing was materially misleading. By March 15, 2022, the risk had already produced a criminal case, and police had searched Beijing BoYu and seized company computers, records, and products.

**D. June 16, 2022 Second-Round Reply, Legal Opinion, and June 17, 2022 Form 8- K**

a. <u>The independent-development, non-infringement, and "no dispute or potential dispute" statements</u>

168. On June 16, 2022, Tongmei and Haitong executed the Second-Round Reply and KWM issued Supplementary Legal Opinion (II). Young signed and certified the Reply; Fischer signed the Form 8-K furnishing both to U.S. investors. The Reply stated:

> The Company insists on the technology development mode of **independent R&D**; its core technologies are obtained through independent R&D and **do not infringe upon trade secrets**, patents or other intellectual properties of other entities, and **there is no dispute or potential dispute with relevant entity**.

(Emphasis added.)

169. The representation contained three categorical assertions of present fact: that Tongmei's core technologies originated through independent R&D; that Tongmei did not infringe Guojing's trade secrets or other intellectual-property rights; and that no actual or potential dispute existed. The "no dispute or potential dispute" representation was materially false and misleading when made. By June 16, 2022:

a. Guojing had identified Beijing BoYu as the likely user of its technology;
b. Guojing's legal representative had confronted He;
c. He had denied the accusation;
d. Guojing had sent Beijing BoYu a written demand that it stop the alleged infringement;
e. Beijing BoYu had not provided a written response;
f. Guojing had reported the matter to the police;
g. the police had formally opened a criminal case;
h. Guojing had submitted the Report Letter to the Shanghai Stock Exchange;
i. the Exchange had issued a formal inquiry into the accusation;
j. Tongmei, Haitong, and KWM had conducted a detailed investigation into the matter; and
k. police had searched Zhang's Beijing BoYu workplace and seized R&D materials, composite heaters, computers, USB drives, and mobile phones.

170. Those facts established an actual controversy and, at a minimum, a potential dispute. Tongmei's belief that it would ultimately prevail did not make the dispute nonexistent.

b. The statements minimizing Zhang's technical and patent-related role

171. Supplementary Legal Opinion (II) stated:

> The involved employee . . . **is not a core technician of the Company, and has not formed any patent in the Company either**. . . . [H]e is neither a core technician of the Company nor a core technician of Beijing Boyu.
>
> (Emphasis added.)

172. The characterization was materially misleading when read in context. Tongmei's own opinion admitted that Zhang was "chiefly responsible" for R&D involving auxiliary PG and PBN-PG composite heaters. The criminal judgment further recounted testimony that Zhang served as a project supervisor, jointly performed the boron-doped PG-coating R&D, transmitted drawings and process parameters to Chaoyang BoYu, collected results, drafted the initial patent disclosure, and supplied the technical data and documents used in the patent application. *See* Ex. 23 at 18–20. The absence of Zhang's name from the patent's inventor designation and his lack of a formal "core technician" title did not make his contribution marginal. Tongmei used those labels to minimize Zhang's role while omitting his admitted substantive R&D responsibilities, his preparation of the initial patent disclosure, his supply of the technical data and documents used in the application, and the criminal escalation of the controversy.

c. Defendant Young's certification of the Second-Round Reply

173. Defendant Young signed the June 16 Second-Round Reply and certified:

> I have **carefully read the entire reply** to the inquiry letter for Beijing Tongmei Xtal Technology Co., Ltd. in this audit, and hereby confirm that the reply **contains no false records, misleading statements or major omissions**, and I assume corresponding legal responsibility for the authenticity, accuracy, completeness and timeliness of the reply.

(Emphasis added.)

174. Young's certification was materially misleading because KWM stated that it had personally interviewed him to confirm the independent-development, noninfringement, and no-dispute conclusions, and because the Reply he certified recited the very accusation those conclusions denied.

**E. August 2, 2022 Form 8-K and Registration Package**

a. The acceptance, ordinary-review, and no-assurance statements

175. On August 2, 2022, AXT filed a Form 8-K signed by Defendant Fischer reporting that the CSRC had accepted Tongmei's registration application and furnishing the Registration Package. The Form 8-K stated:

> On August 1, 2022, Tongmei's revised IPO application was accepted for review by the China Securities Regulatory Commission. . . . The STAR Market IPO remains subject to review and approval by the CSRC and other authorities. **The process of going public on the STAR Market includes several periods of review and, therefore, is a lengthy process. There can be no assurances that the proposed STAR Market listing and IPO will ultimately be approved** . . . .

176. The filing accurately reported acceptance but was materially misleading because it described the remaining uncertainty as ordinary regulatory process while omitting the trade-secret and criminal matter.

b. The Registration Prospectus's hypothetical competitor-IP warning

177. The Registration Prospectus repeated the following warning:

> Any IP dispute raised by our competitors against us or infringement of our IPs by our competitors **may have an adverse effect on our production and operations**.

(Emphasis added.)

178. The statement was materially misleading because the competitor dispute was no longer hypothetical. Tongmei had received a specific accusation, investigated it, and denied it, and a criminal case was pending.

c. The Registration Prospectus's clear-ownership statement

179. The Registration Prospectus further represented:

> The ownership of the Issuer's main assets, **core technologies**, and trademark **is clear, there is no major ownership dispute** . . . .

(Emphasis added.)

180. This present-tense assurance was materially misleading because Guojing's claim challenged the source and use of the very technologies Tongmei described as clearly owned.

d. The Registration Prospectus's independent-intellectual-property statement

181. The Registration Prospectus also stated:

> After years of accumulation, the Company **has developed a large number of core technologies with independent intellectual property rights and applied them to its main products** . . . .

(Emphasis added.)

182. The statement was materially misleading for the same reasons: it assured investors that Tongmei's technology portfolio was independently developed while omitting the accusation and the criminal case.

e. Defendant Young's Registration Prospectus certifications

183. Defendant Young signed the Registration Prospectus as a Tongmei director and as AXT's authorized representative, representing that the prospectus contained no false record, misleading statement, or material omission and accepting legal responsibility for its accuracy and completeness.

184. Those certifications were materially misleading because Young had already participated in the Guojing investigation and certified the categorical denial two months earlier.

**F. October 27, 2022 Earnings Call**

185. On October 27, 2022, after the CSRC had issued its two-question registration inquiry, Fischer stated:

> We have had feedback from the CSRC in the form of questions, and **our advisors believed the questions were normal and customary**. We hope to get **CSRC approval soon** and Tongmei hopes to accomplish the offering **as early as Q4 2022**. This has been a long process, but we remain very enthusiastic and optimistic.

(Emphasis added.)

186. The statements were materially misleading because the CSRC had issued only two questions, one of which expressly required Tongmei to address the trade-secret dispute, whether a public security agency had opened a case against Tongmei or its subsidiaries, whether the conduct constituted a corporate crime, and whether it obstructed the IPO. A question of that kind is not "normal and customary."

**G. February 16, 2023 Earnings Call**

187. On February 16, 2023, Fischer stated:

> Since the Chinese New Year, **we have had active dialogue again with the [CSRC]**. Their process is detailed and thorough, and **they have asked us to respond to a couple of additional items. We are in the process of doing so now** and remain optimistic that we will get CSRC approval **in the coming months**.

(Emphasis added.)

188. The present-tense statements were materially misleading because they described an ordinary active response process without disclosing that the publicly identified questions included the Guojing dispute, possible criminal proceedings, possible corporate crime, and an

IPO obstacle, and that no response had been publicly filed for more than six months. The statements also suggested that only routine supplemental work remained and that near-term approval was reasonably expected, while omitting the substantive legal and regulatory issue that had prevented the application from advancing.

### H. March 16, 2023 Form 10-K

189. On March 16, 2023, AXT filed its Form 10-K for 2022 (the "2022 Form 10-K"), signed by Young and Fischer, which stated:

> Tongmei submitted its IPO application to the Shanghai Stock Exchange and it was formally accepted for review on January 10, 2022. The Shanghai Stock Exchange approved the IPO application on July 12, 2022. On August 1, 2022, the CSRC accepted for review Tongmei's IPO application. The STAR Market IPO remains subject to review and approval by the CSRC and other authorities. The process of going public on the STAR Market includes several periods of review and, therefore, is a lengthy process. **Subject to review and approval by the CSRC and other authorities, Tongmei expects to accomplish this goal in the coming months. . . . There can be no assurances that Tongmei will complete its IPO in 2023 or at all.**
>
> The aggregate redemption amount is approximately $49 million. . . . **Any redemptions could have a material adverse effect on our business, financial condition and results of operations.**

(Emphasis added.)

190. The statements were materially misleading because they portrayed the application as a lengthy but ordinary review expected to conclude in the coming months and redemption as a generic future risk while omitting the unresolved CSRC's specific trade-secret and criminal-case inquiry, the absence of a Tongmei response, and the material regulatory obstacle preventing the application from advancing.

### I. April 27, 2023 Earnings Call

191. On April 27, 2023, Fischer repeated

> Since the Chinese New Year, **we have had active dialogue again with the [CSRC]**. Their process is detailed and thorough, and **they have asked us to respond to a couple of additional items. We are in the process of doing so now** and remain optimistic that we will get CSRC approval **in the coming months**.

(Emphasis added.)

192. The statement was materially misleading for the same reasons and because an additional two months had passed without a public response or advancement. Repeating the same near-term narrative increased the misleading impression that a routine response was actively moving toward approval rather than that an unresolved trade-secret and criminal issue continued to impede the process.

**J. August 3, 2023 Earnings Call**

193. On August 3, 2023, Craig-Hallum's analyst called the STAR-listing question "obligatory" and asked Defendants to identify the nature of the remaining comments and why review had run past their prior estimates. Young responded:

> We really rely heavily [on] **our bankers in China**. And we were surprised to see that **these 2 little question[s] took so long** to get the authorities to be comfortable with our answers. **We think we provide[d] really good answers.** But as I've been telling **my Board** that I expect it next week, but don't count on it. But we do—we **only have one question to be answered** . . . . [I]t could be as quick as next month . . . and if not, definitely towards the end of the quarter.

(Emphasis added.)

194. In the Chinese IPO context, Young's reference to AXT's "bankers in China" meant Tongmei's IPO sponsor and lead-underwriter team, including Haitong—not a commercial lender. The statements were materially misleading because Young characterized the outstanding regulatory items as "2 little question[s]" and Tongmei's answers as "really good" while omitting that one of only two questions concerned the trade-secret dispute, a possible criminal case against

Tongmei or its subsidiaries, possible corporate crime, and an obstacle to the offering—and while omitting that police had by then served evidence demands on Beijing BoYu and Chaoyang BoYu, which had answered in writing.

## K. November 2, 2023 Earnings Call

195. On November 2, 2023, Defendant Fischer stated:

> In regards to Tongmei, **we do need to resolve one open item. Morris is in China as we speak and is working on this matter.** Although it is moving slower than we expected, **we are making progress**, and we are confident that Tongmei remains an excellent candidate for a listing and **will be approved to proceed**.

(Emphasis added.)

196. The statements were materially misleading because they portrayed the sole remaining matter as a limited item moving toward resolution, omitting that it was the unresolved CSRC's trade-secret and criminal question, that no public response had been filed in fifteen months, and that police were then obtaining evidence from the BoYu entities.

## L. February 22, 2024 Earnings Call

a. <u>Fischer's "one open item," "making progress," and "excellent candidate" statements</u>

197. On February 22, 2024, approximately six weeks before the end of the Class Period, Fischer stated:

> In regards to Tongmei, **we need to resolve 1 open item**. Although it is moving slower than we expected, **we are making progress** and are confident that Tongmei remains **an excellent candidate for listing**.

(Emphasis added.)

198. The statements were materially misleading because the application had not advanced for approximately eighteen months after the CSRC's inquiry, and because Zhang had

been taken into custody on December 23, 2023 and formally arrested on January 5, 2024. *See* Ex. 23 at 1, 5–6.

b. Defendant Young's assurance that progress was occurring despite being "less visible externally"

199. During the same call, Young stated in substance that the team continued working diligently and that progress might be less visible externally:

> while the progress on our IPO may be less visible externally, I'm very grateful for **the diligence of our team and confident that we can successfully bring it to fruition.** In the meantime, we will continue to prioritize cost savings and efficiency, and we are focused on accelerating our return to profitability. And thank you to our customers, our shareholders for their continued support.

(Emphasis added.)

200. Young's assurance was materially misleading because he had personally participated in the Guojing response, assessed the answers given to the CSRC, and worked in China on the unresolved item, yet described the delay only as reduced visibility.

## M. March 15, 2024 Form 10-K

a. The statement that Tongmei hoped to complete the IPO "in the coming months"

201. On March 15, 2024, AXT filed its annual report on Form 10-K for the year ended December 31, 2023 (the "2023 Form 10-K"), signed by Young and Fischer, which stated:

> Tongmei submitted its IPO application to the Shanghai Stock Exchange in December 2021 and it was formally accepted for review on January 10, 2022. The Shanghai Stock Exchange approved the IPO application on July 12, 2022. On August 1, 2022, the CSRC accepted for review Tongmei's IPO application. . . . Subject to review and approval by the CSRC and other authorities, Tongmei **hopes to accomplish this goal in the coming months**.

(Emphasis added.)

202. The statement was materially misleading because it presented the application as a lengthy but ordinary review susceptible to near-term completion, omitting the unresolved criminal trade-secret question, Zhang's arrest, and the police demands on the BoYu entities.

b. <u>The generic completion and redemption warnings</u>

203. The 2023 Form 10-K further warned:

> There can be no assurances that Tongmei will complete its IPO in 2024 or at all. In the event that investors exercise their redemption rights, we may be required to seek additional capital . . . . **Any redemptions could have a material adverse effect on our business, financial condition and results of operations.**

(Emphasis added.)

204. The warnings were materially misleading because they described failure and redemption only as generic future risks while omitting the specific unresolved trade-secret and criminal obstacle, the prolonged absence of a response, the fact that maintaining the application in a pending posture continued to defer the approximately $49 million redemption rights and that the condition deferring redemption had already broken down.

## VI. PARTICULARIZED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

205. Plaintiffs incorporate the foregoing allegations. The following facts, individually and collectively, give rise to a cogent and compelling inference that Young, Fischer, and AXT acted with actual knowledge or deliberate recklessness in issuing, approving, signing, and disseminating the false and misleading statements alleged herein.

206. Plaintiffs do not rest scienter on executive titles, signatures on SEC filings, the importance of the IPO, or generalized access to information. Plaintiffs plead particularized company-level notice, direct governance of the entities implicated by the misconduct, police activity at those entities, the Guojing-specific investigation, Young's personal interview and

certifications, Defendants' own admissions about the CSRC questions and answers, Board reporting, personal work on the unresolved matter, and the financial consequences of keeping the application pending.

207. Plaintiffs allege scienter as to two distinct categories of concealed fact, neither dependent on the other. First, Defendants knew that an actual dispute existed between Guojing and Tongmei's wholly owned BoYu subsidiaries over the source of the PBN-PG composite-heater technology. Knowledge of that dispute required no knowledge of any criminal proceeding: it was the subject of Guojing's written demand to Beijing BoYu, of its Report Letter to the Exchange, of the Exchange's formal inquiry, and of the investigation in which KWM personally interviewed Young. Second, Defendants knew, or deliberately disregarded, that the dispute had escalated into a criminal matter the CSRC identified as a potential obstacle to registration—knowledge established by the police search and seizure at Beijing BoYu, the sealed written responses the BoYu entities gave police, and Young's own account of the CSRC's two questions.

208. For each Defendant, the allegations below identify what he knew, how he learned it, and when. Young learned: by June 16, 2022, that Guojing had accused Tongmei and Zhang of trade-secret infringement, from KWM's interview of him and from the Reply he read in full and certified; by February 23, 2022, that a criminal authority had searched premises he chaired and legally represented and seized that company's computer, records, and composite heaters; by October 27, 2022, that the CSRC had issued exactly two questions, one captioned "Regarding Trade Secret Disputes"; by May 2023, that the same authority was serving evidence demands on Beijing BoYu and Chaoyang BoYu and that those companies were answering under seal; and by August 3, 2023, that Tongmei's answers had not satisfied the regulator and one question remained open, which he told investors that day.

209. Fischer learned: by June 17, 2022, the contents of the Second-Round Reply and KWM's opinion, which he signed a Form 8-K to furnish to U.S. investors; by October 27, 2022, that the CSRC had issued written questions, whose receipt he announced and whose character he called "normal and customary"; throughout the Class Period, that he sat on the boards of the three BoYu entities from which police were seeking evidence; by November 2, 2023, that one item remained and that AXT's CEO had gone to China to work on it personally, which he told investors; and continuously, from the filings he signed, that the application's pendency was all that deferred an approximately $49 million redemption obligation.

**A. Defendant Young Acted with Actual Knowledge or Deliberate Recklessness**

a. Defendant Young had direct responsibility for Tongmei's technology, IPO, and BoYu operations

210. Young's scienter is not inferred from his status as AXT's CEO. AXT's Board expressly authorized him to promote Tongmei's offering and listing. He was Tongmei's Chairman and legal representative, signed both prospectuses as a Tongmei director and AXT's authorized representative, and was identified by Tongmei as one of its four core technicians who led its technology team and directed technical routes, equipment, and consumables. He was also legal representative and Chairman of all three BoYu entities. He therefore held the highest governance position at every level of the wholly owned chain tied to Zhang's employment, the disputed R&D data, the accused products, the police search, and CN110662314B.

b. Guojing placed BoYu's senior technical and operating management on notice before the Class Period

211. According to CW-1, a Guojing principal contacted He in approximately September or October 2019 about whether Beijing BoYu was using Guojing's technology, and He denied it. After confirming in early 2020 that Zhang had joined Tianjin BoYu and worked

from Beijing BoYu's premises, Guojing sent Beijing BoYu a written demand to cease. Beijing BoYu did not respond.

c. The criminal investigation directly reached the BoYu workplace before Young's June 2022 certification

212. The February 23, 2022 search was directed at company property on company premises, not at Zhang's home or person. The desktop computer seized was the workstation at his desk inside Beijing BoYu; the four composite heaters were taken from the company's office cabinets and display area. A criminal investigative authority does not enter a company's offices, remove hardware from its workstations, and take product samples from its display area without the company knowing. Young was that company's registered legal representative, the person through whom, under Article 61 of the Civil Code of the People's Republic of China, the company acts and is bound. Fischer sat on its board. The search preceded the March 2022 Form 10-K, the Exchange's inquiry, Young's KWM interview, and his certification.

d. Defendant Young personally participated in a detailed, Guojing-specific investigation and confirmed the challenged conclusions

213. KWM described an investigation directed specifically to Zhang, Guojing, and the technologies identified in Guojing's Report Letter. KWM reviewed Zhang's Tongmei employment and interview records, identification documents, résumé, Boyu Hengye ownership documents, his employment and confidentiality agreements with Guojing, materials on his departure, twelve months of bank statements, his communications with Guojing personnel, his written statement, and a legal opinion prepared for him by his attorney. KWM also interviewed Tongmei's core technicians, its PBN R&D leaders, and responsible personnel at Beijing BoYu about the sources of the disputed technologies. This was no generic IP review.

214. KWM expressly stated that its conclusions—independent development, no infringement, and no dispute or potential dispute—rested on explanations from Tongmei and its core technicians and were "confirmed through the interviews with" Young and Tongmei's General Manager. Young was therefore interviewed on the precise conclusions challenged here.

215. The "no dispute or potential dispute" representation is the cleanest measure of Young's state of mind, because its falsity depended on nothing he could plausibly claim not to know. The Exchange asked, in terms, whether any dispute or potential dispute existed. KWM answered no, and said it confirmed that answer through its interview of Young. The document containing that answer recited the accusation: Tongmei acknowledged receiving a Report Letter alleging that an involved employee had infringed a former employer's trade secrets. A person interviewed about whether a dispute exists, in connection with a document reciting the accusation, who then certifies that he has "carefully read the entire reply" and that it contains "no false records, misleading statements or major omissions," knows an accusation was made and that a dispute at least potentially exists.

216. The point is not that Young should have known better. It is that the categorical denial he certified contradicted the document he certified. Tongmei could not disclose that a competitor had reported it for trade-secret infringement, describe the fourteen-category investigation undertaken in response, and simultaneously represent that "there is no dispute or potential dispute with relevant entity." Young read and certified both halves of that contradiction.

217. Young then signed the June 16 Second-Round Reply and certified:

> "I have carefully read the entire reply to the inquiry letter for Beijing Tongmei Xtal Technology Co., Ltd. in this audit, and hereby confirm that the reply contains no false records, misleading statements or major omissions, and I assume corresponding legal responsibility for the authenticity, accuracy, completeness and timeliness of the reply."

e. <u>The criminal judgment further undermines the innocent inference</u>

218. The Criminal Judgment identified CN110662314B as the patent through which Zhang disclosed Guojing's protected information, and recounted testimony that he drafted the initial patent disclosure, supplied the technical data, transmitted process parameters to Chaoyang BoYu, and performed the boron-doped PG work jointly with BoYu personnel. The named inventor was He—the same executive on whose prior work Tongmei relied to deny infringement. The judgment also recounts that BoYu had no composite-heater technology before the project began, and that the coating work was completed in August 2019, months after Zhang arrived. That directly contradicts the development timeline Young confirmed.

f. <u>The BoYu entities' 2023 police interactions preceded Young's detailed public descriptions of the CSRC questions</u>

219. Before Young's August 3, 2023 statements, Beijing BoYu—an entity he chaired and legally represented—had already received repeated police evidence demands and answered them in writing. The interactions continued: police returned to Chaoyang BoYu on August 18, 2023; Chaoyang BoYu responded on August 22 that the process materials were on Zhang's seized computer and could be retrieved, printed, stamped, and submitted; and Beijing BoYu answered again on September 13, 2023. *See* Ex. 23 at 5–6.

220. Each written response was a corporate act, not a personal act of Zhang. Chaoyang BoYu's response stated that the materials could be retrieved, printed, stamped, and submitted—confirming that the company answered under its own official seal. In Chinese corporate practice, the official company seal is the instrument by which a company binds itself; it is registered with the Public Security Bureau, is controlled by the legal representative or an officer he designates, and is not affixed to a submission to a criminal investigative authority without senior-management

authorization. Young was the registered legal representative of both companies when each response was sealed and submitted.

221. The pattern forecloses the inference of executive ignorance. Between May 8 and September 13, 2023, police made at least six approaches to the BoYu companies. Named Beijing BoYu managers Liu Shuyue and Wang Junyong accepted the evidence demands but refused to sign, then failed to appear and did not answer calls or messages; Chaoyang BoYu personnel refused to cooperate on May 10. Coordinated non-cooperation with a criminal investigative authority across three wholly owned subsidiaries, sustained for five months, is not something middle managers adopt without the knowledge of the chairman and legal representative of all three.

222. Young's own words on August 3, 2023 establish his knowledge of the criminal question. The CSRC's registration-stage inquiry consisted of exactly two questions. Young identified that number publicly, calling them "these 2 little question[s]." He graded the answers as "really good." He reported repeatedly briefing AXT's Board on expected timing. And he said "we only have one question to be answered." He also identified his source: the Chinese IPO sponsor and lead-underwriter team.

223. A chief executive who knows there are two questions, has evaluated the answers to both, has briefed his board on when approval will follow, and knows one remains open cannot plausibly be unaware of what the open question asks: the field is two. Young therefore knew, no later than August 3, 2023, that a securities regulator had asked whether Tongmei and its subsidiaries faced criminal exposure from the trade-secret dispute and that the question was unresolved. He told investors approval "could be as quick as next month."

g. <u>Defendant Young personally worked in China on the sole unresolved item and continued the near-approval narrative</u>

224. On November 2, 2023, during the prepared STAR Market update on AXT's third-quarter 2023 earnings call, Defendant Fischer stated:

> We do need to resolve **one open item**. **Morris is in China as we speak and is working on this matter**. Although it is moving slower than we expected, **we are making progress**, and we are confident that Tongmei remains an excellent candidate for a listing and **will be approved to proceed**.

(Emphasis added.)

225. Fischer then turned the call over to Young: "Morris, welcome from China." Young, on the call from China, responded immediately and did not correct or qualify Fischer's description of his personal work on the sole remaining item, the asserted progress, or the expectation of approval.

226. On February 22, 2024, Fischer again said Tongmei needed to resolve only "1 open item," that AXT was "making progress," and that Tongmei remained an "excellent candidate for listing." Young said progress might be "less visible externally" but that he remained confident. Those statements followed Zhang's renewed detention on December 23, 2023 and his arrest on January 5, 2024.

227. Young's statements were not an isolated or mistaken prediction. They formed a continuing narrative running from his June 16, 2022 certification of the categorical denial, through his August 2023 assessment of Tongmei's "really good answers," his November 2023 work in China on the sole remaining item, and his February 2024 assurance that progress was merely "less visible externally." At a minimum, an executive charged with advancing the IPO who did all of that acted with deliberate recklessness in assuring investors that approval was near without disclosing the nature of the obstacle.

### B. Defendant Fischer Acted with Actual Knowledge or Deliberate Recklessness

a. Defendant Fischer directly governed the exact operating entities implicated by the controversy

228. Throughout the Class Period, Fischer was a director of Beijing BoYu, Tianjin BoYu, and Chaoyang BoYu. He was one of only five registered principal personnel at Beijing BoYu, one of four at Tianjin BoYu, and one of five at Chaoyang BoYu—the entities tied to Zhang's employment, the internal R&D data, the composite-heater development, the police search and evidence demands, and CN110662314B. See Exs. 20–24.

b. The criminal investigation directly involved companies Defendant Fischer governed

229. Police searched Zhang's Beijing BoYu workplace in February 2022 and seized company records and products; during 2023 Beijing BoYu and Chaoyang BoYu received evidence demands and answered in writing. Fischer was a director of each entity throughout. That makes the competing inference—that he reported the IPO's regulatory status while unaware of a criminal matter affecting the exact companies he governed—less compelling.

c. Defendant Fischer's IPO involvement was direct, substantive and every day

230. On April 28, 2021, during AXT's first-quarter 2021 earnings call, Craig-Hallum analyst Richard Shannon asked about the STAR Market process and increasing Chinese regulatory scrutiny. Young answered: "So let me try that first. But definitely, Gary is more qualified. He's very much involved. I mean every day, there are many, many activities Gary is covering." Fischer then answered the question himself and discussed the Chinese regulatory review and Tongmei's qualifications. That first-person description establishes daily substantive involvement beyond Fischer's title.

231. Fischer announced the CSRC's questions and characterized them himself. On October 27, 2022 he told investors that AXT had "feedback from the CSRC in the form of questions" and that AXT's advisers considered them "normal and customary." A chief financial officer who publicly characterizes a regulator's written questions has either read them or consciously chosen not to. There were two. One asked whether a public security agency had opened a criminal case against Tongmei or its subsidiaries—three of which he served as a director—whether the conduct was a corporate crime, and whether it barred the offering. Nothing about that question was normal or customary. Either Fischer knew what he was calling routine, or he described a regulator's questions without knowing what they said. Each suffices.

d. Defendant Fischer repeatedly disseminated the evolving disclosure narrative concerning the same entities he governed

232. On April 28, 2022, on AXT Q4 2023 Earnings Call, Fischer delivered AXT's STAR Market update immediately after reviewing quarterly results. He said the review was "proceeding according to our expectations"; that Tongmei had submitted a "lengthy and detailed response" to the Exchange's first inquiry; and that "earlier this week" Tongmei had received a second set of questions, whose timing he called "positive" and a "very fast turnaround" with which management was "pleased."

233. These were not generalized statements that an application remained pending. On November 2, 2023, Fischer identified the precise number of unresolved items, disclosed that Young was personally in China working on the sole remaining matter, said the work was producing progress, and predicted that Tongmei "will be approved to proceed." On February 22, 2024, after Zhang's custody and arrest, he again identified one unresolved item, said progress was being made, and called Tongmei an excellent listing candidate. The inference that he described all of that while

unaware of the subject matter of the sole unresolved item is substantially less compelling than the inference that he knew, or deliberately avoided learning, what it was.

e. Fischer Understood the Redemption Mechanism and the Financial Consequence of Maintaining the Application in Pending Status

234. Fischer's knowledge of the redemption mechanism is established by the filings he signed. On November 19, 2020 he signed the Form 8-K disclosing that the investors could require AXT to repurchase their Tongmei shares at cost if the listing had not been completed and the CSRC had not approved the application by December 31, 2022. On February 18, 2021 he signed the Form 8-K reporting the approximately $49 million funding for an approximately 7.28% interest. On March 23, 2021 he and Young signed the Form 10-K disclosing that redemption would be deferred while an accepted application remained under review, and warning that "[a]ny redemptions could have a material adverse effect on our business, financial condition and results of operations." AXT's 2021, 2022, and 2023 Form 10-Ks, each signed by Fischer, repeated the same disclosure.

235. Fischer confirmed that understanding in his own words on May 2, 2024 on AXT Q1 2024 earnings call. Asked what would happen if the application were rejected, whether AXT would have to repay the private-equity investment, and how it would finance repayment, Fischer answered: "Well, as long as we're in the process they have no right for redemption." He added that the investors did not want their money back. Young then discussed alternatives if the IPO did not occur. Fischer added: "Yes, let me give you—we have talked about this internally. So, we're not worried about it."

236. Those statements confirm what the Class Period filings already reflected: keeping the application formally "in process" deferred redemption, while rejection or withdrawal could activate a material repayment obligation. Because the May 2 statement postdates the Class Period,

Plaintiffs rely on it as corroboration of Fischer's understanding, not as the sole basis for his earlier scienter.

f. <u>At minimum, Defendant Fischer acted with deliberate recklessness</u>

237. Even if Fischer did not know every procedural detail of Zhang's criminal matter, his repeated representations about the number, status, and expected resolution of the regulatory questions—made while he served as a director of the companies dealing with police, and while omitting that one of only two CSRC questions concerned an actual trade-secret dispute, a possible criminal case, possible corporate crime, and an IPO obstacle—were an extreme departure from ordinary care.

## C. AXT Acted with Corporate Scienter

238. Young and Fischer made the challenged statements within the scope of their authority as AXT's CEO and CFO. They spoke on AXT's earnings calls, signed its SEC filings, furnished Tongmei's regulatory materials to U.S. investors, and addressed a transaction and financial exposure central to AXT. Young acted under express Board authorization and served as legal representative and Chairman of Tongmei and all three BoYu entities; Fischer's prepared remarks and filings stated AXT's official disclosure position and he was a director of all three. The repeated narrative across filings, releases, and calls reflects a corporate disclosure position, not a drafting error. Their scienter is attributable to AXT.

## D. The Scienter Allegations Are Cogent and Compelling When Considered Holistically

239. The scienter allegations must be read collectively. They establish a continuous, escalating sequence: Guojing confronted He in 2019 and demanded in writing that BoYu stop; the BoYu entities applied for the patent later found to have disclosed Guojing's information; police opened a criminal case in October 2021 and searched Beijing BoYu in February 2022; the

Exchange demanded answers and Tongmei, Haitong, and KWM investigated and denied everything after interviewing Young; the CSRC then asked, in one of only two questions, whether a criminal case existed and whether it barred the offering; police pressed the BoYu entities for evidence through 2023; Zhang was arrested in January 2024—and throughout, Defendants told investors the process was ordinary, active, progressing, and nearly complete.

240. The concealed facts also concerned matters of such magnitude that Defendants' knowledge may be inferred from their positions, independently of the particularized allegations above. Tongmei generated approximately 97% of AXT's revenue and employed approximately 99.8% of its workforce. The BoYu entities were not a financing vehicle: they conducted Tongmei's PBN operations, one of the two "wings" of its business, supplying two of twelve categories of core technology, five of fifty-two domestic invention patents, and approximately 12% of Tongmei's 2021 revenue. The Guojing matter put the lawful ownership of that technology in question, exposed Tongmei and its subsidiaries to potential corporate criminal liability, and threatened a cash obligation larger than AXT's unrestricted cash. Plaintiffs plead this as one strand among many.

241. These allegations do not depend on corporate titles or theoretical access. Young was legal representative and Chairman of all three BoYu entities and Fischer a director of each; they were two of only four or five registered principal personnel at each; and each entity reported enrollment below approximately 115 persons. The conduct involved the R&D data, products, personnel, police searches, evidence demands, written company responses, and patent of those exact entities.

242. The approximately $49 million redemption exposure supplies further context. Defendants signed repeated disclosures explaining that rejection or withdrawal could activate a

material repayment obligation while continued pendency deferred it. Fischer later confirmed that "[a]s long as we're in the process" the investors had no redemption right and that management had "talked about this internally." Plaintiffs do not rely on motive alone; management's understanding of that benefit reinforces the inference arising from Defendants' detailed involvement and repeated assurances.

243. The magnitude of the deferred obligation was extraordinary relative to AXT's size. At December 31, 2023, AXT reported approximately $52.3 million in cash, cash equivalents and investments, of which approximately $12.4 million was restricted, against approximately $52.9 million in short-term bank debt, and generated only approximately $3.4 million in operating cash flow. Its market capitalization was approximately $138 million. A $49 million redemption demand would have exceeded all unrestricted cash and equaled more than one-third of the Company's market value. That is not the generalized wish for a higher stock price; it is a quantified, contemporaneous benefit flowing exclusively from keeping the application "in process."

244. The competing innocent inference would require the Court to conclude that Young could govern the relevant entities, lead Tongmei's technology organization, participate personally in the Guojing investigation, certify that no dispute existed, assess the two CSRC answers, brief the Board, and work in China on the sole remaining item—yet remain unaware of the obstacle. It would simultaneously require that Fischer could govern the same entities, be involved daily, disseminate every stage of the disclosure narrative, describe the questions and the response process, know Young was working on the sole unresolved matter, and understand the redemption consequences—yet not know what prevented approval.

245. That inference is substantially less compelling than the inference that Young and Fischer knew, or were deliberately reckless in disregarding, the nature and seriousness of the Guojing dispute, the criminal proceedings, and their effect on Tongmei's IPO. Considered holistically, the allegations establish a cogent and compelling inference of scienter at least as strong as any opposing inference.

## VII. LOSS CAUSATION

### A. Defendants' Statements Created and Maintained a Distinct IPO-Related Component of Inflation

246. Defendants' statements created and maintained a distinct component of inflation in AXT's stock price: the market's expectation that Tongmei remained a viable candidate for a value-enhancing STAR Market IPO. AXT repeatedly represented that the listing would replenish cash, increase market value with minimal dilution, strengthen the balance sheet, fund expansion, and create shareholder value. The stock rose approximately 23.3% after the November 2020 announcement. Craig-Hallum estimated as much as 200% upside from a successful listing; Needham treated listing as part of the bull case and failure as part of the bear case. That IPO-related component remained in the stock immediately before the Class Period ended.

247. In August 2023, an analyst called the listing question "obligatory," demonstrating continuing market attention. In November 2023 and February 2024, AXT continued to state that only one item remained, progress was being made, and Tongmei remained an excellent candidate.

248. The challenged statements therefore maintained that inflation by keeping the market from learning that the process was not moving through ordinary review, that the unresolved matter was an actual trade-secret and criminal issue, and that the stalled application increased the risk to both expected IPO value and the approximately $49 million investment.

**B. The April 4, 2024 J Capital Report Revealed an Integrated Concealed Condition, Not Merely a Half-Page IP Allegation**

249. On April 4, 2024, before the market opened, J Capital Research published a 38-page report on AXT (the "J Capital Report," Ex. 8), titled "*AXTI May Be on the Brink of Collapse: Chinese Headlines Say Its Local IPO Has Failed. Its Revenue Is Plummeting and Creditors Are at the Door—The Chinese Reports AXTI Doesn't Want You to See*." Its title and opening summary told U.S. investors that Chinese reporting indicated Tongmei's local IPO had failed or been blocked, that the listing vehicle had raised approximately $49 million from private investors, that approximately eighteen months had passed since the last IPO update, and that "U.S. investors haven't been told that the IPO has apparently been blocked by Chinese regulators."

250. That was materially different information about the status, cause, and financial consequences of Tongmei's application. It directly contradicted Defendants' representations that Tongmei remained in an active, ordinary review; that it maintained "active dialogue" with the CSRC; that only a small number of items were being answered; that only "one open item" remained; that progress was being made; and that approval was expected "soon" or "in the coming months."

251. The Report also identified the concealed trade-secret matter as one reason the IPO had not advanced. Under "Problem No. 3: The company is being sued for allegedly stealing IP," it stated: "An allegation against Tongmei of IP infringement is reportedly among the issues blocking an IPO."

252. The Report cited and linked Chinese-language reporting on the same Guojing dispute Tongmei had acknowledged and rejected in the June 16 Second-Round Reply. Although J Capital's heading said Tongmei was being "sued," the cited reporting described the matter's criminal escalation: Guojing had reported Zhang and Tongmei to the Yucheng City Public

Security Bureau; police had opened a criminal investigation in October 2021; the investigation had concluded and the case had been transferred to the procuratorate for prosecution; and the dispute had become the "biggest" obstacle to the IPO.

253. Through the Report and the Chinese sources it disseminated, U.S. investors learned what AXT's disclosures had omitted: the accusation acknowledged in June 2022 had escalated into a police investigation and anticipated prosecution; the criminal matter concerned the same employee, technologies, and BoYu operations addressed in Tongmei's independent-development and no-dispute representations; and that matter had become a material obstacle to the application. Those facts corrected Defendants' portrayal of the outstanding issue as routine, limited, progressing, and near resolution.

254. The Report separately explained the financial consequence. If the listing were rejected, AXT would have to repay the approximately $49 million; the agreements deferred redemption while an accepted application remained pending, but the deferral would end on rejection or withdrawal. The Report stated: "The Shanghai Stock Exchange accepted the application in January 2022, but the IPO is still in limbo."

255. The Report compared the potential redemption demand with AXT's year-end 2023 position—approximately $39.9 million in unrestricted cash and short-term investments, approximately $12.4 million in restricted cash, approximately $3.4 million of 2023 operating cash flow, and approximately $52.9 million of short-term bank debt—and concluded that a $49 million demand could severely threaten AXT's financial condition.

256. The Report therefore did more than repeat AXT's previously disclosed redemption terms. It connected that disclosed mechanism to a newly disclosed, company-specific condition: the IPO had stopped progressing because of an undisclosed trade-secret and criminal matter, and

the application's continued formal pendency was all that postponed a material cash demand. The disclosure made the exposure immediate and concrete.

257. The corrective information is not measured by the half-page under "Problem No. 3." The Report disclosed the integrated condition across several portions: its title and opening summary disclosed the failed or blocked IPO; the intellectual-property section and the Chinese reporting it cited supplied the concealed trade-secret and criminal cause; and its financial discussion explained the redemption consequence.

258. Prominence, not page count, determines what a market report communicates. The IPO obstruction appeared in the Report's title, subtitle, opening summary, investment thesis, and closing financial analysis. The title placed the failed IPO before every reader before any numbered "Problem" heading was reached. By contrast, the seventeen pages of historical legal and regulatory matters appeared last, under the sixth heading, and consisted principally of proceedings AXT had already furnished to U.S. investors in English as a Form 8-K exhibit.

### C. The J Capital Report's Six Numbered Problems and Additional Accusations Did Not Carry Equal Incremental Informational Content

259. The J Capital Report contained six numbered "problems" and several unnumbered accusations concerning AXT's finances, properties, suppliers, advisers, management, and prospects. Space devoted to a subject does not establish how much new information it conveyed. Substantial portions reproduced or adversely characterized facts already available through English-language SEC filings and earnings materials. The Report's subjects therefore differed materially in novelty, factual basis, connection to the challenged statements, and incremental informational content.

a. <u>The Report's Opening, Unnumbered Discussion Disclosed the Stalled IPO and Made the Previously Disclosed Redemption Terms Materially More Concrete</u>

260. Before its six numbered "problems," the Report devoted its title, opening summary, and an early section titled "AXTI's China IPO pipe dream is blocked, but AXTI has said nothing" to the stalled IPO. It stated that approximately eighteen months had passed since the last substantive update, that "U.S. investors have been told nothing," and that Chinese reporting indicated the application had been blocked, and connected that to the approximately $49 million private-equity investment. The amount and the contractual mechanism were not new. What was new was that the condition maintaining the deferral had allegedly broken down.

b. <u>Problem No. 1: The General Risk and Prior Operational Effects of Environmental Shutdowns Were Public, Although Certain Local Incidents Were Incremental</u>

261. Under "Problem No. 1: Tongmei production has been halted >10x for environmental infractions," J Capital alleged that regulators had repeatedly halted or restricted Tongmei's production. *See* Ex. 8 at 9–14. J Capital added Chinese-local details that may not have been available through ordinary U.S. channels, including its allegation of more than ten shutdowns, particular regulatory notices, groundwater findings, an alleged 2020 fire, and an anonymous employee's account of a relocation. But the incremental point was narrower than J Capital's characterization. The underlying facts regarding the existence and operational consequences of environmental shutdowns had previously been disclosed and were already known. AXT's 2021 Form 10-K (at 28, 40)[2] had already disclosed in English that Chinese environmental restrictions could interrupt manufacturing and reduce revenue, describing an approximately ten-day shutdown in early 2018, delayed shipments, reduced quarterly revenue,

[2] https://www.sec.gov/ix?doc=/Archives/edgar/data/1051627/000155837022003664/axti-20211231x10k.htm

and the risk of recurrence. As confirmed by Wedbush Securities later, it had seen no evidence from the J Capital Report that AXT faced an unusual or disproportionate risk of future environmental disruption. *See* Ex. 18 at 1–2.

c. Problem No. 2: AXT's Severe Business Contraction Was Public, Although the Anonymous Production and Yield Estimates Were Incremental

262. Under "Problem No. 2: Plummeting production," J Capital reported that former Chinese managers estimated that production volume had fallen to approximately 50% of prior levels and, during some months, to approximately 10%. It also attributed to a former production leader specific estimates concerning deteriorating manufacturing yield and efficiency in Liaoning. *See* Ex. 8 at 14. The precise anonymous-source percentages and operational descriptions were incremental. The underlying contraction in demand, sales, and profitability, however, was not new. AXT's Form 10-Q for the first quarter of 2023 reported revenue of approximately $19.4 million, compared with approximately $39.7 million in the first quarter of 2022—a year-over-year decline of approximately 51.1%.[3] AXT subsequently reported year-over-year revenue declines of approximately 52.9% in the second quarter[4] and 50.6% in the third quarter of 2023.[5]

263. As Wedbush explained, materially lower production and utilization were the logical consequence of AXT's publicly reported sales decline unless AXT was producing additional inventory without corresponding demand. *See* Ex. 18 at 1. Therefore, the central fact that AXT's business and utilization had contracted severely had previously been disclosed and already publicly known.

---

[3] https://www.sec.gov/Archives/edgar/data/1051627/000155837023009109/axti-20230331x10q.htm?utm_source=chatgpt.com

[4] https://www.sec.gov/Archives/edgar/data/1051627/000155837023014267/axti-20230630x10q.htm?utm_source=chatgpt.com

[5] https://www.sec.gov/Archives/edgar/data/1051627/000155837023018573/axti-20230930x10q.htm?utm_source=chatgpt.com

d. Problem No. 3: The IP and Criminal Matter Was Qualitatively Different and Directly Corrected Defendants' IPO Narrative

264. J Capital's shorthand reference to Tongmei being "sued" did not capture every procedural detail. The Chinese source it disseminated described a criminal investigation, its completion, and a pending prosecution.

265. As stated above and below, Problem No. 3 therefore differed qualitatively from the other numbered problems. The criminal escalation, the related proceedings, and their role in obstructing the registration had never been disclosed to U.S. investors and directly contradicted the challenged statements.

e. Problem No. 4: The Related-Party Transactions and Their Scale Were Extensively Disclosed; J Capital Added Adverse Characterizations and Selected Local Commentary

266. Under "Problem No. 4: Fishy related-party sales," J Capital alleged that related-party purchases and sales approached 50% of Tongmei's revenue and occurred at "sweetheart prices." J Capital expressly relied on AXT's own English-language SEC exhibits, including the August 1, 2022 Form 8-K and earlier responses AXT had furnished. Those materials disclosed the amounts and percentages of related-party purchases and sales, the counterparties and their relationships, the pricing mechanisms, the effect on Tongmei's costs and results, and the procedures Tongmei, Haitong, KWM, and the reporting accountants used to examine them.

267. J Capital therefore did not first reveal the existence or scale of the related-party transactions.

f. Problem No. 5: Wage Disputes were Immaterial

268. Under "Problem No. 5: Tongmei has been sued multiple times for defaulting on wages to employees," J Capital relied on a 2022 Chinese-language article and Chinese court records describing wage claims against Tongmei entities. J Capital, however, did not identify them

as a reason the registration had stalled, and they bore no relationship to any statement challenged here.

269. Based on Plaintiffs' independent research using Tianyancha, a comprehensive Chinese corporate-information database that compiles extensive corporate, regulatory, and litigation records, Tongmei was involved in twelve identified legal proceedings, only three of which concerned wage disputes. Those three matters consisted of: (i) the Cui Dongmei matter discussed by J Capital, involving RMB 406,835.60; (ii) Beijing Tongzhou Labor and Personnel Arbitration Case Nos. [2019] 3892–3897, involving RMB 8,952; and (iii) Beijing Tongzhou Labor and Personnel Arbitration Case Nos. [2019] 3924–3929, involving RMB 6,100. Together, the three matters involved approximately RMB 421,887.60—less than $80,000—and were immaterial to Tongmei, its IPO and AXT. *See* Ex. 24.

g. <u>Problem No. 6 Had Previously Been Disclosed</u>

270. Under "Problem No. 6: Numerous legal violations," J Capital expressly stated that AXT's January 10, 2022 Form 8-K included a seven-page English-language list of the matters it discussed. The 22 historical legal and regulatory proceedings it collected were therefore taken from a document AXT itself had furnished to U.S. investors more than two years earlier.

h. <u>The Report's Additional, Unnumbered Accusations Likewise Combined Public Facts, New Local Details, and Adverse Interpretations</u>

*(i) Inventory and Short-Term Borrowing*

271. After Problem No. 6, J Capital alleged that AXT's inventory had grown to roughly sixteen months of sales and suggested that some of it might not exist or might be overstated, and pointed to AXT's short-term borrowings.

272. The reported inventory balances, product categories, reserve accounting, sales decline, short-term bank debt, and operating cash flow had previously been disclosed. AXT's 2023

Form 10-K disclosed approximately $86.5 million of net inventory, an approximately $21.9 million reserve for excess and obsolete inventory, the auditors' treatment of inventory-reserve valuation as a critical audit matter, and approximately $52.9 million of short-term bank debt. J Capital's months-of-inventory figure was a calculation from those public numbers.

273. Wedbush characterized as speculative J Capital's suggestion that the reported inventory might not exist, explaining that AXT's inventory was consistent with levels reached when IC demand surged and with management's stated difficulty reducing inventory without further cutting utilization. *Ex*. 18 at 1.

*(ii) Property, Plant, Equipment, and Building Costs*

274. J Capital separately questioned AXT's reported building costs and called certain facilities "ramshackle," relying on AXT's reported building balance of approximately $99.3 million and its approximately $166.3 million of net property, plant, and equipment—both disclosed in AXT's 2023 Form 10-K. J Capital added Chinese land records, photographs, physical-condition descriptions, and its own valuation conclusions.

275. Wedbush responded that J Capital's analysis omitted the DingXing facility that had appeared in AXT's investor deck for some time. *See* Ex. 18 at 1.

*(iii) Purchases from Equity Investments and Alleged Circularity*

276. In an unnumbered section titled "Procuring from and investing in the same companies," J Capital observed that AXT purchased raw materials from companies in which it held equity interests. Before publication of the J Capital Report, AXT's English-language SEC filings had disclosed its equity interests in Chinese raw-material suppliers, its purchases from those companies, the ownership percentages and accounting methods applicable to the investments, and the concentration of raw-material sales among a limited number of customers. Tongmei's English-

language prospectuses, regulatory responses, and audited financial statements furnished by AXT likewise identified the affiliated suppliers, materials purchased, transaction amounts, pricing methods, and related-party relationships. See AXT 2023 Form 10-K (equity interests, purchases, accounting treatment, and customer concentration)[6]; AXT Forms 8-K, Ex. 99.1 (June 17, 2022) (suppliers, purchases, and affiliated entities)[7], and Exs. 99.1 (transfer of suppliers and related-party purchasing)[8] and 99.4 (Aug. 2, 2022) (detailed related-party purchases and sales)[9].

*(iv) Haitong Securities and the IPO Investments*

277. J Capital also asserted that Haitong-related entities invested in Tongmei to generate interest in the IPO or "inflate the orderbook," noted that Haitong had sponsored withdrawn offerings, and discussed warnings, disgorgement, and fines imposed on Haitong. *See* Ex. 8 at 32–33. The existence and extent of the Haitong-related investments were expressly disclosed in the English-language Initial Prospectus and Registration Prospectuses. Those materials identified Haitong Innovation, Haitong New Driving Force, and Haitong New Energy as Tongmei shareholders; disclosed their respective ownership percentages; described their relationships with Haitong Securities; and addressed whether those interests could affect Haitong's performance of its sponsorship duties. The information had therefore been previously disclosed.

---

[6] https://www.sec.gov/Archives/edgar/data/1051627/000155837024003410/axti-20231231x10k.htm?utm_source=chatgpt.com
[7] https://www.sec.gov/Archives/edgar/data/1051627/000155837022011572/axti-20220801xex99d1.htm?utm_source=chatgpt.com
[8] https://www.sec.gov/Archives/edgar/data/1051627/000155837022010098/axti-20220617xex99d1.htm?utm_source=chatgpt.com
[9] https://www.sec.gov/Archives/edgar/data/1051627/000155837022011572/axti-20220801xex99d4.htm?utm_source=chatgpt.com

*(v) Management, Board, Auditor, and Underwriter Histories*

278. In an unnumbered section on the "checkered history" of AXT's executives and Board, J Capital discussed Fischer's 2007 SEC proceeding and other management and auditor histories. Fischer's 2007 SEC proceeding was longstanding public information. The SEC announced the settlement, disgorgement, civil penalty, and five-year officer-and-director bar on August 1, 2007.[10] J Capital revealed no new proceeding. Wedbush treated it as old and immaterial to AXT's current operations. *See* Ex. 18 at 1.

*(vi) Export Controls, "AI Washing," Falling Revenue, and Competitive Fundamentals*

279. The Report also described AXT as a low-margin, cyclical commodities business, accused management of "AI washing," questioned AI-related demand, and pointed to export controls and falling revenue. AXT's quarterly revenue, losses, margins, inventory levels, management's AI-related statements, and exposure to Chinese export controls on gallium and germanium were all disclosed in AXT's SEC filings, earnings releases, and earnings calls. J Capital's contribution was its adverse characterization of that public record.

280. In sum, the principal factual subjects underlying J Capital's non-IPO discussions had already been publicly disclosed through English-language SEC filings and other U.S. market materials and had been incorporated into AXT's stock price before April 4, 2024. Although J Capital added certain local details and adverse characterizations, the substantial factual core of those discussions was not newly revealed by the Report.

---

[10] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-20219?utm_source=chatgpt.com

### D. The Six Problems and Additional Accusations Cannot Be Treated as Equally New or Equally Corrective

281. AXT's own subsequently reported results confirmed that the non-IPO allegations described no actual deterioration in the business. On May 2, 2024—four weeks after the Report—AXT reported first-quarter 2024 revenue of approximately $22.7 million, up from approximately $20.4 million in the fourth quarter of 2023 and approximately $19.4 million in the first quarter of 2023; a non-GAAP net loss of $0.03 per share; non-GAAP gross margin of 27.3%, up from 23.2% in the prior quarter; and second-quarter guidance of $25.5 million to $27.5 million. Those results were irreconcilable with J Capital's assertions that production had collapsed to as little as 10% of prior levels and that AXT's reported inventory might not exist. Yet AXT's stock did not return to its April 3, 2024 closing price of $4.95.

282. The non-IPO subjects also bore no relationship to the statements challenged in this action. None of the challenged statements concerned production volumes, the existence of inventory, building costs, related-party pricing, wage judgments, environmental compliance, or Fischer's 2007 SEC proceeding. Those subjects therefore cannot "relate back" to any alleged misrepresentation, and any portion of the decline attributable to them is severable from the portion attributable to the concealed IPO obstruction.

283. By contrast, the IPO-related corrective information was the only subject in the Report that was, at once: new to ordinary U.S. investor channels; unrebutted by any analyst; never denied by AXT; the sole subject of any analyst question to management after publication; identified by a covering analyst as a continuing "Real Risk"; and directly corrective of the specific statements challenged here. Those facts, taken together, support the inference that the IPO-related information—not the Report's cumulative, discredited, or unrelated accusations—caused the substantial and unrecovered portion of the April 4–5, 2024 decline.

### E. Analyst Commentary Distinguishing the IPO and Redemption Issues, Together with the Limited April 8 Rebound, Further Supports the IPO-Related Causal Inference

450. At 7:06 a.m. on April 8, 2024, Wedbush Securities—an analyst that covered AXT and made a market in its securities—published a report titled Does "J" Stand for "Just Lazy Speculation"? addressing the J Capital Report, which Wedbush said had "caused the stock to tumble by ~1/3 last week." Wedbush described J Capital's approach as selecting "disparate" and "mostly irrelevant" facts and "speculatively distort[ing]" them. *See* Ex. 18 at 1–2. Wedbush then rejected or substantially discounted five principal non-IPO components of the thesis.

451. Wedbush did not dismiss the IPO issue. Under "AXTI's Real Risks and Opportunities," it separately addressed Tongmei's proposed listing, identified the competitor's IP claim as "one last surmountable obstacle it needs to address before gaining approval for a listing with a competitor claiming AXTI is infringing on its IP," and explained the listing's independent significance to AXT's valuation and to the approximately $49 million investment. A sophisticated analyst that rejected substantial portions of J Capital's thesis thus separated the IP and IPO obstacle from the rest and continued to treat the listing as independently relevant to AXT's value and risk.

452. AXT's trading confirms that differentiation. AXT closed at $4.95 on April 3, 2024, at $3.22 on April 4 after the premarket publication, and at $3.11 on April 5—a two-day decline of $1.84 per share, or approximately 37.2%. Following Wedbush's April 8 report, AXT closed at $3.57, an increase of $0.46 per share, or approximately 14.79%.

453. The April 8 move therefore recovered only about 25% of the $1.84 decline, leaving approximately $1.38 per share—roughly 75% of the decline, and approximately 27.9% of AXT's pre-Report price—unrecovered. Wedbush had just rejected or substantially discounted the principal non-IPO allegations and reaffirmed a price target nearly double the market price. Had those allegations caused the decline, that rebuttal would have restored a far greater share of the

lost value. What Wedbush did not rebut was the stalled IPO, the intellectual-property obstacle, and the associated private-equity exposure, which it continued to treat as real. The persistence of roughly three-quarters of the decline after the non-IPO allegations were publicly discredited supports the inference that the IPO-related corrective information caused the bulk of the loss.

454. The differentiation was more express on AXT's May 2, 2024 earnings call. Of the six "problems," only one drew an analyst question. No analyst asked about production volumes, whether the reported inventory existed, building costs, related-party pricing, wage judgments, environmental shutdowns, or Fischer's 2007 SEC matter. The only question directed to the Report concerned the STAR Market listing and the private-equity repayment exposure, which Craig-Hallum's analyst introduced by dismissing the rest of the Report as "Malarky for the most part" while identifying the listing and repayment risk as a concern "a lot of investors bring up with me." Analysts allocate their limited questions to what moved the stock.

455. AXT never denied the Report's central assertion. It issued no press release, filed no Form 8-K, and made no other public statement disputing that Tongmei's IPO had been blocked or had failed. On the May 2, 2024 call, Defendants disputed neither the absence of any substantive public update since August 2022 nor the assertion that a competitor's IP claim was among the reasons. Fischer instead confirmed the mechanism on which the Report's analysis rested—"as long as we're in the process they have no right for redemption"—and conceded that management had "talked about this internally." Young then discussed where AXT might find alternative financing.

**F. The IPO-Related Corrective Information Was One Substantial Cause and a Substantial Factor Contributing to the Loss**

456. J Capital published its Report before the market opened on April 4, 2024. AXT's stock fell $1.73 per share, or approximately 34.9%, from $4.95 on April 3 to $3.22 on April 4,

and fell a further approximately 3.4% to $3.11 on April 5—a cumulative two-day decline of $1.84 per share, or approximately 37.2%.

457. Allocating the April 4–5 decline among the Report's subjects does not change that the IPO-related information was a substantial contributing factor. Allocation is a question of damages; these allegations identify a direct and plausible causal connection between the concealed condition and a material portion of the loss. Plaintiffs need not allege that the concealed IPO obstruction was the sole cause of the decline, or apportion the decline at the pleading stage. It is enough to allege facts permitting the plausible inference that the concealed condition, once revealed, was a substantial cause of and a substantial contributing factor to the loss. Allocation of a multi-subject disclosure is resolved through expert testimony on a developed record.

458. In the alternative, Plaintiffs plead loss causation on a materialization-of-the-concealed-risk theory. The concealed risk was that an unresolved trade-secret and criminal matter involving Tongmei's wholly owned BoYu subsidiaries would prevent registration from advancing and would convert AXT's contingent obligation to return approximately $49 million into a live one. That risk materialized: on April 4, 2024 the market learned the application had made no substantive public progress in approximately eighteen months and had apparently been blocked; and on June 26, 2026 Tongmei withdrew the application, which AXT disclosed on July 8, 2026 had given the eleven funds the right to demand redemption of approximately $49 million. Under either theory, Plaintiffs' losses were a foreseeable consequence of the concealment.

459. The withdrawal confirmed the contractual mechanism's operation: AXT disclosed that it gave the eleven funds the right to require redemption of approximately $49 million, and that AXT and Tongmei were discussing whether each fund would remain invested or exercise that right.

### G. SEDA's Event Study and Information-Content Analysis Support That the IPO-Related Corrective Information Was an Economically Material Contributor to the April 4–5, 2024 Decline.

460. Plaintiffs retained SEDA Experts ("SEDA"), a financial-economics expert, to analyze AXT's price reaction to the Report and whether the disclosure of the IPO obstruction, the underlying intellectual-property and criminal matter, and the related approximately $49 million exposure (the "IPO-Related Corrective Information") was a substantial cause of the April 4–5, 2024 decline.

461. SEDA reviewed AXT's historical price and volume data, market and sector movements, AXT's SEC filings and disclosures, the Report, analyst reports, financial-news coverage, and earnings-call discussions.

462. SEDA controlled for market movements using the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index and for sector movements using the Nasdaq Electronic Components Index—the same industry index AXT used in its own annual reports—over an estimation period of March 23, 2021 through April 3, 2024, with an event window of April 4–5, 2024, including indicator variables for earnings-announcement dates.

463. On April 4, 2024, AXT's actual logarithmic return was −43.00% on volume of approximately 6.36 million shares, against average Class Period volume of approximately 450,000 shares. The Market Index fell 1.20% and the Industry Index 0.34%, and SEDA's model predicted an expected AXT return of −1.78%. The abnormal return was therefore −41.22%, or approximately −$1.67 per share, with a t-statistic of −12.24, significant at the 99% confidence level.

464. Over the full April 4–5 window, AXT's cumulative actual return was −46.48% on volume of approximately 9.79 million shares, against a predicted −0.26%, yielding a cumulative

abnormal return of −46.21%, or approximately −$1.83 per share, with a t-statistic of −9.71, significant at the 99% confidence level.

465. Based on the event study, the absence of other AXT-specific news in the window, the prior public availability or analyst rejection of the Report's non-IPO subjects, the IPO's demonstrated pre-disclosure importance to AXT's valuation, and the materiality of the approximately $49 million exposure, SEDA concluded that the IPO-Related Corrective Information was a substantial cause of the April 4–5, 2024 decline.

### H. The July 2026 Withdrawal Occurred Under Materially Different Financial and Market Conditions

466. By July 2026, AXT's financial position had changed materially. At December 31, 2023 it reported approximately $52.3 million in cash, equivalents, and investments[11]; at June 30, 2026 it reported approximately $412.2 million in cash and equivalents, $5.0 million in short-term investments, and $298.6 million in long-term investments.[12]

467. Tongmei's eventual withdrawal does not sever the causal chain, and AXT's framing of it does not defeat the claim. By June 26, 2026, the application had been pending approximately fifty-three months without advancing past the CSRC's August 10, 2022 inquiry. Whatever additional reasons AXT gave for abandoning the STAR Market in favor of Hong Kong, the withdrawal confirmed both that the application never advanced past the trade-secret question and that its termination triggered the approximately $49 million redemption right exactly as the contracts and AXT's filings said it would.

---

[11] https://www.sec.gov/Archives/edgar/data/1051627/000155837024003410/axti-20231231x10k.htm?utm_source=chatgpt.com

[12] https://investors.axt.com/Investors/news/news-details/2026/AXT-Inc--Announces-Second-Quarter-2026-Financial-Results/default.aspx

468. The market's response to the July 2026 withdrawal therefore does not measure its response to the adverse STAR Market development standing alone. By then the market had known of the allegedly blocked IPO for more than two years; AXT's liquidity had changed materially; the withdrawal was announced together with a prospective Hong Kong listing and favorable AI- and data-center demand information; and AXT assured investors it could fund any redemption.

## VIII. THE OMITTED CHINESE-LANGUAGE INFORMATION WAS NOT CREDIBLY AVAILABLE TO REASONABLE U.S. INVESTORS

### A. The Criminal Escalation and IPO Obstruction Were Not Disseminated Through Ordinary U.S. Market Channels

469. During the Class Period, AXT did not disclose through its SEC filings, English-language press releases, earnings calls, or investor presentations the criminal escalation of Guojing's accusation, the related proceedings, the unanswered CSRC trade-secret question, or the significance of those matters to the IPO. That information appeared, if at all, only in Chinese-language regulatory records and local Chinese financial reporting.

470. Locating those materials required Chinese-language proficiency and specialized knowledge of China's regulatory websites. An investor would have had to navigate to the Exchange's specialized issuance-and-listing directories and to the CSRC's government-information directory, and to search using Tongmei's precise Chinese corporate name; searches using AXT's ticker or Tongmei's English name did not retrieve the project record. See, e.g. Exs. 1-4, 9-12.

471. Even after locating them, an investor would have had to synthesize documents issued at different stages of the review to determine that the trade-secret question remained unanswered and that the application had not advanced.

472. The Exchange materials did not themselves reveal the full criminal escalation. The June 2022 submissions acknowledged Guojing's Report Letter only to reject it, and disclosed neither the October 2021 criminal case, the February 2022 search of Beijing BoYu, nor the seizure of company property.

**B. The Chinese Financial Reporting Concerning the Criminal Case and IPO Obstruction Was Not Part of Ordinary U.S. Investor Information Channels**

473. The fuller information appeared in Chinese-language financial reporting directed to domestic readers—the March 2023 Economic Herald article (Ex. 5) and the October 2023 Koukoucaixun article on Guojing (Ex. 6), the investigation, the anticipated prosecution, and the effect on Tongmei's registration. Those articles were in Chinese, referred to the companies and agencies by their Chinese names, did not identify AXT by its Nasdaq ticker, and were not carried by any English-language wire service or reflected in AXT's filings, calls, or analyst coverage during the Class Period.

474. J Capital changed the information's accessibility on April 4, 2024 by identifying the Chinese reporting, translating and summarizing it, linking the trade-secret and criminal matter to the stalled IPO, connecting that to AXT and the approximately $49 million exposure, and disseminating the result to U.S. investors in English.

**C. Defendants' Selected English-Language Disclosures Did Not Place the Omitted Truth on the Market**

475. The selected English translations AXT furnished did not disclose the concealed truth. The Initial Prospectus warned only that competitors "may" raise IP disputes and represented that ownership was clear. The June 16 materials acknowledged a Report Letter but denied infringement and stated categorically that "there is no dispute or potential dispute with relevant

entity." The Registration Package carried the same narrative forward and continued to omit the criminal proceedings.

476. Those disclosures would have reduced, not increased, a reasonable investor's incentive to search obscure Chinese sources. AXT and Tongmei affirmatively represented in English that the accusation had been investigated, that the technologies were independently developed, that no infringement had occurred, and that no dispute existed. Defendants later called the CSRC questions "normal and customary," said "active dialogue" continued, said Tongmei had given "really good answers," and predicted approval "soon" or "in the coming months."

477. The corrective information relates back to Defendants' specific representations. Defendants represented that there was "no dispute or potential dispute"; J Capital disclosed an accusation that had become a police investigation and a pending prosecution. Defendants called the CSRC's questions "normal and customary" and reported "active dialogue"; J Capital disclosed that the application had been in limbo since August 2022. Defendants said only "one open item" remained and that "we are making progress"; J Capital disclosed that the unresolved item was reported to be the biggest obstacle to the listing. Defendants warned that redemption "could" be triggered if the IPO failed; J Capital disclosed that the condition deferring redemption had already broken down.

f. Guojing had reported the alleged infringement to the police;

g. the police had formally opened a criminal case;

h. police had searched Zhang's workplace at Beijing BoYu and seized company-related R&D materials and composite heaters;

i. Beijing BoYu and Chaoyang BoYu were responding to police evidence demands;

j. the matter had advanced toward criminal prosecution; or

k. the trade-secret and criminal matter had become a material obstacle preventing Tongmei's IPO from advancing.

## IX. PLAINTIFFS' CLASS ACTION ALLEGATIONS

478. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased AXT common stock during the Class Period and were damaged thereby (the "Class"). Excluded are Defendants, the Company's officers and directors, the Individual Defendants' immediate family members and their legal representatives, heirs, successors, and assigns, and any entity in which Defendants have or had a controlling interest.

479. The Class is so numerous that joinder of all members is impracticable. AXT common stock traded actively on NASDAQ throughout the Class Period. Although the exact number of Class members can be ascertained only through discovery, Plaintiffs believe there are hundreds if not thousands.

480. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

481. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

482. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;
- whether the prices of the Company's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

483. A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy. Joinder of all members is impracticable, and because individual damages may be relatively small, the expense of individual litigation would make individual redress impracticable. This action presents no unusual management difficulties.

484. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;
- as a public issuer, the Company filed public reports;
- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

- the Company's common stock was liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

485. The market for AXT common stock therefore promptly digested current information about the Company from all publicly available sources and reflected that information in the price of its common stock. Plaintiffs and the Class are entitled to a presumption of reliance on the integrity of the market.

486. Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because Defendants omitted material information they had a duty to disclose.

## X. COUNTS

### A. COUNT I - For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

487. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

488. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

489. During the Class Period, Defendants directly or indirectly disseminated or approved the false statements specified above, which they knew or deliberately disregarded were

misleading in that they misrepresented and failed to disclose material facts necessary to make the statements made, in light of the circumstances, not misleading.

490. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

491. Defendants acted with scienter. They knew that the documents and statements issued in the Company's name were materially false and misleading, knew those statements would reach the investing public, and knowingly and substantially participated or acquiesced in their issuance. By virtue of their receipt of information reflecting the true facts, their control over the Company's statements, and their positions of access to confidential information, Defendants participated in the fraudulent scheme alleged herein.

492. The Individual Defendants, senior executives and directors of the Company, had actual knowledge of the material omissions and the falsity of the statements set forth above and intended to deceive Plaintiffs and the Class or, in the alternative, acted with reckless disregard for the truth in failing to ascertain and disclose the true facts.

493. As a result, the market price of AXT common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the Class relied on those statements and on the integrity of the market price in purchasing AXT common stock at artificially inflated prices.

494. Had Plaintiffs and the Class known that the market price had been artificially inflated by Defendants' misleading statements and by the material adverse information Defendants withheld, they would not have purchased AXT common stock at the prices they paid, or at all.

495. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

496. Defendants therefore violated Section 10(b) of the Exchange Act and Rule 10b-5 and are liable to Plaintiffs and the Class for the substantial damages they suffered in connection with their purchases of AXT common stock during the Class Period.

## B. COUNT II - Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

497. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

498. During the Class Period, the Individual Defendants participated in the operation and management of the Company and in the conduct of its business affairs. Because of their senior positions, they knew the adverse non-public information alleged herein.

499. As officers of a public company, the Individual Defendants had a duty to disseminate accurate and truthful information about the Company's financial condition and results and to correct promptly any public statement that had become materially false or misleading.

500. Because of their positions of control and authority, the Individual Defendants were able to and did control the contents of the reports, press releases, and public filings the Company disseminated during the Class Period, and they exercised that authority to cause the Company to engage in the wrongful acts alleged. They were therefore "controlling persons" within the

meaning of Section 20(a), and in that capacity participated in the unlawful conduct that artificially inflated the price of AXT common stock.

501. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 4, 2026

Respectfully submitted,
**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
275 Madison Avenue, 40th Floor
New York, NY 10116
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

Jing Chen, Esq.
101 Greenwood Ave, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jchen@rosenlegal.com

*Lead Counsel for Plaintiffs*
*and the Putative Class*

## CERTIFICATE OF SERVICE

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On August 4, 2026, I electronically filed the foregoing THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on August 4, 2026.

/s/ Laurence M. Rosen
Laurence M. Rosen